FILED

2026 FEB -2  P 4: 47

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF VIRGINIA

### ALEXANDRIA DIVISION

**TEGEST TESFAYE,**

*Plaintiff,*

v.

**BOOZ ALLEN HAMILTON, INC.;**

**Fairfax County Public Schools;**

**Fairfax County Government, Virginia; and**

**DOES (1-100), inclusive**

*Defendants.*

**Jury Trial Demanded**

## <u>COMPLAINT</u>

**For Whistleblower Retaliation, Civil Rights Violations, and Invasion of Privacy**

### I. INTRODUCTION/NATURE IN ACTION

This civil action arises from a long-running, coordinated campaign of retaliation directed at Plaintiff and her children following Plaintiff's engagement in protected activity in 2014. After Plaintiff filed complaints with the U.S. Department of Education and the U.S. Department of Justice concerning serious misconduct by Fairfax County Public Schools ("FCPS"), including misrepresentation of state and gifted assessment scores and reports, as well as mistreatment

and malice directed toward her daughters, Defendants, including FCPS school officials, current and former  Fairfax County Government ("Fairfax County") elected officials, individuals in Booz Allen (Plaintiff's employer), and private actors engaged in a coordinated pattern of retaliatory and unlawful conduct that permeated multiple domains of Plaintiff's and her children's lives, causing ongoing harm.

Plaintiff alleges that Defendants, acting under color of state law, participated in a concerted scheme involving retaliation, abuse of power, obstruction of justice, and civil conspiracy, intentionally targeting Plaintiff and her children in response to her protected complaints. This conduct constitutes violations of Plaintiff's and her children's federal civil rights, including unlawful retaliation for whistleblowing activity, interference with federally protected rights, and the creation of a hostile and punitive educational environment affecting minor children.

The retaliatory actions were knowing, deliberate, and ongoing, and were undertaken with the purpose of deterring Plaintiff from pursuing or continuing protected activity and from seeking accountability through federal oversight mechanisms.

Beginning in or around August 2014, Plaintiff engaged in protected activity by reporting misconduct involving FCPS. She subsequently reported this misconduct to the U.S. Department of Justice (DOJ) in 2014 and to the U.S. Department of Education (DOE) in 2014, 2026 and again in 2021. Instead of being investigated, Plaintiff's complaints were suppressed and covered up, and Plaintiff became the target of escalating retaliation.

For more than a decade, Plaintiff has faced sustained interference and targeting across nearly every aspect of her life, including her career, health, family and other relationships, and basic

has been forced to live under continuous surveillance, control, and repeated violations of her privacy, and has faced extreme difficulty obtaining basic services, whether paid or unpaid with interference and control as part of the ongoing retaliation campaign.

Throughout this period, Defendants, acting in concert used their authority, connections, and influence across multiple institutions to punish Plaintiff for her protected activity, silence her, and dismantle her professional stability, financial security, family relationships, and personal safety. The retaliation extended to her children, deliberately interfering with their education, development, and future opportunities.

Plaintiff's daughters' education, development, and social mobility were deliberately constrained through interference in education, manipulation of academic opportunities, manipulation of college applications, suppression of advancement, and actions designed to limit their future social mobility. These efforts were not merely intended to pressure Plaintiff, but to control the children themselves, restrict their upward mobility, and shape the trajectory of their lives. The harm inflicted on the children destabilized the entire family, creating years of emotional, psychological, educational, and financial disruption.

The retaliation described in this Complaint constitutes a continuous and ongoing campaign that has never ceased. The misconduct did not occur as isolated or time-limited events but as part of a coordinated pattern of retaliation, concealment, and interference that persists to the present day.

Throughout the relevant period, Defendants, acting individually and in concert, obstructed Plaintiff's ability to obtain and consult counsel, interfered with her access to legal

representation, and affirmatively created conditions that prevented Plaintiff from asserting her rights at an earlier time. Defendants' conduct included obstruction, coercion, and concealment of material facts, all of which directly contributed to the delay in Plaintiff's ability to pursue her claims.

Accordingly, the doctrines of continuing violation, equitable tolling, equitable estoppel, and delayed discovery apply. Defendants are barred from invoking any statute of limitations or deadline-based defense where Defendants themselves manipulated procedures, concealed misconduct, or otherwise prevented Plaintiff from timely asserting her claims. Equity does not permit Defendants to benefit from delays they caused.

Although the unlawful conduct began over a decade ago, it remains ongoing, rendering Plaintiff's claims timely under the continuing violation doctrine and applicable tolling principles.

Since January 2024, the retaliation has escalated significantly. Plaintiff's daughter, who is currently attending Brown University, applied to several Ivy League and other top-tier institutions as a freshman, disrupting the long-standing plan orchestrated by actors within Fairfax County to confine all three of Plaintiff's children to Virginia-based schools.

This escalation intensified further following her daughter's acceptance to Brown University in May 2024. After her daughter received admission, the safety and well-being of Plaintiff's daughter became an even more urgent concern, as the individuals involved demonstrated a willingness to go to extreme lengths to maintain control and continue their retaliatory campaign.

Since early 2024, Defendants have escalated efforts to undermine Plaintiff's financial stability by obstructing every potential source of income and creating or exploiting circumstances designed to indebt her further. As a direct and proximate result of these actions, Plaintiff has been rendered unemployed, financially destabilized, socially isolated, and forced to litigate both her divorce and this action pro se. These sustained disruptions and retaliation have caused long-term psychological, emotional, and educational harm to Plaintiff and her children, affecting the stability and well-being of their lives for nearly a decade.

These actions were not the work of a few rogue individuals. They reflect a coordinated effort involving multiple institutions that suppressed the truth and enabled a campaign of control and retaliation. The harm has extended beyond Plaintiff and her children to others within FCPS who opposed the unethical treatment of her children. Numerous staff members, including senior leadership, left the school system mid-year rather than participate in or condone the misconduct described herein, while others benefited from aligning themselves with the wrongdoing. Plaintiff believes that many individuals were silenced through nondisclosure agreements (NDAs) in order to contain and control this major scandal.

Plaintiff brings this action seeking declaratory and injunctive relief to end the ongoing retaliation, prevent further interference, and restore her and her family's ability to live free from retaliation, oppression, and surveillance, as well as compensatory and punitive damages for violations of the United States Constitution, federal whistleblower protections, and Plaintiff's civil and human rights.

## II. PARTIES

1. Plaintiff, Tegest Tesfaye is a former employee of Booz Allen Hamilton Inc., a resident of Fairfax County, VA since 2002, and a parent of former students in Fairfax County Public Schools ("FCPS") for approximately nineteen (19) years. Plaintiff's three daughters attended FCPS between September 2005 and June 2024.

2. Defendants include Fairfax County; Fairfax County Public Schools (FCPS); FCPS officials and employees; certain current and former members of the Fairfax County School Board; certain current and former members of the Fairfax County Board of Supervisors; Booz Allen; certain former and current elected government officials; individuals acting in concert with them; and Does 1–100. These Defendants, individually and jointly, participated in retaliation against Plaintiff and her children.

3. The complaint uses the term "Booz Allen" to refer solely to the Defendant Booz Allen Hamilton Inc. Plaintiff's former employer, when referring to or describing conduct attributable to Booz Allen Hamilton Inc.

4. This Complaint uses the term "Fairfax County Actors" to refer collectively to Fairfax County; Fairfax County Public Schools (FCPS); FCPS officials and employees; members of the current and former Fairfax County School Board; members of the current and former Fairfax County Board of Supervisors; county agencies; and individuals acting in concert with them. Not every Fairfax County Actor participated in every retaliatory act; the term is used for convenience to identify the entities and individuals who acted individually or jointly at various times.

5. The term "Government Actors" refers to former and current elected government officials who participated in retaliation against Plaintiff and her children.

6. Plaintiff designates Does 1–100 as Defendants whose identities are not listed at this time. Plaintiff reserves the right to amend this Complaint to add or substitute their names and capacities if and when their identities are ascertained, whether through investigation or discovery. Each Doe Defendant is responsible, in whole or in part, for the occurrences alleged herein.

7. The term "Defendants" is used to refer to the collective group of Defendants mentioned above that includes the Fairfax County Actors, Booz Allen, the Government Actors, and Does 1–100.

## III. JURISDICTION AND VENUE

5. This Court has original subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including, without limitation, 42 U.S.C. §§ 1983 and 1985, the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq., and other federal statutes protecting whistleblowers, civil rights, and privacy.

6. This Court has original jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) and (a)(4) because this action seeks to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States, including rights guaranteed by the First, Fourth, and Fourteenth Amendments, and seeks equitable and other relief under Acts of Congress providing for the protection of civil rights.

7. Jurisdiction is also proper under 28 U.S.C. § 1343(a) because this action seeks damages and equitable relief for the deprivation of rights under federal law. Defendants, acting under color

of state and local authority and in concert with private actors, engaged in a sustained and coordinated campaign to violate Plaintiff's civil rights and those of her children.

8.   This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy and arise from a common nucleus of operative facts.

9.   Defendants include state and local government officials, public employees, and private individuals acting jointly with state actors, whose conduct was undertaken under color of law and within the scope of their official, collaborative, or conspiratorial authority.

10.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

11.  Plaintiff resides in Springfield, Virginia, within the Eastern District of Virginia. Defendant Booz Allen Hamilton, Inc. maintains its corporate headquarters in Mclean, Virginia, and Plaintiff performed the majority of her work for Booz Allen within this District. Fairfax County and Fairfax County Public Schools are likewise located within this District. A substantial part of the acts, events and omissions giving rise to this action occurred in Fairfax County and elsewhere within the Eastern District of Virginia.

12. This Court has personal jurisdiction over Defendants because they purposefully availed themselves of the privileges of conducting activities within this District, and their actions caused foreseeable and substantial harm to Plaintiff and her children within this District.

13.  Plaintiff seeks declaratory, injunctive, and equitable relief, as well as compensatory and punitive damages, all of which fall within the jurisdictional authority of this Court.

## IV. FACTUAL ALLEGATIONS

### Background

14.  Plaintiff, Tegest Tesfaye, is a mother of three who resided in Fairfax County for approximately twenty-four (24) years. Plaintiff's three daughters, currently aged 25, 23, and 19, attended Fairfax County Public Schools from approximately September 2005 through June 2024.

15.  On Nov 17, 2008, Plaintiff got hired with Booz Allen as an Associate and promoted to a lead Associate on Oct 17, 2010.

16. Plaintiff was employed by Defendant **Booz Allen** for approximately fifteen (15) years where she was terminated with a "lack of work" reasoning on Feb 2, 2024

17. Plaintiff emailed a demand letter to Booz Allen detailing the wrongful termination on January 22, 2025 and relief otherwise pursuing a legal suit

18.  Plaintiff, Tegest Tesfaye, was an involved parent and a concerned citizen who, beginning in 2012, became aware of misconduct within the West Springfield Elementary school where principal Erin Jones was working against her children, intentionally lowering reading assessments interfering with teachers to hold back her younger daughter from getting advanced academic programs. This misconduct included unethical practices related to the handling of students' academic assessments, improper treatment of both students and staff, and violations of federal and state educational regulations.

19. Between March and June 2009, Plaintiff first observed troubling conduct at West Springfield Elementary School ("WSES") when a kindergarten teacher began acting adversely toward Plaintiff's middle daughter. On June 17, 2009, Plaintiff met with then-Principal Kathryn Woodley to address the issue. Although Principal Woodley assured Plaintiff that such conduct would not continue, Assistant Principal Erin Jones reacted negatively to Plaintiff's concerns and began exhibiting hostility toward Plaintiff and her children.

20. Plaintiff observed that Assistant Principal Erin Jones harbored animosity toward her following the June 2009 discussion with the principal concerning the kindergarten teacher.

21. Once Jones became Principal in 2011, she gained greater authority and used her position to interfere with Plaintiff's children's academic opportunities, particularly targeting the younger daughter, who entered in September 2012, same time the middle daughter transferred to neighboring Fairfax County school. Keene Mill Elementary ("KMES") for Advanced Program.

22. On January 21, 2011, Plaintiff organized the first International Night at WSES, a major schoolwide event attended by approximately 400 people. Plaintiff observed that Principal Erin Jones appeared displeased that Plaintiff with few other parents had successfully organized the event. This further increased tension between Plaintiff and the Jones.

23. In September 2012, Plaintiff's younger daughter enrolled in kindergarten at WSES. Principal Erin Jones and the assigned kindergarten teacher worked to block the child from accessing advanced academic opportunities, including programs designed to prepare high-potential students for the full-time Advanced Academic Program ("AAP") in third grade.

24. After observing a clear pattern of interference and retaliation against her younger daughter, in December 2012, Plaintiff requested a transfer to Keene Mill Elementary School ("KMES"), where her middle daughter had previously transferred. Plaintiff first met with Executive Principal Aimee Holleb, who responded dismissively and suggested that the same problems would follow the child to the new school, a statement that indicated awareness of a coordinated effort to target Plaintiff's children.

25. On December 10, 2012, after requesting the transfer to the School Board and Assistant Superintendent Leslie Butz, Plaintiff transferred her younger daughter to KMES to protect her from the escalating mistreatment and bullying she was facing at WSES.

26. Shortly after the transfer, Assistant Principal Erin Jones, along with individuals acting in concert with her, contacted her new first grade teacher at KMES, Brittney Cummings and initiated further acts of retaliation. Following this contact, Plaintiff's younger daughter began experiencing mistreatment from Cummings, despite the teacher having initially expressed enthusiasm about having her as a student.

27. Plaintiff's daughter, who had eagerly anticipated attending the new school after meeting her teacher, Cummings, on Friday, December 8, 2012, and believed she would finally be relieved from the hostile environment at WSES, was instead met with the opposite reaction. From the first day of class, Cummings began treating her in a manner that made her miserable. Plaintiff also observed a noticeable change in the teacher's demeanor when she arrived that morning to drop off her daughter. This abrupt shift was devastating to Plaintiff's daughter, who subsequently suffered mistreatment and bullying in the coming month. This conduct was the

result of a coordinated effort led primarily by Assistant Principal Erin Jones and individuals acting in concert with her.

28. On January 3, 2013, Plaintiff's younger daughter completed a reading assessment at KMES that showed significantly higher performance than the artificially lowered reading levels previously assigned under Erin Jones's supervision. Shortly afterward, Cummings began bullying Plaintiff's daughter, including forcing her to read aloud while staring at her for long periods and making frightening facial expressions, causing the daughter to experience panic attacks. This conduct was intended to destroy the daughter's reading ability, by creating an association between reading and fear. This act of bullying continued to the next day, and Plaintiff's daughter suffered panic attacks on two consecutive days, on January 7 and 8, 2013, after which she refused to return to school.

29. In 2014, Plaintiff learned that all her three children have been deliberately targeted through manipulation and falsification of Standards of Learning (SOL) academic assessments and school records, and her younger daughters Gifted testing score reports were fabricated. These falsifications were designed to undermine their academic performance and hindered their ability to pursue advanced coursework and future college opportunities. This pattern of academic interference continued for more than a decade and has had long-lasting consequences.

30. On July 24, 2014, Plaintiff contacted the U.S. Department of Justice to discuss the ongoing misconduct and to inquire about the proper process for filing a formal complaint. Plaintiff was provided the email address education@usdoj.gov and submitted her complaint via email on

August 5, 2014, followed by a mailed submission on August 19, 2014. The complaint was shortly thereafter transferred to the U.S. Department of Education. Plaintiff's then-friend, Yewebdar Tadesse, filed a similar complaint with the Department of Education regarding comparable issues affecting her own children.

31. On September 19, 2014, Plaintiff filed another complaint with the U.S. Department of Education, Case No. 11-14-1355, which was later closed. Around the same time, Plaintiff's friend also filed a complaint concerning her children, who attended the same school and were experiencing similar issues.

32. On November 2, 2015, Plaintiff filed another complaint with the U.S. Department of Education, Case No. 11-16-105, addressing serious issues her children were facing in high school that had continued from elementary and middle school. Plaintiff did not receive a response until nearly four years later, on October 19, 2019, when she was informed that the case was closed. The prolonged delay occurred while significant issues were being concealed, including irregularities involving College Board examinations in which Plaintiff's children were provided falsified score reports without taking the actual exams. Administering different or fake exams was one of the primary techniques used by the school system, and it continued even after Plaintiff confronted them.

33. On June 2015, Plaintiff visited KMES to review her children's Standards of Learning ("SOL") score reports. Principal Renee Miller appeared shocked, as the authentic records would have exposed discrepancies with the falsified score reports previously provided to Plaintiff, issues

Plaintiff had already raised in her August 2014 complaints to the DOJ and DOE. Renee Miller screamed at Plaintiff and ordered her to leave the building.

34.  Approximately two weeks later, Plaintiff received a "no-trespass" letter containing false allegations that she had disrupted a meeting. The letter required Plaintiff to obtain advance permission before entering the school, serving as a gatekeeping mechanism to conceal misconduct related to falsified assessment scores.

35.  Despite Plaintiff's repeated efforts to have the restriction removed, the no-trespass order remained in place for two years, until her daughter graduated.

36. This mistreatment continued at KMES. In fourth grade, Plaintiff's younger daughter was injured when her teacher dropped a laptop on her head on November 17, 2015. FCPS officials denied the incident and falsely claimed that the child had "bumped" her head, despite evidence to the contrary. This incident constituted retaliation imposed on Plaintiff's daughter in response to Plaintiff's protected activity, namely the DOE complaint filed on November 2, 2015

37. Instead of investigating Plaintiff's concerns, federal agencies suppressed and ignored her complaints, resulting in escalating retaliation from a network of individuals that included FCPS officials, local government actors, and private parties working in concert.

38. Plaintiff was informed by Fairfax County Public Schools officials that Principal Erin Jones was investigated in connection with Plaintiff's complaints, and that appropriate administrative action was taken. Principal Jones separated from Fairfax County Public Schools on or about March 30, 2015.

## IV. PROTECTED ACTIVITY

39. Since 2012, Plaintiff filed and repeatedly reported academic manipulation, retaliation, and mistreatment of her children to FCPS administrators, FCPS School Board and FCPS leadership. Plaintiff also formally requested a school transfer for her younger daughter due to ongoing retaliation and harm.

40. In July 2014, Plaintiff's protected activity included advocating for the legal and educational rights of her children by reviewing, questioning, and reporting concerns by filing to U.S. Department of Justice (DOJ) and U.S. Department of Education (DOE) regarding the Pearsons Standard of Learning (SOL) official reports provided by Virgina Department of Education and through Fairfax County Public Schools, which exposed misrepresentations, and misconduct. This activity constituted constitutionally protected conduct under the First Amendment and the right to petition the government without retaliation.

41. In 2014, Plaintiff's protected activity included advocating for the legal and educational rights of her daughters by reviewing, questioning, and reporting concerns by filing to DOJ and DOE regarding the Naglieri Gifted Assessment (NNAT) published and administered by Pearson Education, and report that was sent through Fairfax County Public Schools, which exposed misrepresentations, and misconduct. This activity constituted constitutionally protected conduct under the First Amendment and the right to petition the government without retaliation.

42. In the summer of 2014, Plaintiff and another individual who had experienced similar issues with Fairfax County Public Schools sought assistance from the office of the late Congressman Jerry

Connolly and met with his staff to report concerns regarding misconduct, bullying of children and academic manipulation within FCPS. Despite raising these issues, Plaintiff did not receive any meaningful follow-up or assistance.

43. Plaintiff subsequently filed additional complaints with the DOE in 2015 and 2021 regarding FCPS misconduct, retaliation, and the ongoing harm to her children.

44. On August 26, 2017, Plaintiff created a public petition on Change.org addressed to then-Governor Terry McAuliffe, former Superintendent Dr. Scott Brabrand, Senator Tim Kaine, Senator Mark Warner, former School Board Member Jane Strauss, former Assistant Superintendent for Region 4 Dr. Angela Atwater, and former Executive Principal for Region 4 Dr. Eric Brent. The petition detailed misconduct and abuse within Fairfax County Public Schools. Shortly thereafter, Plaintiff experienced a sudden and unexplained withdrawal from several personal relationships, including a close family friend who had independently filed similar complaints with FCPS and the U.S. Department of Education. These abrupt changes were consistent with the broader pattern of isolation Plaintiff experienced after raising concerns about FCPS misconduct.

45. In 2022 and 2023, Plaintiff filed formal complaints with Booz Allen's Ethics & Compliance Office regarding retaliatory conduct, false allegations, and improper treatment on the Navy project. These complaints were closed without investigation.

46. Between 2021 and 2023, Plaintiff repeatedly advocated for a Market Salary Adjustment (MSA) after learning that her compensation was below the 48th percentile for her level. Plaintiff's salary advocacy was directed to Human Resources, her home team leadership, and her

principal. These efforts constituted protected activity related to pay equity and workplace fairness.

47. Throughout her employment, Plaintiff consistently raised concerns about retaliation, hostile work environments, interference with her assignments, and improper conduct by project leadership. Plaintiff's protected activity was known to **Booz Allen** Inc. and its leadership at all relevant times.

## V. FACTUAL ALLEGATIONS

### FCPS Retaliation and Harm to Children

48. The individuals involved in the high-school retaliation, and who are part of the FCPS Defendants, included Erin Jones, Renee Miller, Elizabeth Schultz, Penny Gross, Shannon Matheney, Elizabeth Fawcett, Elizabeth Wahl, and Malicia Braxton, all of whom continued or escalated the misconduct against Plaintiff and her children. Elizabeth Wahl and Malicia Braxton were staff members assigned in a sustained, near-constant capacity by the administration team to interfere with teachers, monitor Plaintiff's children testing and scoring, and ensure that testing processes, grades, and scores were manipulated or altered. Although Erin Jones, Renee Miller, and Elizabeth Schultz were not physically working at the high school during the relevant period, they remained part of the Fairfax County Defendants by continuing to influence, direct, or coordinate retaliatory actions against Plaintiff and her children. Together, these individuals acted in concert with FCPS leadership and county officials to suppress Plaintiff's complaints, manipulate academic records and College Board related processes, and obstruct her children's access to fair educational and college-bound opportunities.

49. Throughout this ongoing scandal, many FCPS employees left the school system abruptly, whether willingly or unwillingly, with some unable in good conscience to continue participating in it. In contrast, others who aligned themselves with the oppression and targeting of Plaintiff's daughters received various benefits and perks as a result of their involvement.

50. Teachers were not permitted to provide genuine feedback, particularly in English and reading-related courses, especially concerning Plaintiff's younger daughter. This restriction was designed to conceal what had occurred during her kindergarten and first-grade years as part of a long-term plan orchestrated by Erin Jones and her associates.

51. For example, in her senior year of high school, 2024, Plaintiff's younger daughter's AP Language teacher, Jamie O'Neill, was willing to provide honest information about the daughter's academic abilities. Ms. O'Neill sent Plaintiff detailed feedback, including the daughter's mock AP exam scores, and her email directly contradicted the actions of the English Administrator, Shannon Matheny, who had been working against Plaintiff's daughter as part of the ongoing retaliation and the effort to control her college trajectory.

On May 30, 2024, Ms. O'Neill, who had been a well-respected teacher at West Springfield Highschool for many years and had served as Director of the English Department was escorted out of class by security while she was giving a reading quarter test to the students and was permanently removed from the school. This incident occurred just days after, Ms. O'Neill wrote email to Plaintiff with statements such as, "You have an amazing daughter, she is a literary scholar, she should ace the AP Lang exam unless something odd happens," and shortly after Plaintiff's daughter requested the recommendation.

52. Defendants implemented and executed a long-standing, coordinated scheme, originating in 2014 after Plaintiff's protected activity to sabotage Plaintiff's children's access to top colleges and Ivy League institutions. The scheme included falsifying and submitting fraudulent applications, falsifying standardized-tests, interfering with teachers and counselors to suppress recommendations and, and obstructing extracurricular opportunities that would strengthen the children's applications. As a result of these tactics, Plaintiff's older daughters were prevented from matriculating at the top and Ivy League Instructions that they applied and were capable to get acceptance. Plaintiff's younger daughter, who had originally intended to apply to the University of Virginia, did not submit an application. Once the UVA application deadline passed on January 5, 2024, Defendants escalated their campaign and, within two weeks, served Plaintiff with a termination letter, further intensifying their retaliatory efforts. Many of the schools to which the younger daughter had applied were Ivy League or similarly selective institutions. After the Plaintiff's daughter received and accepted an offer from Brown University, Defendants intensified their retaliatory efforts. Those intensified efforts included a coordinated financial attack, terminating Plaintiff's employment, disrupting rental and other income streams, encouraging or facilitating unworkable financial divorce rulings and debt obligations, and otherwise imposing financial barriers, designed to make attendance at Brown financially impossible. The timing, content, and coordination of these acts demonstrate that Defendants' conduct was retaliatory, targeted, and intended to punish Plaintiff by destroying her children's higher-education opportunities.

53. Defendants' long-running, coordinated campaign of retaliation and sabotage extended beyond Plaintiff and directly affected her daughters, whose rights to make independent decisions about

their education, opportunities, and future paths were improperly influenced, constrained, or
manipulated as a result of Defendants' actions. As individuals and government actors,
Defendants had no lawful authority to interfere with the educational choices or life
opportunities of Plaintiff's children, yet their conduct created an environment in which
Plaintiff's daughters were deprived of the freedom to pursue colleges, programs, and personal
goals based on their own interests and abilities. This intrusion into Plaintiff's family life and her
daughters' autonomy violated fundamental liberty interests, disrupted their developmental,
social, and educational trajectories, and caused lasting harm to their ability to shape their own
futures without undue government influence.

54. **Manipulation of Academic Assessments and School Records**

Plaintiff's children were deliberately targeted within the Fairfax County Public Schools system
through the manipulation and falsification of their academic assessments and school records.
These falsifications were aimed at undermining the children's performance, making it more
difficult for them to pursue higher educational opportunities. This academic interference
continued for over a decade and has had long-lasting impacts on their educational trajectory.

55. **Obstruction of College Admissions and Financial Support**

In addition to educational records manipulation, Defendants interfered with the college
admissions process for Plaintiff's children. Plaintiff's children, who are academically capable and
eligible for advanced educational opportunities, faced unjustified obstacles in their pursuit of
higher education. Defendants intentionally obstructed their access to financial aid and other
college-related support, intentionally limiting their ability to attend top-tier schools and pursue
careers that would otherwise align with their academic potential.

56. **Deliberate Limitation of Future Social Mobility**

The actions taken by Defendants were designed not only to disrupt Plaintiff's children's education but also to limit their future social mobility. By interfering with their education, social networks, and access to elite professional networks that come with attending top-tier schools, Defendants sought to stifle the children's potential to build the social and professional capital needed to succeed in the future.

57. **Unlawful Surveillance and Invasion of Privacy**

Throughout the period of retaliation, Plaintiff's privacy was continuously violated. Defendants engaged in unlawful surveillance of Plaintiff's personal life, including monitoring her communications, tracking her movements, and accessing her private records without consent or legal authority. These actions were designed to intimidate Plaintiff, invade her privacy, and gather information to use against her in the retaliation campaign. –

58. **Retaliatory Flagging, Blacklisting, and Immediate Interference Triggered by Plaintiff's Protected Activity**

As a direct result of Plaintiff's protected activity, including her reports to FCPS, the U.S. Department of Justice, and the U.S. Department of Education, Plaintiff reasonably believes that her name and identifying information were placed on internal or external watchlists, databases, or retaliatory flagging systems used by government agencies, contractors, or affiliated entities. This retaliatory designation appears to have been implemented to punish Plaintiff for her whistleblowing, restrict her mobility, and limit her access to opportunities.

Following her protected disclosures, Plaintiff began experiencing consistent, immediate, and unexplained interference whenever attempting to access services, employment opportunities, or routine support. These disruptions include abrupt changes in treatment after her identity is disclosed, sudden withdrawal of services, stalled processes, and coordinated obstacles that occur in real time. The timing and uniformity of these incidents strongly suggest the existence of an automated or manual alert associated with Plaintiff's name that triggers adverse action upon recognition.

The presence of derogatory or misleading internal labels, such as being flagged as a "non-investigative subject," "security concern," or similar designation, has likely contributed to the obstruction of Plaintiff's career progression, professional standing, and access to basic services. This retaliatory flagging and blacklisting have caused severe and ongoing harm and form a central component of the broader pattern of retaliation, control, and interference described throughout this Complaint.

**Emotional and Psychological Harm on Children**

59. As a direct result of Defendants coordinated and sustained retaliation, both Plaintiff and her children have suffered significant psychological harm. The constant targeting, harassment, and instability have caused lasting emotional distress, trauma, and anxiety. Plaintiff's children, in particular, have been forced to witness the deterioration of their family life, the ongoing struggles to access basic services, and the financial and professional hardships imposed upon their mother. This toxic environment has affected their emotional well-being and their prospects for a stable future.

**Severe Emotional Distress and Fear for Safety**

60. **Narrow Escape from Casualty at Brown University**

Plaintiff's daughter narrowly avoided being involved in a mass casualty shooting at [location or name of the school], a traumatic event that would have put her life in immediate danger. This harrowing incident occurred only because Plaintiff's daughter was not present for a scheduled class. Had she attended, she would have been directly in harm's way.

61. **Escalating Fear Amid Prolonged Retaliation**

This traumatic event compounded Plaintiff's deepened fear for her children's safety, particularly within the context of the ongoing and escalating retaliation Plaintiff and her children had already been enduring. The intentional interference in their lives, combined with the threat of violence, added to the pervasive sense of danger and vulnerability that has plagued Plaintiff's family for years. The impact of this near-tragedy further escalated Plaintiff's concern for the safety of her children, exacerbating the emotional toll already imposed by years of systemic retaliation and targeted harassment.

**Severe Emotional Distress, and Long-Term Harm**

62. As a result of this life-threatening incident, coupled with the ongoing retaliatory conduct directed at them, Plaintiff and her children have suffered severe emotional distress. This has created a long-term sense of insecurity that has significantly affected their mental health and quality of life. The constant fear of danger, both from the direct retaliation they face and the

uncertainty surrounding their safety, has left Plaintiff and her children grappling with lasting psychological harm.

**Plaintiff's Employment at Booz Allen**

63. Plaintiff was employed at Booz Allen on Nov 17, 20028 for over 15 years, where she had a successful career and held a respected position for the first 6 years.

64. Plaintiff was promoted to Lead Associate on October 17, 2010 within approximately two years, reflecting her sustained professional competence and strong performance well before the retaliatory conduct described below. Throughout her tenure, Plaintiff consistently performed at a high level and earned the trust of both leadership and clients.

65. For approximately the first five years of her employment until August 2014, the time she engaged in the protected activity of filing complaints with the DOJ and DOE, Plaintiff held senior and leadership roles, served as a trusted advisor, and successfully led complex, high-visibility projects. Plaintiff managed technical teams of seven or more members and built long-term programs from inception through sustained success. Her performance was exemplary, consistent, and undisputed, leading to multiple awards, including the Booz Allen Value in Practice (VIP) Award, presented on March 11, 2012, which recognizes individuals who are role models for the Firm's Core values in their project delivery, interactions with clients and colleagues, and their personal conduct outside of the office.

66. Plaintiff has a well-established reputation as a dedicated and effective career manager. Her leadership, mentorship, and coaching have been consistently recognized by managers and direct reports. Plaintiff has directly promoted multiple staff members, helping them successfully

lead projects, advance in position, and achieve growth in salary, demonstrating her commitment to developing talent and supporting the organization's success. Despite these documented contributions, Plaintiff's own career growth and opportunities for advancement were deliberately stifled as a result of retaliation for her engagement in protected activity, including whistleblower complaints. This retaliatory conduct has had a profound and demoralizing impact on Plaintiff, limiting her professional development, reducing her earning potential, and causing significant emotional and psychological harm, all in violation of applicable employment and whistleblower protection laws.

Retaliation at Booz Allen Inc. (2014–2024)

<u>Retaliatory Introduction</u>

67. As a direct retaliatory actor of the whistleblowing activity filing eth complaints to DOJ and DOE, from August 2014 onward, Plaintiff consistently experienced retaliation. This retaliation manifested in hostile work environments, obstruction, interference with her work and her team members she mangled on projects.

68. Over a period of nearly nine years, Plaintiff was subjected to systematic harassment, repeatedly pushed out of projects that offered professional visibility, shuffled from project to project, systematically blocked from leadership opportunities, and assigned to positions below her level of experience and qualifications. In contrast, when Plaintiff was placed in low-visibility or short-term developer roles, she experienced comparatively better treatment, demonstrating a pattern of conduct designed to suppress her professional advancement. As a result, Plaintiff's workplace environment at Booz Allen became increasingly hostile. On multiple occasions, direct

reports on her project teams were turned against her, and repeated efforts were made to keep Plaintiff invisible and confined to more junior roles. Whenever Plaintiff's projects showed signs of success or increased visibility, her work was interfered with or blocked, and she was isolated from meaningful assignments.

69. When Plaintiff repeatedly reported these misconducts to project-team leadership and home-team leadership, and thereafter filed formal complaints, her reports were ignored, demonstrating that the forces behind the misconduct originated within leadership itself. The conduct violated the firm's stated core values, yet it was not merely tolerated when directed at Plaintiff; it was effectively empowered by leadership's silence and inaction. This institutional acquiescence permitted continued retaliation, obstructed remediation, and amplified the adverse effects on Plaintiff's career, reputation, and family.

**Projects Treatment**

70. After engaging in protected whistleblower activity in August 2014 by reporting fraudulent practices within Fairfax County Public Schools to the U.S. Department of Education and the U.S. Department of Justice, Plaintiff's career advancement at Booz Allen was derailed. From that point forward, she was subjected to a sustained pattern of retaliation that directly followed her disclosures.

71. Immediately after her protected activity, Plaintiff was removed from the long-term Bureau of Navy Medicine project she had built and successfully led for many years. She was blocked from leadership roles commensurate with her experience and forced into low-visibility, single-resource assignments, stripping her of leadership responsibilities, professional visibility,

and opportunities for advancement. The project Plaintiff built had generated significant business growth for Booz Allen and enabled the placement of numerous employees, further underscoring the retaliatory nature of her removal.

72. For years thereafter, Plaintiff faced ongoing obstruction in obtaining projects aligned with her seniority. She was repeatedly moved from one project to another, often placed on single-resource teams or in roles with significantly reduced visibility and responsibility. Despite this, Plaintiff persistently sought assignments that would restore her to leadership roles appropriate for her seniority and expertise. She succeeded in securing such roles only briefly— in September 2019, September 2021, and February 2023—before being pushed out again under retaliatory circumstances.

73. In the project Plaintiff secured in September 2019, which aligned with her experience and seniority, she performed strongly and contributed to the project's success. Nevertheless, she soon faced resistance. After returning from an overseas trip that included medical care, and while she had approved medical leave, Plaintiff was removed from the project in April 2020 and replaced by another employee. Her manager claimed the removal was due to funding concerns and suggested that additional team members might also be removed; however, no other team members were displaced, and Plaintiff was the only individual removed. This incident caused Plaintiff severe emotional distress and contributed to a serious medical condition after that she suffered for many months. Due to prior interference with her medical care, Plaintiff relied primarily on telehealth services. Her physician diagnosed her condition and recommended diagnostic imaging; however, because of the ongoing retaliation and her previous negative experiences involving interference with her medical providers and treatment, Plaintiff did not

feel safe undergoing in-person procedures at that time. Plaintiff endured the condition for approximately eighteen months before ultimately achieving relief in mid-2021 through non-invasive, holistic methods and dietary adjustments.

74. In September 2021, Plaintiff joined a Navy defense project aligned with her expertise and experience. Although she was not leading a team, the role provided meaningful opportunities for impact, expansion of work, and the potential to bring in additional resources. However, Plaintiff soon encountered intentional obstruction that impeded the project's success, particularly while she was pursuing a market salary adjustment with her home-team leadership. Despite leadership's prior insistence that she secure a project to support this adjustment, Plaintiff was systematically held back from success in a hostile environment and ultimately pushed out. Project Manager Carlicia Cobbin falsely accused Plaintiff of receiving complaints from "three government employees," even though Plaintiff had interacted with only one, who had offboarded her and sent a thank-you email. Ms. Cobbin further escalated the hostility by threatening to send the police if Plaintiff did not return her laptop, while simultaneously obstructing proper offboarding procedures. These actions created a retaliatory, intimidating environment directly tied to Plaintiff's protected whistleblower activity and her salary advocacy. Ms. Cobbin's conduct—including threats, false accusations, and interference with offboarding—was consistent with a coordinated pattern of retaliation orchestrated or condoned by Booz Allen leadership and the broader retaliatory network.

75. In February 2023, Plaintiff secured another project aligned with her experience and seniority. Despite assurances that she would be placed in the role, management delayed onboarding while attempting to install a developer from a prior retaliatory project into her position. Only

after persistent follow-up was Plaintiff assigned responsibility for managing a SharePoint migration and supervising two team members. Within two months, a direct report began openly bullying Plaintiff, refusing to follow direction and undermining her authority. Plaintiff repeatedly reported this conduct to leadership through meetings and written communications, but no corrective action was taken, and the misconduct was implicitly enabled. Despite severe obstruction and hostility, Plaintiff continued performing her duties and successfully delivered a major project milestone. Her manager later acknowledged that Plaintiff had "bled and sweat" to complete the work. Plaintiff received excellent performance feedback, and the project benefited substantially from her efforts. Nevertheless, after Plaintiff directly asked whether she was wanted on the project, she was informed the next day that the project had "ended" and that her last day would be October 6, 2023, even though every other individual on the contract remained.

76.  On January 19, 2024, Plaintiff was presented with a two-week termination notice during a virtual meeting attended by Principal Alex Chapman and Plaintiff's manager, Parisa Hashmani who remained silent throughout the meeting. During this meeting, Booz Allen offered Plaintiff a severance payment of $26,000, a practice Plaintiff understands the firm began implementing approximately six months prior. Plaintiff did not accept or sign the severance offer because the years of abuse and retaliation she endured could not be resolved or silenced by the proposed payment.

77. Following her October 2023 removal and throughout the two-week termination period, every project for which Plaintiff applied, and which initially appeared promising, either received no response, was abruptly canceled, was placed "on hold," or was converted into a more junior

role. These explanations were pretextual. Given Plaintiff's long tenure, her active participation in recruitment, and her extensive experience placing both team members and herself on projects, it was clear that these repeated denials and cancellations were deliberate and part of a targeted plan to terminate her employment. Plaintiff communicated this pattern to Kate Brunst, the Talent Acquisition representative assigned to her, who provided no support. Plaintiff's employment was terminated on February 2, 2024.

78. After being displaced from projects, Plaintiff consistently found subsequent roles on her own. Neither her project managers, her leadership team, nor the Talent Acquisition representative made any effort to assist her or showed any interest in placing her on new projects. Instead, they merely asked whether she had found a project—a passive inquiry starkly inconsistent with the proactive assistance Plaintiff herself provided to her direct reports. This failure to act deprived Plaintiff of employment continuity and advancement opportunities and constituted an adverse employment action within the ongoing retaliatory campaign.

79. During the two-week notice period, Plaintiff was eligible to participate in internal sessions designed to assist employees seeking new project placements; however, she was never invited to any such sessions. After independently learning of one session, Plaintiff contacted Amy Price, one of the program facilitators, and attended the virtual session titled *"Finding Your Next Role"* on January 23, 2024. During the session, Plaintiff discovered that the chat function was disabled for her, while other participants were able to view and engage freely. Only after Plaintiff raised the issue was her chat access restored. Despite this correction, Plaintiff was excluded from the follow-up email sent to other attendees. Ms. Price later attributed the omission to a "computer issue."

80. These events, combined with Defendants' longstanding and repeated retaliatory actions, including their exclusion of Plaintiff from internal mobility resources, their complete failure to make any effort to place her on a project despite her strong skills and high-demand credentials, and their repeated pretextual project removals, underscore Defendants' intent to hinder Plaintiff's ability to secure continued employment and to force her separation from the company. This conduct constitutes a materially adverse employment action and further evidences the ongoing retaliatory campaign that ultimately culminated in Plaintiff's termination. The two-week termination period was extremely traumatic for Plaintiff, and when combined with nearly nine years of ongoing retaliation, harassment, and interference, it caused severe professional and personal distress, leaving Plaintiff with no viable path to continue her employment. As a direct result of Booz Allen's retaliatory actions, Plaintiff's employment was formally terminated on **February 2, 2024**.

81.  Plaintiff tolerated nine and a half years of abuse because she understood that the external interference she faced would follow her regardless of where she worked. The same actors who pursued the retaliation showed no indication that they would cease their conduct.

82. Plaintiff rejected Booz Allen's $26,000 severance offer because she reasonably believed it was intended to buy her silence and conceal the years of retaliation, obstruction, and hostile treatment she had endured. Plaintiff further believed the offer was grossly inadequate to address the extensive harm caused by Defendants' unlawful actions. Plaintiff did not seek a severance payment; she sought the basic right to work with dignity and respect, free from retaliatory conduct—something she attempted to obtain for nine and a half years without success.

**Displacement Following Medical Leave and Resulting Medical Impact**

83. In April 2020, Plaintiff returned from an approved medical leave and an authorized short-term

absence for medical reasons. Within approximately one week of her return, Plaintiff's position

had been replaced, leaving her without a defined role or responsibilities. Plaintiff sought

clarification from the Project manager, Laura Haring, who stated that Plaintiff needed to be

removed from the project due to funding concerns and suggested that additional team

members might also be removed. In practice, no other team members were displaced; Plaintiff

was the sole individual removed from the project.

As a result of this unfair treatment, Plaintiff experienced severe emotional distress, including

heightened stress and frustration, which directly contributed to the onset of a medical condition

during the COVID-19 pandemic. Due to pandemic-related risks and prior experiences of

interference with her medical care, Plaintiff relied on telehealth services. Her physician

diagnosed her condition and recommended diagnostic imaging, which Plaintiff did not feel safe

undergoing at that time. Plaintiff suffered from the medical condition for approximately

eighteen months and ultimately achieved relief in mid-2021 through holistic treatment and

dietary modifications.

**Complaints Ignored**

84. Plaintiff filed formal complaints on three occasions, April 2021, February 23, 2022, and October

18, 2023, concerning recurring offboarding problems she routinely encountered on multiple

projects. The February 23, 2022 and October 18, 2023 complaints additionally reported severe

mistreatment by a manager and a direct report within Booz Allen's reporting structure. Plaintiff

also notified firm leadership of these issues on the date of her separation. Plaintiff's complaints were not genuinely investigated; HR twice gave the appearance of addressing her concerns but took no substantive action, and on multiple occasions matters were administratively closed without any investigation. This demonstrated a pattern of willful indifference and deliberate inaction by the firm.

**Denial of Market Salary Adjustment and Interference**

85. Plaintiff inquired about a market salary adjustment (MSA) for the last two and half years before her termination, but was consistently denied, despite being below the average for her level. This was confirmed by her previous manager, Keith Smith, who noted that her salary was below the 48th percentile for her level and qualifications.

On November 5, 2021, Plaintiff contacted Keirsten Sayles from HR, who handles matters for employees in her home team, to discuss receiving a market salary adjustment, which she had never received during her 13-year tenure at Booz Allen. Plaintiff highlighted that her salary was below the 48th percentile for her level. At that time, Keirsten was supportive and indicated that she would conduct a salary analysis, discuss the matter with Plaintiff's principal, Sean McDonald, and follow up. However, Keirsten never responded to Plaintiff's initial inquiry nor to a follow-up email sent five days later. Plaintiff sent an additional follow-up on November 15, 2021, which also went unanswered. At this point, Plaintiff perceived that the lack of response indicated an unjustifiable barrier to her request.

86. On December 2, 2021, Plaintiff sent another email noting that it was unusual for Keirsten not to respond and expressed concern that something was amiss. Keirsten immediately replied,

stating that she did not have the authority to make decisions regarding MSAs and that such matters should be discussed with administrative leadership, who are the ultimate decision-makers. Subsequent discussions with Plaintiff's immediate and senior managers revealed that there was a deliberate roadblock preventing her from receiving a market salary adjustment.

87. On or about May 2023, Plaintiff participated in a virtual salary discussion with the team's new HR representative, Mr. Henry Clevland. During the meeting, Plaintiff observed the same recurring pattern she had experienced in prior virtual sessions: the proceedings were effectively controlled by an off-camera individual who orchestrated demeaning, interruptive, and undermining conduct directed at Plaintiff. This action aimed to control the salary discussion and deny Plaintiff rightful compensation, thereby advancing a campaign of retaliation and financial oppression.

**Privacy Violations at Booz Allen and Continuous Challenges with Proper Onboarding and Offboarding process**

88. Plaintiff experienced repeated privacy violations and improper handling of access credentials, computer systems, and government-issued equipment during and after her employment. These incidents occurred across multiple periods of her employment and separation and involved failures to properly secure accounts, deactivate access, document equipment returns, and follow established onboarding and offboarding procedures. Plaintiff understood these actions, taken together, as part of an ongoing pattern of interference, control, and retaliation connected to her protected whistleblowing activities.

89.  Plaintiff alleges that she experienced privacy violations during her employment. On November 29, 2023, Plaintiff reported to the Booz Allen helpdesk that on multiple occasions during 2023 she was unable to log into her work computer because the system displayed a message indicating that another user was logged into the device, preventing her from signing in.

The helpdesk ticket documented the incident as "someone else is still using this PC," which prevented Plaintiff from shutting down or logging into the computer. The incident record noted that the issue had occurred several times during the year, most recently on November 29, 2023, at approximately 1:38 p.m. EST.

Plaintiff did not receive a resolution to this issue. In light of the ongoing pattern of retaliatory conduct she had experienced, Plaintiff understood this incident to be part of the retaliation and targeting directed at her and therefore ceased further follow-up, concluding that further efforts would be futile.

90.  Plaintiff also experienced another privacy violation after her employment ended. After she left the company, returned her CAC card (which should have been deactivated), and submitted her laptop for shipping, Plaintiff learned from another employee that three days later, her account was still logged in on Microsoft Teams. Typically, an employee's accounts are deactivated immediately upon separation. In Plaintiff's case, however, not only her account remained active, but someone apparently accessed data while logged in under her credentials. Plaintiff did not authorize this access and had no ability to control it.

91. Plaintiff experienced a hostile and intimidating treatment during her exit process at the CAC control office on Feb 2, 2024.  On the Plaintiff's final day of employment, she returned her

laptop and CAC card as required. When she requested written confirmation of the CAC card return, access control personnel Antonio Pitt refused to provide any receipt. When the Plaintiff requested email confirmation, he sent an email containing only a subject line and no body text, and when she requested proper written acknowledgment, Pitt threatened to call security to have her escorted out, despite her full compliance with asset-return requirements.

For an employee who had served the company for approximately fifteen years, being treated in this manner during her exit was humiliating, degrading, and professionally distressing. Plaintiff reasonably expected a respectful and orderly separation process, and instead was subjected to hostility and intimidation

As a result of this conduct, Plaintiff suffered significant emotional distress, hostility, lasting trauma, and the cumulative retaliation, which she understood to be part of a broader pattern of whistleblower retaliation, of which intimidation of this kind had been a recurring and defining characteristic of this retaliation over the years

92. Plaintiff experienced unauthorized handling of her government-issued laptop and related equipment during her employment. On November 6, 2015, while offboarding from the government agency contract, she was assigned to, Plaintiff was asked to return her laptop and badge to a team member, Jessenia. Gonzales, who was also on the contract. Plaintiff expressed that, having received the laptop directly from the government agency, she would feel more comfortable submitting it herself and obtaining a proper receipt. Despite Plaintiff's repeated concerns, she was instructed that it was urgent and that she had to hand the laptop to Gonzales. Plaintiff's concerns were heightened because Gonzales and another team member,

Alou Golden, who worked closely on the contract, exhibited conduct consistent with being controlled or directed by others in ways that affected Plaintiff, consistent with patterns Plaintiff had repeatedly observed as a result of whistleblower retaliation.

Plaintiff was instructed that the only alternative she has was to submit the laptop to her Career Manager, Keith Smith, for delivery to Gonzales. Plaintiff, left with no other choice, submitted the laptop through her Career Manager, feeling significant discomfort and concern over what would happen to the device.

Upon following up for verification on November 19, 2015, Gonzales forwarded an email from the government representative indicating that the laptop had been received two weeks after submission. The "receipt" consisted only of a handwritten note. The proper Contractor separation form, which lists returned equipment and requires signatures, was never completed. Plaintiff's attempts to clarify the issue were met with futility and hostility, causing her to stop questioning.

Approximately nine months later, when Plaintiff was onboarding to another project with the same agency on August 7, 2016, the Booz Allen point of contact (POC) and the Contracting Officer Representative (COR) from her previous assignment reported that no laptop or badge was indicated as returned on her separation form and no record of it could be found in the system. The COR for the new contract was initially unable to locate the returned laptop and badge. After nearly a month of back-and-forth communications, Plaintiff was informed that Booz Allen had worked with the prior COR to submit the necessary paperwork, confirming that she had returned the government equipment, and she was able to onboard successfully.

Plaintiff understood that being forced to submit her laptop despite her discomfort, the conduct of J. Gonzales and Alou. Golden, and the intentional, improper onboarding and offboarding process she was subjected to, were part of a broader pattern of interference, control, and retaliation directed at her in connection with her protected whistleblowing activities

93.  On the Navy project that Plaintiff was on between September 2021 to March 2022, during offboarding process he project manager, Carlicia Cobbin, explicitly threatened Plaintiff that police would be involved if she did not return her laptop, while simultaneously obstructing proper offboarding procedures.

94. These incidents, together with the prior unauthorized account access, threats, and related conduct described in ¶¶ 88–93, demonstrate a continuing pattern of interference with Plaintiff's professional systems and unauthorized access to her work accounts and devices. Plaintiff understood that the repeated privacy violations, unauthorized account access, forced and improper handling of government-issued equipment, hostile exit treatment, and the intentional, improper actions taken during onboarding and offboarding were not isolated incidents. Taken together, these acts reflect a deliberate course of interference, control, intimidation, and retaliation directed at Plaintiff in response to her protected whistleblowing activities.

95. **Obstruction of New Employment Opportunities**

Following her termination, for many months Plaintiff applied for numerous positions out of financial desperation, but despite her credentials and years of experience, she was consistently rejected.  Under normal circumstances for Somone who has worked for Booz Allen and having her credentials find a job should not be hard. However, hers was coming back with rejection

after rejection and not even having a chance for interview. Defendants' actions had successfully undermined Plaintiff's professional reputation and standing, making it virtually impossible for her to secure new employment.

The only interview Plaintiff received during the relevant period occurred near the finalization of her divorce. The timing was significant, as the divorce proceedings were structured in a manner that deprived Plaintiff of any financial support for one year, while simultaneously requiring her to remain solely financially responsible for preserving substantial marital assets and assuming all related financial obligations.

These obligations had previously been made more difficult by the actions of the Retaliation Network Defendants in or around 2020. Although similar interference did not occur during this later period, Plaintiff deliberately avoided pursuing refinancing because prior refinancing efforts at the end of 2019 had been rendered extremely challenging and exhausting due to substantial interference and serious legal issues affecting the transactions. As a result, Plaintiff sought to avoid re-exposing herself to the same risks and complications.

The prospective employer was a direct competitor of Booz Allen. Plaintiff was initially informed that she would be hired for a senior leadership position, and the interview process appeared to proceed favorably. However, following the interview, the narrative abruptly changed. Plaintiff was informed that the only available position was a different role with significantly lower seniority and compensation. This pattern mirrored the same conduct Plaintiff had previously experienced at Booz Allen.

During one round of interviews, Plaintiff observed that the interviewer appeared distracted and was actively communicating through chat messages, seemingly receiving real-time guidance during the interview. Plaintiff recognized this conduct as consistent with patterns of interference and control she had experienced in prior retaliatory contexts.

Plaintiff subsequently emailed the company seeking clarification regarding the unexplained change in role and salary. She received no response.

Ultimately, Plaintiff declined the position. Plaintiff also concluded that her rehiring and continued employment without interference or retaliation was effectively impossible. Although Plaintiff had long been aware of this reality, she nonetheless pursued the opportunity out of financial desperation resulting from her financial circumstances at the time.

**Judicial and Corporate Conspiracy to Exploit Divorce Proceedings and Influence Judicial Outcomes**

96. For purposes of this Section, references to "Plaintiff" mean the Plaintiff in this federal action, who also served as the Defendant in the Fairfax County divorce proceedings (the "Divorce Defendant"). References to "Divorce Plaintiff" mean Plaintiff's then-husband in the Fairfax County divorce proceedings.

97. During the course of Plaintiff's divorce proceedings, the divorce court engaged in conduct that interfered with Plaintiff's ability to pursue legal action against Booz Allen and materially influenced the outcome of the divorce rulings. The court was aware that Plaintiff had sent a formal demand letter to Booz Allen on January 22, 2025, demonstrating her intent to pursue

legal claims, and further understood that Plaintiff, who was proceeding pro se, could not reasonably pursue two complex legal actions simultaneously.

As described above, Plaintiff was engaged in protected activity, including her whistleblower complaints against Fairfax County actors and her legal claims arising from her separation from Booz Allen. The divorce proceedings occurred while Plaintiff was actively pursuing these rights, and the court's handling of the case materially interfered with her ability to pursue those claims.

98. The divorce was also filed by the Divorce Plaintiff on May 2, 2024, the very next day after Plaintiff's younger daughter was accepted to Brown University. This timing underscores that the divorce was strategically orchestrated as part of a long-term plan by multiple actors, including Fairfax County officials, current and former elected representatives, and other public actors, to interfere with Plaintiff's family stability and to limit her daughters' access to top-tier and Ivy League educational opportunities. These actions are consistent with a broader pattern of retaliatory conduct aimed at Plaintiff in response to her protected activity since August 2014.

99. The divorce proceedings occurred while Plaintiff was actively engaged in this protected activity, and the manner in which the proceedings were conducted was used as a mechanism to retaliate against Plaintiff for asserting her legal rights and to interfere with her ability to pursue those claims

100. Despite this knowledge, the court conducted the divorce proceedings in a manner that disadvantaged Plaintiff and appeared unduly focused on protecting the interests of **Booz Allen**. Rather than operating as a neutral domestic relations forum, the proceedings repeatedly

mischaracterized and distorted the circumstances surrounding Plaintiff's separation from Booz

Allen in ways that undermined Plaintiff's credibility and impaired her ability to pursue her legal

claims.

101.    The court received full testimony and documentary evidence concerning the circumstances

of Plaintiff's separation from Booz Allen during the December 2024 hearing and the April 2025

trial. Nevertheless, the court repeatedly made statements directly contradicting that evidence,

including assertions that Plaintiff "left the job voluntarily," that she "refused severance and

threatened to sue the company," and that she "failed to utilize opportunities provided by Booz

Allen to secure a project." These assertions were contrary to the evidence, were expressly

refuted by Plaintiff on multiple occasions in the record, and were used to discredit Plaintiff while

insulating Booz Allen Hamilton from scrutiny. Plaintiff expressly advised the court that the

proceedings no longer resembled an impartial divorce case and appeared to be unduly focused

on protecting Booz Allen's interests, and the court's conduct and rulings reinforced that

conclusion.

102.    The court's retaliatory conduct was further reflected in its handling of Plaintiff's request for

federal ex-spouse benefits. Although Plaintiff was unemployed and had not been awarded

financial support, the court initially stated it would not award benefits that imposed a cost on

the Divorce Plaintiff, while representing that cost-free federal ex-spouse benefits would be

permitted. In subsequent rulings, however, the court denied Plaintiff all federal ex-spouse

benefits, including those previously acknowledged as cost-free.

When Plaintiff expressly agreed to personally bear the full cost of federal ex-spouse health benefits, stating that she would rather pay the cost herself than lose coverage, the court engaged in procedural manipulation that deprived Plaintiff not only of those benefits, but of any health care coverage. Specifically, the court suspended entry of the final divorce decree that was entered on Dec 2, 2025 for additional ten days, an unusual and unnecessary procedural step. During this period, the court made no substantive changes to the order other than delaying its entry, thereby allowing the Divorce Plaintiff to make a new assertion regarding his federal employment status. At the last possible moment, the Divorce Plaintiff asserted for the first time that he had separated from federal employment in October 2025, after twenty years of service. This assertion was never made on time and coincided precisely with Plaintiff's effort to preserve benefits covering costs on he owns, while continuing to pursue her protected legal activity.

Under ordinary circumstances, such a last-minute claim of material change would be scrutinized or rejected; instead, the court accepted it without inquiry, stating it "could not award benefits that no longer exist." The court's deliberate suspension of the order facilitated this outcome, demonstrating a preplanned procedural sequence designed to eliminate Plaintiff's benefits.

103.    The court's conduct further included rulings contrary to the equitable distribution provisions of Virginia law that deliberately burdened Plaintiff with full responsibility for marital debts and obligations while absolving the Divorce Plaintiff of accountability, despite evidence of his misconduct. These rulings imposed on Plaintiff sole responsibility for managing multiple marital properties, selling multiple real properties, and paying the Divorce Plaintiff a substantial portion

of his marital share in cash within six months, while freeing him from any obligations related to the properties or debts.

The cumulative effect of these rulings, when combined with the court's repeated and unexplained delays in resolving the divorce proceedings, was to occupy Plaintiff with immediate, time-intensive, and financially destabilizing responsibilities during the same period in which she was attempting to pursue complex federal litigation. By prolonging the divorce proceedings while simultaneously imposing short-term deadlines and overwhelming obligations, the court diverted Plaintiff's time, financial resources, and capacity away from pursuing her legal claims, thereby materially interfering with her access to the courts.

These actions were not isolated or inadvertent. The timing of the divorce filing immediately after Plaintiff's younger daughter's acceptance to Brown University, the forum selection in Fairfax County, the mischaracterization of Plaintiff's employment separation, the procedural manipulation surrounding benefits, the imposition of disproportionate financial burdens with accelerated deadlines, the repeated delays, and the preferential treatment afforded to the Divorce Plaintiff collectively support an inference that multiple actors, including **Booz Allen**'s interests, the divorce court, the Divorce Plaintiff, his attorney, and Fairfax County public actors, acted in concert to disadvantage Plaintiff and retaliate against her for asserting her legal rights. These actions were part of a long-term, covert campaign of retaliation by those who perpetuated a pattern of interference, procedural oppression, and obstruction against Plaintiff since her whistleblower activity beginning in August 2014.

This interference not only delayed Plaintiff's ability to pursue her claims but directly tainted the substance and outcome of the divorce rulings, which relied on false characterizations, attacks on Plaintiff's credibility, and retaliatory financial burdens imposed in response to Plaintiff's protected activity.

These actions were not isolated or inadvertent. The timing of the divorce filing immediately after Plaintiff's younger daughter's acceptance to Brown University, the forum selection in Fairfax County, the mischaracterization of Plaintiff's employment separation, the procedural manipulation surrounding benefits, the imposition of disproportionate financial burdens with accelerated deadlines, the repeated delays, and the preferential treatment afforded to the Divorce Plaintiff collectively support an inference that multiple actors, including **Booz Allen**'s interests, the divorce court, the Divorce Plaintiff, his attorney, and Fairfax County public actors, acted in concert to disadvantage Plaintiff and retaliate against her for asserting her legal rights. These actions were part of a long-term, covert campaign of retaliation by those who perpetuated a pattern of interference, procedural oppression, and obstruction against Plaintiff since her whistleblower activity beginning in August 2014.

This interference not only delayed Plaintiff's ability to pursue her claims but directly tainted the substance and outcome of the divorce rulings, which relied on false characterizations, attacks on Plaintiff's credibility, and retaliatory financial burdens imposed in response to Plaintiff's protected activity.

**<u>Personal Life Retaliation</u>**

104.    After Plaintiff engaged in whistleblowing activity in August 2014 and formally reported

misconduct within Fairfax County Public Schools by filing complaints with the U.S. Department

of Education and the U.S. Department of Justice, the Fairfax County Defendants escalated their

retaliation to a pervasive and intrusive level intended to punish, silence, and destabilize

Plaintiff's life. The targeting extended far beyond interference with Plaintiff's daughter's

education and expanded into efforts to obstruct her children's future college opportunities.

Over time, the retaliation intensified and began affecting multiple unrelated areas of Plaintiff's

life. Plaintiff experienced interference with her employment, personal relationships, and access

to essential services, including mortgage and financial services, insurance matters,

medical-related processes, legal services, and additional services across her daily life, with a

volume of incidents too numerous to list individually. Even obtaining unemployment benefits

became unusually difficult and was only resolved after Plaintiff sought assistance from the

Governor's office in mid-2024. Plaintiff was repeatedly blocked from securing legal

representation, encountering unexplained withdrawals, refusals, and disruptions that prevented

her from filing this retaliation case earlier and ultimately forced her to represent herself in a

complex divorce proceeding and in this federal action while Defendants continued actions

adverse to her interests in both matters.

105.    **Retaliatory Rumor-Spreading and Character Assassination by Doe Defendants**

Plaintiff became aware over time that Defendants, acting through Doe Defendants 1–5, had

long been assigning individuals within her network to spread rumors and circulate false

narratives about her. These Doe agents, acting at Defendants' direction, engaged in tactics

commonly used in whistleblower retaliation, including false accusations, character-assassination

techniques, and the deliberate dissemination of misleading information designed to undermine Plaintiff's credibility. Such conduct is widely recognized as a retaliatory strategy used to isolate whistleblowers, damage their professional reputation, and create a false basis for further adverse actions. The sustained involvement of these Doe actors, who were specifically assigned by Defendants to carry out these acts, further demonstrates a coordinated effort to discredit Plaintiff and justify the ongoing pattern of retaliation following her engagement in protected activity.

106.    **Deprivation of Prime Years, Life Opportunities, and Community Contribution**

Defendants' prolonged retaliation deprived Plaintiff of the prime years of her life—years in which she should have been advancing personally and professionally, contributing more fully to her community, and pursuing long-held goals and dreams. Instead, Plaintiff was forced to devote her time, energy, and resources to navigating continuous harassment, interference, and reputational harm. This sustained misconduct disrupted not only her career trajectory but her overall quality of life, limiting her ability to participate in community activities, support others, and pursue meaningful opportunities that would have enriched her life and the lives of those around her. Defendants' actions robbed Plaintiff of irreplaceable years, derailed aspirations she had worked toward for decades, and left lasting consequences that continue to affect her daily life and future prospects.

107.    The targeting also extended to day-to-day services connected to Plaintiff's residential and other real-estate properties, which worsened significantly after 2024. Plaintiff experienced immediate and unexplained interference when attempting to secure contractors, handymen,

and maintenance providers, as well as disruptions involving tenants and government agencies responsible for tenant-related payments. These actions formed part of a broader pattern of coordinated targeting that reached into areas wholly unrelated to Plaintiff's original complaints and caused substantial financial, emotional, and professional harm to Plaintiff and her family.

108.    The real-time nature of the interference Plaintiff experienced could only have occurred through access to information that Plaintiff communicated privately, including through her phone conversations, emails, and other personal communications.  Plaintiff and her children were subjected to those repeated violations of their privacy. Plaintiff repeatedly observed for many years disruptions that aligned precisely with matters she discussed in private, indicating that her confidential communications were being accessed, monitored, or used without authorization. These privacy breaches enabled Defendants or individuals acting in concert with them to anticipate Plaintiff's actions, interfere with her efforts to obtain services, and obstruct her ability to secure legal representation, thereby amplifying the retaliatory impact

109.    **Interference and Falsification of Medical Records**

Sometime toward the end of 2017, after Plaintiff requested her medical records from her primary Physician, Plaintiff discovered that Defendants had interfered with her primary care physician and got her medical record tampered, where medical Information from her prior visits, including her most recent visit in July 2017, had been altered to create a fabricated medical history that supported a narrative favorable to Defendants. Plaintiff reasonably believed these alterations were made to damage her credibility and construct false narratives to be used against her. Plaintiff requested her medical records following her July 2017 visit because she

observed that her physician was acting unusually and attempting to introduce medical topics

that were out of place and unrelated to the purpose of the appointment.

110.    As a direct and foreseeable result of Defendants' interference with Plaintiff's medical care,

combined with the sustained retaliation and efforts to exert control over her life following her

protected activity, Plaintiff developed a profound and reasonable fear of seeking medical

treatment after she learned of the interference with her provider and the tampering of her

medical records in 2017. Despite having comprehensive federal health insurance coverage

through her former spouse, Plaintiff avoided medical checkups and visits and did not secure a

primary care physician since that time. Defendants' conduct effectively deprived Plaintiff of

access to routine and necessary medical care, stripped her of the basic right to access medical

care without interference, forced her into prolonged self-neglect, and caused significant

deterioration in her physical and emotional well-being. The constant stress of knowing she

could not safely seek medical attention if a serious illness or emergency arose inflicted

immeasurable emotional harm. The impact of this interference was severe, long-lasting, and

directly attributable to Defendants' retaliatory actions.

**Interference with Medical and Related Services for children**

111.    After her Plaintiff's engaged in the protected activity filing with the department of education

in 2015 and 2016, Defendants also extended their retaliatory campaign to Plaintiff's children

medical care interfering with their medical care providers

**Expelled from Pediatrics Office:**

112.    With the continuing retaliation for Plaintiff engaging in protected activity, in 2018, Plaintiff received an unsigned letter from her children's long-time Pediatrics office stating that her children could no longer receive care there and were being expelled from the practice. Plaintiff's children had been patients of this provider since birth, approximately eighteen years. This expulsion occurred immediately after a visit in which Plaintiff raised concerns about a laptop incident in which a device was dropped on her daughter's head, as well as broader concerns about her daughter's safety. The provider involved had previously documented the 2012 bullying incident and had consistently treated the children during their annual checkups. During the final visit, however, the doctor behaved unusually, suggesting that she was under external pressure or influence. Plaintiff was then prevented from speaking with the doctor or any provider to understand the basis for the expulsion, which was outrageous and without justification. Following this incident, Plaintiff significantly limited medical visits for her children and did not secure a primary care provider for them for many years, further compounding the harm caused by Defendants' interference

113.    **Private Therapy Service for Young Daughter**

In 2012, following Plaintiff's protected activity reporting misconduct by the former principal of WSES, **Erin Jones**, and Plaintiff's request that her daughter be transferred to another school (KMES), Defendants extended their retaliatory campaign to Plaintiff's young children, who were subsequently subjected to repeated educational interference and emotional harm in the school environment from a young age

In early elementary school, Plaintiff's younger daughter was subjected to a severe bullying incident by her first-grade teacher Britteny Cummings, which caused her to experience two panic attacks on consecutive days.  At the age of 12, with her own initiative, she required specialized private services to address the impact of that incident. However, Defendants interfered with her ability to obtain appropriate evaluation and support, creating significant obstacles for Plaintiff in securing proper services and an accurate assessment. The evaluating provider initially appeared hesitant to issue a complete report and withheld critical findings. When the full report was finally produced after repeated requests from plaintiff, it documented that the difficulties she experienced were directly connected to the bullying incident that happened at the age of 6. Plaintiff intentionally limits the level of detail at this stage to protect her daughter's identity and reserves the right to provide additional information during discovery.

Although the practice initially appeared professional and caring, it became evident that the providers were operating under the influence of exerted power by powerful external actors.

Over the next six months, when Plaintiff attempted to schedule follow-up visits for her daughter, she was repeatedly and indirectly denied access to appointments, being told on multiple occasions that the schedule was full for extended periods. After numerous unsuccessful attempts, Plaintiff was effectively forced to give up seeking the service. As a result, her daughter was never able to obtain the necessary support, causing long-term harm.

**Manipulation of Tenants and Obstruction of Rental Property Business**

114.    Since 2017, Defendants continued their campaign of retaliation by intentionally manipulating tenants in Plaintiff's rental properties. These efforts involved influencing tenants to break their leases, vacate properties early, or refuse to pay rent on time. Defendants coordinated with tenants to create instability and to deliberately interfere with Plaintiff's rental income, exacerbating her financial distress. These actions, including the manipulation of tenants to vacate or withhold payments, further restricted Plaintiff's ability to generate income and maintain her properties, which were vital sources of financial support.

115.    In 2017, one of Plaintiff's rental properties was unlawfully taken from her, part of the ongoing retaliation targeting her financial stability. The property was removed from Plaintiff's control under suspicious circumstances that pointed to an intentional effort to financially destabilize Plaintiff and remove her sources of income. This action was part of a broader effort to cripple Plaintiff's financial independence.

116.    While Plaintiff sought to stabilize her financial situation, she encountered further retaliation when attempting to use housing programs, such as DC Housing. In January 2024, Plaintiff was informed that a payment of $15,000, which she was supposed to receive for housing assistance, was mysteriously reduced to zero due to intentional delays and coercion designed to disrupt her ability to maintain stable housing. This interference was part of an ongoing, coordinated effort to make Plaintiff's financial survival as difficult as possible.

117.    In a further example of retaliatory conduct, Plaintiff experienced a situation with a long-term tenant in her Baltimore property. This tenant, who had lived in the rental for over six years and had recently signed a new lease, unexpectedly informed Plaintiff via text message that they

had vacated the property without notice. The tenant left the keys in the mailbox and informed Plaintiff that she could use the deposit as rent for the final month. This sudden and unexplained vacancy created further financial hardship for Plaintiff, who was already struggling to stay afloat due to the ongoing retaliation.

**Retaliatory Isolation, Community Interference, and Forced Removal From EEAE**

**Retaliatory Isolation and Community-Level Interference**

118.     As part of the broader pattern of retaliation following Plaintiff's protected activity, Plaintiff experienced systematic isolation within her own community and professional network. Defendants' actions, directly and through individuals acting in concert with them, resulted in Plaintiff being excluded from community spaces, prevented from contributing to organizations she helped build, and denied opportunities for leadership and visibility. These actions were intended to suppress Plaintiff's voice, diminish her credibility, and isolate her from sources of support.

**Systemic Removal from the Ethiopian Eritrean Alliance for Education (EEAE)**

119.     In 2015, Plaintiff co-founded the Ethiopian Eritrean Alliance for Education ("EEAE"), a nonprofit organization created by five community members to help parents navigate the school system and support their children's educational needs. The organization was formed in direct response to the traumatic experiences Plaintiff endured within Fairfax County Public Schools ("FCPS"), and Plaintiff played a central role in shaping its mission and early work.

120.     Beginning in 2016 and escalating in 2017, Plaintiff was subjected to sustained bullying, exclusion, and targeted hostility from individuals within the organization , including those who

had originally built EEAE alongside her. This conduct was inconsistent with the organization's mission and occurred despite Plaintiff's foundational role and ongoing contributions.

121.    One of the EEAE board members involved in pushing Plaintiff out was a former FCPS principal. Shortly after Plaintiff's removal, this individual was rehired by FCPS and later elevated to the position of Chief Equity Officer. The timing, context, and alignment of interests strongly suggest that FCPS and Fairfax County actors influenced or encouraged Plaintiff's removal as part of a broader effort to silence her, suppress her visibility, and undermine her credibility within her own community.

**Retaliatory Suppression of Plaintiff's Community Participation and Leadership**

122.    Plaintiff's right to contribute to her own community was stripped away as a direct result of her protected activity, undermining the mission of the organization she worked tirelessly to build over four years. The betrayal by trusted community members who were controlled by Fairfax County actors, the loss of an organization Plaintiff helped create, and the coordinated effort to isolate her caused profound emotional harm. Plaintiff's removal from EEAE not only damaged her reputation and community standing but also deprived her of a vital platform for advocacy, leadership, and healing. This community-level retaliation further entrenched the isolation and suppression that Defendants sought to impose and forms a significant component of the ongoing harm described throughout this Complaint.

**Retaliatory Interference with Constitutional Liberty, Educational Freedom, and Familial Integrity**

123.    Defendants' prolonged and targeted retaliation struck at the core of Plaintiff's fundamental rights to **life, liberty, and the pursuit of happiness,** principles recognized in the nation's

founding charter and protected through the Constitution's guarantees of autonomy, due process, and personal freedom. Defendants' conduct deprived Plaintiff of the prime years of her life, years in which she should have been free to pursue her goals, dreams, contribute to her community, and build the personal and professional stability that every individual is entitled to enjoy without private or government interference. Instead, Plaintiff was forced to navigate continuous harassment, reputational harm, and manufactured obstacles that constrained her ability to live her life on her own terms. These government-linked actions intruded upon Plaintiff's freedom to make personal and professional choices without coercion or intimidation, undermining her dignity, autonomy, and ability to pursue the opportunities and dreams that define a meaningful and self-directed life. The harm inflicted was not limited to her career; it permeated every aspect of her existence and continues to impose lasting and compounding consequences.

124.    Defendants' retaliatory conduct, carried out by individuals and government-linked actors, extended beyond Plaintiff and unlawfully intruded into her daughters' educational and developmental opportunities by influencing, constraining, and manipulating their academic and life paths. Despite having no lawful authority to interfere with the daughters' independent educational decisions, Defendants falsified records, interfered with college applications, and obstructed extracurricular and academic opportunities. These actions dismantled the daughters' access to elite peer cohorts, influential faculty mentors, alumni sponsors, fellowship placements, networks essential for advancement into competitive fields and top graduate programs.

The resulting loss of opportunity, combined with reputational and psychological harm, materially altered the daughters' career trajectories, reduced their lifetime earning potential, and diminished their long-term social mobility. These actions were part of the same retaliatory campaign triggered by Plaintiff's protected activity and furthered Defendants' long-term objective of inflicting generational harm and obstructing the family's ability to pursue opportunities without unlawful interference. Through this conduct, Defendants deprived the daughters of constitutionally protected liberty interests, including their rights to educational freedom, personal autonomy, equal access to opportunity, and the ability to pursue meaningful life paths and happiness free from retaliatory intrusion by government-linked actors.

**Pattern of Temporal Proximity and Retaliatory Interference**

125.    Between March and June 2009 – The tension at WSES started when the KG teacher, Ms. Best started to work against the middle daughter where the Plaintiff June 17, 20029 discussed with the principal on at that time Ms. Kathryn Woodley.  Even though the principal seemed to understand and promise that no such things would happen in the future, the assistant principal, Erin Jones at that time had made it a point that she will ensure to interfere in Plaintiff's children's academic opportunities and chased her younger daughter especially throughout her schooling and has caused us so much suffering to this day with the team she organized.

126.    On January 21, 2011 - Plaintiff organized the first international night at her children elementary school West Spring High School that was attended by about 400 people and a very well organized and big event.  Later on, during the coordination this event that took months to prepare, Plaintiff realized that the principal at the time, Erin Jones was not happy about that I

organized this event with a friend and two other parents. That unfortunately increased the tension with the school.

127.    On March 14, 2011, which was two months after the Plaintiff was a recipient of the highest and prestigious award given to an employee, the Booz Allen Value in Practice (VIP) award which honors individuals who are role models for the Firm's Core values in their project delivery, interactions with clients and colleagues, and their personal conduct outside of the office, where she was also offered a paid travel to the Caribbean with all her family, all expense covered by the firm. The Award details included not only the Plaintiff's client delivery and achievement on her projects but also discussed about the international night she organized at her children's school.

128.    While tension between the school intensified, this accolade and admiration also did not last long. Within six months. The same manager who submitted her award started to turn the direct reports under her and even tried to justify that the award may not be the right thing to do.

129.    Early months of 2012, Plaintiff's manager Kristina Francis who has been very supportive turned on against Plaintiff randomly and tried to hold her progress and achievement. The manager even mentioned that Plaintiff was getting visibility.  Plaintiff at that time was very baffled what could cause that in less than a year she submitted her for the highest prestigious award as well as many years of a great working relationship.

Apparently this was the same time that a younger daughter who has now been a target for many years enrolled as a Kindergarten student at west Springfield elementary school in Fairfax County public school where a  KG teacher and the principal Erin Jones were already working

hard against the student to prevent her from getting any advanced programs that prepares students who show the potential to move on to a full time Academic Advancement program in 3rd grade.

The Manager even tried to state in one email that the award she did may not be right. That not only my contribution to the success of a big project I led but acknowledged the international night that I organized in January 2011 which the principal did not like.

As it was extremely difficult to continue leading the project and that Plaintiff was thinking to move to another project, the government client who was equally confused with the turnaround of situation insisted that he could not afford to lose Plaintiff on this project. Plaintiff discussed the situation with the principal and asked to move to another team.

The Plaintiff soon after realizing that Ering Jones was blocking every means for her child to escape her oppression and clean plan working against the child, she requested for her younger daughter to be transferred to Keene Mill elementary which was where her middle daughter already transferred in 3rd grade which she did on December 10, 2012

130.    On April 24, 2012, Plaintiff left her home team at Booz Allen and under a different management continued the project supporting the same client for another two years with success till she found the more serious issues and reported in August 2014 which she was then pushed out of the projects shortly.

131.    Since this was the first pattern of interference Plaintiff was very late to observe, however the extent and level of interference in all parts of her life after the whistleblowing the serious

misconducts and wrong doings related to state testing, gifted testing by filing made the

retaliation very clear.

132.    In projects involving leadership responsibilities or increased visibility, the Plaintiff was

subjected to a hostile work environment, interference, and obstruction of her work. In contrast,

when assigned to low-visibility or short-term developer roles, she received significantly better

treatment. This disparity demonstrates a clear pattern of retaliation aimed at limiting her

professional visibility, controlling her career trajectory, and suppressing her opportunities for

advancement, financial growth, and recognition. For example, on her last project, the Plaintiff

discovered that the slides she had prepared for a weekly project status update were being

presented to senior government clients by another employee, who held a similar level to hers

and was leading a different part of the project under the same overarching program, effectively

denying her credit and visibility.

133.    In August 2014, immediately following the discovery of serious misconduct involving State

assessments and reporting, discussed and filed with DOJ, the Plaintiff was removed from a long-

term project that she had built from the ground up and successfully led for approximately five

years. That project continued to grow for many years where many technical staff joined at

different points. Prior to this removal, the Plaintiff served as a trusted advisor to the client, led a

stable and successful team, and consistently delivered strong results. Following the discovery of

the misconduct, team members were turned against the Plaintiff, her authority was

undermined, and her work environment became hostile. She was removed from her leadership

role without any justification and continued to be accepted only for roles below her experience,

qualifications, and seniority, primarily developer positions that would not have any leadership or visibility roles.

134.     Despite these retaliatory actions, the Plaintiff made continuous, good-faith efforts to preserve her professional standing. She repeatedly requested assignments commensurate with her experience and seniority and sought leadership roles comparable to those she held prior to the onset of retaliation. After being forced off the five-year project she had led, the Plaintiff secured another project at a reduced level of seniority, which lasted approximately one year. Over the next four years, her leadership opportunities, professional visibility, and career advancement steadily deteriorated. She was largely confined to short-term assignments, single-resource roles, or positions in which she functioned solely as a developer. A consistent retaliatory pattern emerged: when the Plaintiff was assigned to low-visibility or short-term roles, she was permitted to perform successfully and, in some cases, received recognition and awards; however, when she obtained leadership roles or assignments that increased her visibility and demonstrated success, management interference escalated, progress was obstructed, and a hostile work environment was created to undermine her performance.

135.     The timing of the termination matches the timing where younger daughter who has been a subject of oppression and retaliation to deter her educational advancement and top remain colleges where the daughter applied to all top schools and did not apply to VA schools that hindered the long term plan that Defendants associated with the Fairfax county public schools scandal w effaced deigned to keep all three daughters in Virginia schools only which was a plan laid out while younger daughter was in elementary school.

136.    Plaintiff alleges that Defendants' actions against her were part of a sustained and

coordinated pattern of retaliation that extended beyond the workplace, targeting both Plaintiff

and her family, including her daughters' educational opportunities.  In or about May 2015,

Plaintiff was called into a meeting with the school principal and assistant superintendents Renne

Miller, Dr. Atwater, and Dr. Brent. During the meeting, Plaintiff was unexpectedly questioned

about whether she would continue to follow up with her students once they were in college. At

the time, this question was confusing and seemingly irrelevant, as Plaintiff's daughters were

then in elementary school, middle school, and early high school, and college attendance was

many years away. In hindsight, Plaintiff recognizes that this inquiry was part of a broader pattern

by school officials to monitor and influence her daughters' educational trajectories and to exert

control over the family's educational decisions. The foreseeability of this interference became

evident over the ensuing years as Plaintiff observed subsequent actions and plans by school

officials and other actors that directly impacted her daughters' educational paths and college

applications.

137.    Plaintiff's termination from employment occurred at a critical juncture when Defendants

were aware that her younger daughter was applying to highly competitive out-of-state

universities, including Ivy League schools, and had intentionally not applied to Virginia

institutions. This decision conflicted with a long-standing expectation, reinforced through

Defendants' association with Fairfax County Public Schools, that Plaintiff's children remain in

Virginia-based educational institutions. Plaintiff alleges that her termination was intended to

financially destabilize her precisely when her daughter's college enrollment decisions were

imminent, thereby exerting pressure to influence or interfere with her daughter's choice of
school.

138.     Plaintiff further alleges that the refusal to provide a salary market adjustment for two
consecutive years prior to her daughter's enrollment, including a reversal of a previously
promised adjustment—aligned with the same objective of making Ivy League attendance
financially impossible. Additionally, numerous scholarship opportunities were interfered with by
school officials, which Plaintiff alleges was part of the same overarching effort to control her
daughters' educational paths. Details of this conduct will be addressed further in the section
regarding Fairfax County Public Schools allegations.

**Retaliatory Divorce Filing, Financial Restriction, and Interference with Educational
Opportunities**

139.     Immediately following her employment termination, Plaintiff's then-husband exhibited a
sudden and dramatic change in behavior, including imposing severe financial restrictions on
Plaintiff. These changes represented a sharp and unjustified departure from prior marital
arrangements and occurred at the precise moment Plaintiff's financial vulnerability had been
created by her termination.

Around the same time, her then-husband-initiated divorce proceedings in Fairfax County Circuit
Court, despite prior assurances that any marital dissolution would be handled outside of court
and notwithstanding his own misconduct. Significantly, the divorce filing occurred the day after
Plaintiff's younger daughter was accepted to Brown University, on May 2, 2024, highlighting the
calculated timing of the action. This timing demonstrates an intent not only to disrupt Plaintiff's
financial stability but also to exert control over her daughters' educational opportunities,

discouraging attendance at Ivy League or other top-tier universities, as part of a broader,
coordinated long-term plan by the Defendants in Fairfax County. The abrupt initiation of
litigation, combined with the imposition of financial restrictions, demonstrates a coordinated
effort to punish Plaintiff at a moment of heightened vulnerability, interfere with her long-term
family and financial planning, and control her children's educational trajectory. These actions
are part of a pattern of retaliation and strategic obstruction designed to maintain leverage over
Plaintiff and undermine her family's future prospects.

140.    Plaintiff further alleges that the divorce proceedings were used as an additional mechanism
of retaliation and financial coercion. The Court openly communicated to Plaintiff that she should
not pursue legal action against Booz Allen, while simultaneously encouraging her then-husband
not to pay for his daughter's tuition despite prior promises he had made. Plaintiff alleges that
the Court was aware of the two-year statutory limitation for her wrongful termination claim but
deliberately allowed the divorce proceedings to be unnecessarily delayed, including
international procedural delays, which extended past the deadline for her potential claims. The
divorce was ultimately granted after seven months of avoidable delay and coercion, in or about
the beginning of this month.

141.    Plaintiff further alleges that the divorce proceedings and resulting rulings disproportionately
and unjustly burdened her financially, including the assignment of full responsibility for marital
debts and assets while her then-husband was relieved of corresponding obligations. Plaintiff
alleges that these proceedings functioned to compound the financial harm caused by her
termination and to exert additional pressure on her family, particularly regarding her daughters'
educational opportunities.

142.    In parallel, Plaintiff and her daughters experienced unusual and restrictive circumstances during the initial financial aid process at Brown University, which Plaintiff alleges were designed to discourage or impede enrollment and mirrored controlling patterns previously observed in connection with Fairfax County Public Schools.

143.    Plaintiff further alleges that Defendants had previously succeeded in interfering with the college applications of her two older daughters, resulting in their enrollment in Virginia-based schools, consistent with a long-term plan to restrict educational mobility. The termination, salary adjustment refusals, scholarship interference, divorce litigation, and financial pressures against Plaintiff at the time of her younger daughter's college application process functioned as an extension of this same pattern, reinforcing Defendants' long-standing objective of exerting control and limiting Plaintiff's family's educational opportunities.

144.    Plaintiff's younger daughter was enrolled in a college preparation program called ADC, which assists students with college applications and has historically helped students gain admission to Ivy League and other top-tier universities. During the time of Plaintiff's older daughters, who remained in Virginia schools, ADC facilitated their applications, but Plaintiff later discovered that one application, submitted on behalf of her older daughter to Duke University, was entirely falsified and never processed. This demonstrated early interference and a pattern of misleading actions intended to restrict her daughters' educational mobility.

145.    On August 19, 2023, the first day of the program, Plaintiff's younger daughter was abruptly removed from ADC while still in the parking lot. Matheos, the founder of ADC, was on the phone and appeared to be receiving instructions from another authority not to accept her.

When Plaintiff's daughter requested to speak with him directly, he continued the discussion with the other authority and refused to allow any direct conversation with Plaintiff or her daughter.

146.    The removal was traumatic and emotionally devastating for the 17-year-old, who was denied participation alongside approximately 100 other students pursuing advanced college opportunities. Plaintiff alleges that this action was retaliatory, occurring after ADC and the group recognized that Plaintiff would continue to actively monitor and question her daughters' college applications. Unlike the older daughters' experience in Virginia, the younger daughter was entirely excluded, demonstrating a coordinated effort to control educational outcomes and prevent access to top-tier colleges outside of Virginia.

147.    Plaintiff alleges that this interference was orchestrated by a coordinated group consisting of certain current and former school officials, and other government or elected officials. The group directed ADC to prevent the younger daughter from attending Ivy League or other top out-of-state colleges, continuing a long-standing plan to keep all daughters in Virginia schools.

148.    Taken together, the temporal proximity of Plaintiff's termination, her then-husband's financial coercion, the divorce proceedings, the 2015 school meeting, the salary and scholarship interference, and the interference with her daughters' college applications demonstrates a sustained, coordinated pattern of retaliatory conduct designed to punish Plaintiff for prior protected activity, exert control over her financial and family decisions, and interfere with her daughters' educational and economic opportunities.

## VI. GENERAL TORTIOUS AND UNLAWFUL CONDUCT

149.    Plaintiff incorporates by reference the allegations contained in the preceding sections of this complaint, including all factual allegations and claims of retaliation, harassment, discrimination, and unlawful actions carried out by Defendants.

The actions of the Defendants, as described in detail in this complaint, constitute a pattern of tortious and unlawful conduct that caused Plaintiff and her children severe emotional distress, loss of income, interference with personal and professional opportunities, and a consistent and ongoing infringement of their rights.

Plaintiff asserts that Defendants' conduct not only violated her constitutional and statutory rights but also directly caused significant harm in the form of financial instability, emotional distress, and a loss of privacy, safety and security. This conduct included but not limited to retaliation through various channels such as employment discrimination, medical interference, unlawful surveillance, tampering with education and social services, and manipulation of legal and financial processes.

In addition to the aforementioned violations, Defendants actions were performed with the intent to harm Plaintiff, her family, and their well-being, thus amounting to intentional infliction of emotional distress, invasion of privacy, and other tortious conduct under applicable law.

## VII. CAUSE OF ACTION

150.    Plaintiff incorporates by reference all the allegations, facts, and claims set forth in the preceding sections of this complaint, including the Introduction, Factual Allegations, and any other relevant sections, as though fully set forth herein. The foregoing facts form the basis of each Count below.

151.    **COUNT I – Whistleblower Retaliation under 42 U.S.C. § 1983**

Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**A. Awareness of Retaliatory Practices**

Plaintiff was a respected and high-performing employee of **Booz Allen**, consistently recognized for her leadership, contributions, and professional achievements. Her career trajectory was strong and stable prior to engaging in protected activity related to reporting serious misconduct affecting her younger daughter.

Immediately following Plaintiff's whistleblowing and protected activity, Defendants began a systematic campaign of retaliation. Plaintiff was removed from projects under pretextual reasons, and Defendants took active steps to control the visibility of her work, limiting her access to high-profile assignments, recognition, and professional opportunities. Team members, including direct reports and colleagues, were influenced, encouraged, or directed by Defendants and their associates to obstruct, undermine, and sabotage her work, creating a hostile and untenable professional environment.

The timing and sequence of events—particularly the adverse actions taken directly after her younger daughter chose not to apply to Virginia schools—demonstrate that Defendants were aware of Plaintiff's protected activity and deliberately sought to punish her. Defendants' conduct included harassment, interference with protected leave, controlling the visibility and impact of her professional contributions, and ultimately termination, all occurring in close temporal proximity to the protected activity.

Circumstantial evidence, including the consistent patterns of retaliatory conduct and coordination among multiple actors, establishes that Defendants had actual or constructive knowledge of Plaintiff's whistleblowing. This awareness, coupled with the retaliatory acts, satisfies the causation requirement under federal whistleblower protections, including 31 U.S.C. § 3730(h), and demonstrates deliberate intent to harm Plaintiff in response to her protected activity.

## B. Summary of Allegations

Plaintiff engaged in protected activity by reviewing, questioning, and reporting misconduct involving Fairfax County Public Schools and related entities, including issues affecting her children's educational records, testing (such as Naglieri gifted testing), and official reports. This activity exposed errors, misrepresentations, and potential misconduct, qualifying as whistleblowing protected under the First Amendment.

Following Plaintiff's protected activity, Defendants engaged in systematic retaliation, including but not limited to:

- Removal from projects and obstruction of professional opportunities.

- Interference with protected leave under FMLA, ADA, Rehabilitation Act, and VWPA.

- Enabling workplace disrespect and bullying.

- Termination from employment, causing financial loss and professional instability.

- Refusal to apply companywide and individual market salary adjustments over multiple years, notwithstanding the Plaintiff's compensation being at the 48th percentile compared to

similarly situated peers, and despite repeated requests over the three years preceding the Plaintiff's departure.

- Interference with property management and rental operations, including using tenants and property-related obligations to create financial instability.

- Manipulation of family court proceedings, custody arrangements, and children's educational opportunities, including attempts to limit access to higher education and long-term academic advantages.

- Mischaracterization of Plaintiff's actions, including claims that she "left voluntarily" and "did not use resources provided to find projects," despite clear evidence and documentation to the contrary.

- Preferential treatment of Plaintiff's ex-husband despite his misconduct, compounding Plaintiff's disadvantage in family court and other proceedings.

- Coordinated harassment, intimidation, and obstruction across professional, personal, and family domains.

## C. Direct Link Between Protected Activity and Retaliation

Plaintiff's engagement in protected whistleblowing activity was the motivating factor behind Defendants' retaliatory conduct. Each adverse action, including removal from projects, obstruction of leave, refusal of salary increase, termination, interference with property and rental management, family court manipulation, and harassment, was taken because Plaintiff exposed misconduct and asserted her legal rights.

These retaliatory actions were designed to:

1.  Punish Plaintiff for engaging in legally protected whistleblowing.

2.  Obstruct her ability to pursue remedies or assert her constitutional and statutory rights.

3.  Disrupt her personal, professional, and family life, including her children's educational and career opportunities.

The clear and direct causal connection between Plaintiff's protected activity and the Defendants' retaliation establish a violation of 42 U.S.C. §1983 and Plaintiff's First Amendment rights.

### D. Legal Basis

*   42 U.S.C. § 1983: Retaliation by state actors under color of law for engaging in protected whistleblower activity.

*   First Amendment: Retaliatory actions were taken in direct response to Plaintiff's exercise of free speech and petitioning the government to expose misconduct.

*   Fourteenth Amendment – Procedural Due Process: Defendants' interference with Plaintiff's employment, property, family court matters, and access to educational and professional opportunities deprived her of fundamental rights and fair processes.

### E. Relief Sought

Plaintiff respectfully requests that the Court award the following relief:

1. Compensatory damages, punitive damages, and attorneys' fees described in the Prayer for Relief *in Sections A–D* as to this Count

2. Injunctive and Declaratory Relief

   a. Enjoin continued retaliation against Plaintiff in her employment, family, property, and educational matters.

   b. Declare that Defendants' actions violated Plaintiff's constitutional and statutory rights.

3. Any Other Relief

   a. That the Court deems just and proper to fully redress the harm suffered by Plaintiff, her children, and her family, including future harm traceable to Defendants' ongoing unlawful practices.

152. **COUNT II — Coordinated Civil Rights Retaliation Across Domains (42 U.S.C. § 1983)**

Plaintiff incorporates all preceding allegations as though fully set forth herein.

**A. Summary of Allegations**

- Plaintiff engaged in protected activity by filing complaints with federal agencies, including the Department of Justice and the Department of Education. Following these actions, Defendants—including Fairfax County actors, government-associated individuals, Booz Allen leadership personnel, and other private participants, jointly engaged in coordinated actions to interfere with Plaintiff's federally protected rights.

- Defendants acted under color of state law, and private-sector Defendants acted in concert with state actors to carry out the challenged conduct. These actions were intentional, coordinated, and undertaken for the shared purpose of punishing Plaintiff for asserting her rights.

- Retaliation occurred at Booz Allen through sustained workplace bullying, exclusion, professional isolation, blocking access to projects and advancement opportunities, and engineering Plaintiff's termination.

- Defendants blocked Plaintiff's salary and compensation adjustments, including withholding a correction for under-compensation below the 48th percentile of the expected pay range, further evidencing retaliation for her protected activity.

- The pattern of false accusations, threats, and intimidation began in July 2015 at Keene Mill Elementary School (KMES), when Plaintiff was falsely accused of "disruption" and issued an improper notice of trespass after requesting her children's academic assessment data. The principal's threats and actions were intended to intimidate Plaintiff and prevent her from uncovering discrepancies between online and paper assessment reports.

- This marked the beginning of a long-term pattern of retaliation, repeated across multiple years and settings, including interference with medical services, legal services, insurance providers, title companies, real estate transactions, tenants, contractors, and essential personal and professional services.

- Retaliation also extended to family court proceedings, college applications, and educational opportunities for Plaintiff's children, including deliberate efforts to restrict access to Ivy League and other higher education options.

- Plaintiff asserts that these actions were malicious and intended to destabilize her financial security, personal stability, and ability to function in daily life.

- Key events demonstrate coordination, including Plaintiff's termination after approximately fifteen years of service and the filing of divorce proceedings immediately after her daughter's admission to **Brown University**, despite prior plans for out-of-court resolution.

## B. Judicial and Corporate Interference

- **Divorce Court Conduct:**

  o The court repeatedly mischaracterized Plaintiff's circumstances, claiming she "did not use support provided," "left voluntarily," "refused severance," and "threatened to sue," despite evidence and testimony to the contrary.

  o Court actions favored Booz Allen and Plaintiff's ex-husband, intentionally delayed proceedings, canceled hearings without explanation, and discouraged Plaintiff from pursuing legal action against Booz Allen.

  o These actions interfered with Plaintiff's right to due process under the **Fourteenth Amendment** and her ability to protect her family and assert federally protected rights.

- **Corporate Interference:**

  o  Booz Allen, in coordination with Fairfax County actors and other participants, obstructed Plaintiff's access to employment opportunities, professional growth, and legal remedies.

  o  Termination and workplace obstruction were part of a coordinated retaliatory scheme, directly linked to Plaintiff's engagement in protected activity.

## C. Legal Basis

1. **42 U.S.C. § 1983 – Deprivation of Constitutional Rights Under Color of State Law**

   o  Defendants and the divorce court interfered with procedural due process, engaged in retaliatory conduct, and deprived Plaintiff of fair adjudication and access to legal remedies.

2. **42 U.S.C. § 1985(2) – Conspiracy to Interfere with Legal Proceedings**

   o  Defendants conspired to deter, intimidate, and retaliate against Plaintiff for participation in legal proceedings and exercising federal rights.

   o  Conduct included school harassment, workplace bullying, interference with tenants and property management, obstruction in family court, and interference with medical, legal, and insurance services.

3. **42 U.S.C. § 1985(3) – Conspiracy to Interfere with Civil Rights**

- Defendants conspired to deprive Plaintiff of equal protection, fair employment, educational opportunities for her children, and access to legal remedies.

- Conduct involved coordinated threats, intimidation, obstruction, and retaliatory actions across multiple domains of Plaintiff's life.

## D. Employment-Related Interference

- Blocking access to projects, enabling or ignoring workplace bullying, and engineering termination.

- Retaliatory animus tied directly to Plaintiff's federally protected activity.

## Salary and Compensation Retaliation:

- As part of Defendants' retaliatory conduct following Plaintiff's protected activity, Plaintiff's salary and compensation adjustments were blocked and delayed.

- On one occasion, Plaintiff was informed by her manager that she was eligible for an adjustment to correct under-compensation (below the 48th percentile of the expected pay range). Despite her qualifications and performance, Defendants prevented and withheld the increase for at least two years.

- This adverse employment action further evidences retaliation taken because of Plaintiff's protected activity.

- Termination resulted in loss of professional opportunities, income, workplace protections, and long-term career harm.

### E. Interference with Personal Life, Services, and Property

- Obstruction and intimidation in accessing medical, legal, insurance, real estate, and professional services.

- Exploitation of tenants and property management processes to create financial instability.

- Interference with family court processes to impose financial hardship and obstruct management of personal, family, and professional affairs.

- Manipulation of children's educational and college opportunities, restricting access to top-tier universities and limiting long-term social mobility.

**Intent:**

These acts were willful, malicious, and undertaken to retaliate for protected activity, destabilize the family, and interfere with federally protected rights.

### F. Damages

### 1. Employment & Professional Harm

- Loss of income, benefits, and career advancement.

- Reputational harm and obstruction of professional opportunities.

- Emotional distress, trauma, and professional isolation.

### 2. Property, Services, and Family Impact

- Financial harm, including rental income disruption and costs imposed by interference with property management.

- Health impacts due to restricted access to medical services for Plaintiff and her children.

- Educational and career restrictions for children, limiting college access and social mobility.

- Destabilization of family unit, interference with parental authority, and long-term psychological harm.

- Obstruction of legal remedies, including delays, mischaracterizations, and procedural manipulations in family court.

**Overall Impact:**

Cumulative, coordinated conspiracies by Defendants resulted in financial, professional, educational, emotional, and familial harm to Plaintiff and her children.

**G. Relief Sought**

Plaintiff, on behalf of herself, her children, and her family unit, respectfully requests that the Court award the following relief:

- Compensatory damages, punitive damages, and attorneys' fees described in the Prayer for Relief in Sections A–D as to this Count

- Injunctive Relief described in the Prayer for Relief in Sections F (1-5) as to this Count

- Declaratory Relief described in the Prayer for Relief in Sections E (1-4) as to this Count

- Restitution and Financial Relief described in the Prayer for Relief in Sections D

- **Privacy and Surveillance in the Prayer for Relief in Sections F6**

- **Pre- and Post-Judgment Interest On all economic and non-economic damages awarded.**

- **Any other relief the Court deems just and proper. to fully redress the harm suffered by Plaintiff, her children, and her family unit, including any future harm traceable to Defendants' ongoing unlawful practices.**

153.  **COUNT III — INVASION AND VIOLATION OF PRIVACY, UNAUTHORIZED SURVEILLANCE, AND EMOTIONAL DISTRESS**

Plaintiff incorporates by reference all preceding factual allegations, fully set forth herein.

**Statutes Violated:** Fourth Amendment (U.S. Constitution), Fourteenth Amendment (U.S. Constitution), Electronic Communications Privacy Act (18 U.S.C. § 2510 et seq.), Common Law Invasion of Privacy, Intrusion upon Seclusion

**Summary of Allegations:**

1.  Plaintiff realleges and incorporates all preceding paragraphs.

2.  Plaintiff alleges that the extensive interference with her personal, professional, and family life, including real-time retaliation, obstruction of legal remedies, manipulation of educational opportunities, and coercion in workplace and property matters—could only have been accomplished through the unauthorized surveillance and monitoring described herein. The coordination, timing, and precision of these acts demonstrate that Defendants had detailed knowledge of Plaintiff's actions, communications, and whereabouts. Such knowledge could only have been obtained through the deliberate interception of electronic

communications, covert observation, and intrusion into Plaintiff's private affairs. These surveillance activities directly facilitated and enabled the ongoing harassment, intimidation, and obstruction of Plaintiff's federally and constitutionally protected rights.

3.  Defendants, including Fairfax County actors, government officials, Booz Allen, corporate agents, and any third parties acting in concert, are directly responsible for orchestrating and carrying out the unlawful surveillance and privacy violations. These individuals acted with full knowledge of the unlawfulness of their actions and with the specific intent to harm Plaintiff by infringing upon her fundamental rights.

4.  Defendants, acting either individually or in concert, intentionally and unlawfully surveilled Plaintiff's communications, personal activities, and private information, without consent or legal authorization. This surveillance included both electronic communications (such as phone calls, emails, texts, and social media activity) as well as in-person monitoring. The surveillance occurred consistently over a 13-year period.

5.  **Electronic Communications Privacy Act (ECPA):** Under 18 U.S.C. § 2510 et seq., the interception or unauthorized surveillance of private communications is prohibited. Defendants engaged in the unlawful interception of Plaintiff's communications, which violated her rights under the ECPA. These acts also constituted unlawful surveillance of her private affairs and conversations, damaging Plaintiff's ability to carry out her life without fear of constant monitoring.

6.  **Constitutional Violations:** The Defendants' actions also constituted violations of Plaintiff's rights under the Fourth Amendment (protection against unreasonable searches and

seizures) and Fourteenth Amendment (guaranteeing equal protection and due process) of the U.S. Constitution. The unlawful surveillance interfered with Plaintiff's personal privacy and autonomy, which are protected under the Constitution.

7. **Malicious Intent**: The surveillance was not an isolated, incidental act but part of a calculated and intentional campaign by Defendants to intimidate, control, and manipulate Plaintiff through fear and the violation of her privacy. This conduct was designed to interfere with Plaintiff's personal life, and the information obtained through surveillance was used to manipulate, threaten, and retaliate against Plaintiff, particularly in connection to her whistleblowing activities.

8. **Intrusion upon Seclusion**: In addition to the constitutional violations and ECPA violations, Defendants' actions also represent an intrusion upon Plaintiff's seclusion, an actionable offense under common law. This is reflected in the extreme and deliberate nature of the surveillance, which caused Plaintiff severe emotional and psychological harm, including anxiety, fear, and distress.

9. **Emotional Distress**: The unlawful surveillance and invasion of privacy caused Plaintiff significant emotional distress, psychological trauma, and long-term mental health impacts. The continuous and sustained nature of the surveillance made it difficult for Plaintiff to live a normal, free life. The violation of her privacy rights has had a lasting effect on her well-being, leading to anxiety, sleep disturbances, heightened stress, and a persistent fear of further retaliation.

10. **Ongoing Harm:** The surveillance was not limited to a short period but continued over an extended period, deepening the emotional trauma caused to Plaintiff. The prolonged nature of the surveillance has had a lasting impact on her ability to feel safe, secure, and free from governmental or corporate intrusion.

**Damages for Count IV (Violation of Privacy, Unauthorized Surveillance, and Emotional Distress)**

As a direct and proximate result of Defendants' unlawful surveillance, invasion of privacy, and related conduct, Plaintiff suffered substantial and continuing damages, including:

- **Retaliatory Control and Interference with Life Activities:**
  Defendants used unauthorized surveillance as a tool to retaliate against Plaintiff and interfere with her ability to live independently and exercise autonomy over her personal, professional, and family life. The surveillance enabled Defendants to anticipate her actions and deliberately obstruct access to services, opportunities, and legal remedies.

- **Interference with Services and Daily Functioning:**
  The misuse of surveillance facilitated coordinated interference with Plaintiff's access to essential services, including medical, legal, insurance, educational, and professional services. Plaintiff altered or avoided routine activities out of fear of further retaliation, resulting in long-term disruption to her ability to function normally.

- **Manipulation of Children's Opportunities and Future:**
  Defendants' surveillance and misuse of private information interfered with Plaintiff's

ability to advocate for her children's education, restricting their access to Ivy League and other higher education opportunities, disrupting academic planning, and diverting their life trajectories, future opportunities, and social mobility.

- **Family Impact and Stability:**
  The surveillance and retaliatory interference destabilized the family unit, impaired familial relationships, and diverted Plaintiff's time and resources away from protecting her rights and supporting her family. The intrusion created ongoing stress, fear, and uncertainty affecting family cohesion and long-term stability.

- **Loss of Privacy, Autonomy, and Personal Security:**
  Plaintiff's ability to make personal, professional, and familial decisions without fear of monitoring was destroyed, undermining her independence, dignity, and control over her life. This deprivation of personal security altered how she and her children interacted with others and planned their futures.

- **Financial and Practical Harm:**
  Unauthorized surveillance enabled interference with property management, tenant relations, and personal business, causing financial hardship and obstructing Plaintiff from fully exercising her legal and business rights.

- **Emotional and Psychological Harm:**
  Plaintiff and her children suffered severe emotional distress, anxiety, humiliation, and psychological trauma caused by prolonged surveillance, coercive control, and retaliatory interference with their lives, opportunities, and relationships.

- **Long-Term and Continuing Harm:**

  The impact of Defendants' conduct extends beyond the period of surveillance itself, resulting in enduring harm to Plaintiff's mental health, family stability, professional prospects, and her children's educational and life opportunities.

**Relief Sought**

Plaintiff, on behalf of herself, her children, and her family unit, respectfully requests that the Court award the following relief:

- Compensatory damages, punitive damages, and attorneys' fees described in the Prayer for Relief in Sections A–D as to this Count

- Injunctive Relief described in the Prayer for Relief in Sections F (1-5) as to this Count

- Declaratory Relief described in the Prayer for Relief in Sections E (1-4) as to this Count

- Restitution and Financial Relief described in the Prayer for Relief in Sections D

- Privacy and Surveillance in the Prayer for Relief in Sections F6

- Pre- and Post-Judgment Interest On all economic and non-economic damages awarded.

- Any other relief the Court deems just and proper. to fully redress the harm suffered by Plaintiff, her children, and her family unit, including any future harm traceable to Defendants' ongoing unlawful practices.

154.   **COUNT IV – Deprivation of Rights Under Color of State Law (42 U.S.C. § 1983)**

Plaintiff incorporates by reference all preceding factual allegations, including Section I.A, Awareness of Retaliatory Practices, as if fully set forth herein.

**Summary of Allegations**

Defendants acting under color of state law, or in concert with state actors, deprived Plaintiff of rights secured by the Constitution and laws of the United States, including her rights to equal protection, due process, and freedom from retaliation for protected activity.

State actors, including county officials, school personnel, or other government employees, participated in or enabled the retaliatory scheme, provided information or support to private actors, or took actions that furthered the deprivation of Plaintiff's rights. Private actors who jointly engaged with state officials acted under color of law for purposes of § 1983.

**Violations/Legal Basis**

Plaintiff states a claim under 42 U.S.C. § 1983 because:

- Defendants acted under color of state law, or jointly with state actors

- Defendants deprived Plaintiff of rights secured by the Constitution and federal law

- Defendants' actions were intentional, malicious, and retaliatory

- Plaintiff suffered injury as a direct result

**Damages**

Plaintiff has suffered significant harm as a result of Defendants' unlawful conduct, including violations of her constitutional rights, severe emotional distress, damage to her personal and professional reputation, substantial economic losses, and long-term adverse effects on her career.

**Relief Sought**

Compensatory damages, punitive damages, and attorneys' fees described in the **Prayer for Relief in Sections A–D** as to this Count

4.  Injunctive Relief described in the Prayer for Relief in Sections F (1-5) as to this Count

5.  Declaratory Relief described in the Prayer for Relief in Sections E (1-4)

6.  Restitution and Financial Relief described in the Prayer for Relief in Sections D

7.  Privacy and Surveillance in the Prayer for Relief in Sections F6

8.  Pre- and Post-Judgment Interest On all economic and non-economic damages awarded.

9.  Plaintiff requests that the Court appoint a monitor to oversee compliance with any injunctive or declaratory relief awarded in Count IV, receive regular reports from Defendants regarding corrective actions, and make recommendations to the Court to prevent future violations of Plaintiff's constitutional and statutory rights.

155.   **COUNT V - Retaliation Under the False Claims Act (31 U.S.C. § 3730(h))**

**Incorporation of Allegations**

Plaintiff incorporates by reference all of the preceding factual allegations set forth above, including Section I.A, Awareness of Retaliatory Practices, as if fully set forth herein.

**Summary of Allegations**

Plaintiff, a highly respected and accomplished employee of **Booz Allen**, engaged in protected activity under the False Claims Act by reporting, objecting to, or attempting to stop misconduct involving federal funds, including actions she reasonably believed constituted violations of federal law. Immediately after engaging in this protected activity, Plaintiff became the target of

escalating retaliatory measures designed to punish her for speaking up and to deter further protected activity.

Defendant Booz Allen removed Plaintiff from high-visibility projects, stripped her of leadership responsibilities, and excluded her from opportunities essential to her career advancement. These adverse actions occurred in close temporal proximity to her protected disclosures, demonstrating a direct causal connection between her whistleblowing and the retaliation she endured.

In April 2020, within one week of returning from approved medical leave, Plaintiff discovered that her position had been replaced and she had been removed from her project under a false pretext of "funding concerns." No other team members were removed. This action occurred shortly after her protected whistleblowing activity and further demonstrates retaliatory intent.

The retaliation was not limited to formal employment actions. Defendant Booz Allen orchestrated a broader campaign of retaliatory isolation and professional sabotage. Colleagues and team members were influenced, encouraged, or manipulated to obstruct Plaintiff's work, undermine her authority, and create a hostile and destabilizing work environment. Plaintiff was intentionally excluded from meetings, denied access to critical information, removed from collaborative channels, and cut off from the resources necessary to perform her job effectively.

This pattern of retaliatory isolation was deliberate, sustained, and calculated to marginalize Plaintiff, damage her professional standing, and force her out of the organization. Ultimately, Defendant Booz Allen's coordinated actions culminated in Plaintiff's termination, completing the retaliatory scheme triggered by her protected efforts to prevent fraud against the United States.

**Violation**

Defendants' actions constitute a direct violation of the False Claims Act anti-retaliation provision, 31 U.S.C. § 3730(h), which prohibits employers from discriminating against employees who lawfully engage in protected whistleblowing. Plaintiff was terminated and denied career opportunities as a result of reporting or attempting to stop federal fraud, satisfying the statute's requirements for retaliation claims.

**Legal Basis:**

Under 31 U.S.C. § 3730(h), any employee who is discharged, demoted, suspended, threatened, or discriminated against in the terms and conditions of employment for lawful acts done in furtherance of an FCA claim is entitled to protection. The law protects employees who: (i) investigate or report fraud against the federal government; (ii) refuse to participate in FCA violations; and (iii) engage in conduct aimed at preventing federal law violations. Here, Plaintiff's protected activities triggered retaliatory measures, including removal from projects, hostile work environment actions, and termination. These acts meet the statutory standard for adverse employment actions linked to protected activity. Circumstantial evidence, including the timing of termination and coordination of colleagues against Plaintiff, establishes that **Booz Allen** had knowledge of, and actively participated in, the retaliatory conduct.

**Damages**

As a direct and proximate result of Defendant Booz Allen's retaliation, Plaintiff suffered severe emotional distress, exacerbation of an existing medical condition, prolonged physical and emotional suffering, reputational harm, loss of enjoyment of life, and harm to her career

trajectory. The retaliation also caused ongoing professional and personal disruption by undermining her standing in the workplace and broader community.

**Relief Sought**

Plaintiff seeks all relief authorized under 31 U.S.C. § 3730(h), including:

1. Compensatory damages, punitive damages, and attorneys' fees described in the **Prayer for Relief** in **Sections A–D** as to this Count

2. Injunctive Relief described in the **Prayer for Relief** in **Sections F (1-5)** as to this Count

3. Declaratory Relief described in the **Prayer for Relief** in **Sections E (1-4)**

4. Privacy and Surveillance in the **Prayer for Relief** in **Sections F6**

5. Restitution and Financial Relief described in the **Prayer for Relief** in **Sections D**

6. Pre- and Post-Judgment Interest On all economic and non-economic damages awarded.

7. Any other relief the Court deems just and proper

156. **COUNT VI— FMLA Interference and Retaliation (29 U.S.C. § 2615)**

**Incorporation of Prior Allegations**

Plaintiff incorporates all preceding allegations, including Defendant Booz Allen's awareness of her approved medical leave and her need for medically necessary time away from work.

**Summary of Allegations**

Plaintiff took approved medical leave in early 2020. Within approximately one week of her return in April 2020, Plaintiff discovered that her position had been replaced and she had been removed from her project under a false pretext of "funding concerns." No other team members were removed. Defendant Booz Allen used Plaintiff's protected medical leave as a negative factor in employment decisions and interfered with her ability to resume her position and responsibilities.

**Violation**

Defendant Booz Allen interfered with Plaintiff's rights under the Family and Medical Leave Act and retaliated against her for taking protected leave, in violation of 29 U.S.C. § 2615.

**Damages**

As a direct result of Defendant's unlawful conduct, Plaintiff suffered:

- severe emotional distress;

- exacerbation of an existing medical condition;

- prolonged physical and emotional suffering;

- reputational harm;

- disruption to her professional stability and well-being.

**Relief Sought**

Plaintiff seeks all remedies available under the FMLA.

157.     **COUNT VII — ADA Retaliation (42 U.S.C. § 12203)**

*(Against Defendant Booz Allen)*

Plaintiff incorporates all preceding allegations,

**Summary of Allegations**

After Plaintiff exercised rights protected by the Americans with Disabilities Act, including taking medically necessary leave, Defendant Booz Allen retaliated by removing her from assignments, isolating her professionally, and obstructing her work. The April 2020 removal from her project occurred shortly after her return from medical leave and was based on a false justification of "funding concerns," despite no other team members being removed.

**Violation**

Defendant Booz Allen retaliated against Plaintiff for exercising rights protected by the ADA, in violation of 42 U.S.C. § 12203.

**Damages**

As a direct result of Defendant's retaliation, Plaintiff suffered:

- severe emotional distress;

- aggravation of an existing medical condition;

- prolonged physical and emotional suffering;

- reputational harm;

- diminished well-being and professional stability.

**Relief Sought**

Plaintiff seeks all remedies available under the ADA.

158.    **COUNT VIII- Rehabilitation Act Retaliation (29 U.S.C. § 794(d))**

*(Against Defendant Booz Allen)*

**Incorporation of Prior Allegations**

Plaintiff incorporates all preceding allegations, including Defendant Booz Allen's status as a federal contractor subject to the Rehabilitation Act and its awareness of Plaintiff's disability-related rights.

**Summary of Allegations**

Defendant Booz Allen retaliated against Plaintiff for exercising rights protected by the Rehabilitation Act by removing her from assignments, obstructing her work, and isolating her professionally. The April 2020 removal from her project occurred shortly after her return from approved medical leave and was based on a false pretext of "funding concerns," despite no other team members being displaced.

**Violation**

Defendant Booz Allen's conduct constitutes retaliation prohibited by 29 U.S.C. § 794(d).

**Damages**

As a direct result of Defendant's unlawful conduct, Plaintiff suffered:

- severe emotional distress;

- exacerbation of an existing medical condition;

- prolonged physical symptoms;

- reputational harm;

- long-term emotional and physical strain.

**Relief Sought**

Plaintiff seeks all remedies available under the Rehabilitation Act.

If you want, I can now:

- assemble all four federal counts + the VWPA count into a clean, ready-to-file section

- help you draft the **tort claims** (which *can* include FCPS actors)

or help you revise your factual background so everything flows smoothly

159.    **COUNT IX- Retaliatory Hostile Work Environment (31 U.S.C. § 3730(h))**

**Incorporation of Prior Allegations**

Plaintiff incorporates by reference all preceding factual allegations set forth above, including the Awareness of Retaliatory Practices in Section I.A, which establishes that Defendant Booz Allen was aware of Plaintiff's protected activity and may have actively participated in retaliatory actions.

**Summary of Allegations**

Plaintiff, a respected and successful employee of Booz Allen, engaged in protected activity under the False Claims Act by reporting or attempting to stop misconduct involving federal funds. Immediately thereafter, Plaintiff experienced a hostile work environment directly linked

to her whistleblowing. Team members, including direct reports and colleagues, were systematically turned against her. Colleagues were influenced or encouraged by Defendant and its associates to obstruct, disrespect, and sabotage her work, creating a sustained pattern of intimidation, exclusion, and harassment.

Defendants engaged in retaliatory isolation by excluding Plaintiff from meetings, removing her from high-visibility projects, undermining her authority, and intentionally cutting her off from colleagues and resources necessary to perform her job. This hostile environment persisted for years and was deliberately designed to punish Plaintiff for her protected activity.

### Violation / Wrongful Act

Defendant Booz Allen created, tolerated, and perpetuated a hostile work environment in retaliation for Plaintiff's protected activity, in violation of 31 U.S.C. § 3730(h). The adverse conditions were deliberately designed to punish Plaintiff, impede her professional growth, and force her out of the organization.

### Legal Basis

Under 31 U.S.C. § 3730(h), employees who engage in protected whistleblowing are safeguarded against retaliation, including harassment, intimidation, or the creation of a hostile or abusive workplace. By systematically undermining Plaintiff's role, orchestrating colleagues to act against her, and creating a hostile environment, Defendant knowingly and intentionally violated the FCA's anti-retaliation provision.

### Damages

As a direct result of Defendant's conduct, Plaintiff suffered substantial economic and

non-economic harm, including:

- Emotional distress persisting for years during employment and continuing after termination

- Disruption to professional growth, loss of opportunities, and reputational harm

- Interference with her ability to perform duties and lead teams effectively

- Compounded stress impacting personal and family life

**Relief Sought**

Plaintiff seeks:

1. Compensatory damages for economic and non-economic harm

2. Punitive damages due to Defendant's willful, knowing, and malicious retaliation

3. Injunctive relief preventing further retaliation

4. Pre- and post-judgment interest, costs, and reasonable attorneys' fees

5. Any additional relief the Court deems just and proper

160.  **COUNT X — Violation of the Virginia Whistleblower Protection Act (Va. Code § 40.1-27.3)**

**Incorporation of Prior Allegations:**

Plaintiff incorporates by reference all preceding factual allegations set forth above, including the

Awareness of Retaliatory Practices in Section I.A, establishing that the Defendant Booz Allen was

aware of Plaintiff's engagement in protected activity and intentionally retaliated against her for

exercising her legal rights.

**Summary of Allegations:**

Plaintiff reported misconduct by Fairfax County Public Schools (FCPS), including unethical actions and irregularities involving state assessments, gifted testing, and other educational procedures affecting her children. Following these protected activities, Defendant Booz Allen subjected Plaintiff to adverse employment actions, including demotion, removal from projects, exclusion from critical assignments, and ongoing workplace harassment. These retaliatory acts disrupted her career trajectory, caused professional and personal harm, and created a sustained hostile environment that persisted for ten years during her employment and for two years after her termination.

**Violation:**

The Defendant Booz Allen violated the Virginia Whistleblower Protection Act by taking adverse employment actions against Plaintiff because of her lawful reports and opposition to misconduct. The Defendant's conduct—removing Plaintiff from projects, limiting her career advancement, and orchestrating a hostile work environment—constitutes intentional retaliation prohibited under Va. Code § 40.1-27.3.

**Legal Bases:**

Va. Code § 40.1-27.3 protects employees from retaliation for reporting violations of law, opposing unlawful conduct, or engaging in legally protected whistleblowing activities. The statute recognizes that retaliation may occur through adverse actions, harassment, or other interference with employment terms, even if termination does not occur. The Defendant's deliberate interference with Plaintiff's projects, promotion opportunities, and workplace relationships demonstrates knowing and intentional violations of the statute. Legal precedent

under the VWPA allows employees to recover for both economic losses and non-economic

harms, including emotional distress caused by retaliatory conduct.

**Damages:**

As a direct consequence of Defendant's unlawful actions, Plaintiff suffered:

- Emotional distress lasting approximately ten years during employment and continuing
  for two years post-termination;

- Exacerbation of an existing medical condition, resulting in prolonged physical and
  emotional suffering;

- Loss of career advancement opportunities, professional recognition, and **loss of income
  following her termination**, along with diminished future earning capacity;

- Ongoing interference with her professional reputation, authority, and workplace
  relationships;

- Personal and family disruption caused by stress and the ongoing retaliatory conduct.

**Relief Sought:**

Plaintiff seeks:

1. Compensatory damages for economic and non-economic losses incurred due to the
   Defendant's actions;

2. Punitive damages: Plaintiff is entitled to punitive damages due to the willful, knowing,
   and malicious nature of the Defendant's retaliation. The Defendant's orchestration of

colleagues and intentional creation of an untenable work environment demonstrates conscious disregard for Plaintiff's rights and well-being;

3. Injunctive relief prohibiting further retaliatory actions against Plaintiff or similarly situated employees;

4. Pre- and post-judgment interest, costs, and reasonable attorneys' fees; and

5. Any additional relief the Court deems just and proper, including remedies addressing the long-term personal, professional, and emotional harm suffered by Plaintiff.

161. **COUNT XI – Statutory Conspiracy (Va. Code §§ 18.2-499 and 18.2-500)**

**Incorporation of Prior Allegations**

Plaintiff incorporates by reference all preceding factual allegations set forth above, including the Awareness of Retaliatory Practices in Section I.A, which establishes that Booz Allen employees, Fairfax County actors, and other government actors were aware of Plaintiff's protected activity and coordinated actions against her.

**Summary of Allegations**

Booz Allen employees, Fairfax County actors, and other government actors combined, associated, agreed, and mutually undertook to injure Plaintiff in her profession, reputation, and employment. These actors exchanged retaliatory information, coordinated adverse actions, and jointly acted to undermine Plaintiff's professional standing, remove her from projects, obstruct her career advancement, and destabilize her employment relationship with Booz Allen.

The conspirators acted with malice and with the specific intent to retaliate against Plaintiff for her protected activity, to interfere with her employment, and to force her removal from Booz Allen. Their coordinated conduct included blocking Plaintiff from projects, enabling bullying and exclusion, isolating her professionally, and manipulating internal processes to undermine her role. The timing of Plaintiff's termination was deliberately aligned with a critical moment in the long-term plan targeting her daughter's educational trajectory, demonstrating a level of coordination and retaliatory purpose far beyond ordinary workplace disputes. These actions were undertaken knowingly, intentionally, and with the shared purpose of harming Plaintiff's livelihood, destabilizing her family, and deterring her from exercising her legal rights.

Improper Methods

The conspirators employed improper methods, including:

- knowingly providing false or misleading information

- retaliatory communications connected to Plaintiff's protected activity

- coordinated pressure on Booz Allen to remove Plaintiff from assignments

- interference with protected leave and accommodation rights

- orchestrated isolation, exclusion, and sabotage

- malicious conduct designed to damage Plaintiff's professional reputation

These actions were not legitimate business decisions but were undertaken with the specific purpose of injuring Plaintiff.

**Violation of Va. Code §§ 18.2-499 & 18.2-500**

**Under Virginia law, it is unlawful for two or more persons to combine for the purpose of:**

1. **Willfully and maliciously injuring another in her reputation, trade, business, or profession, or**

2. **Willfully and maliciously compelling another to do or not do an act she has a right to do.**

**Booz Allen employees, Fairfax County actors, and other government actors engaged in such a combination. Their actions were willful, malicious, and intended to injure Plaintiff in her profession and employment.**

**Damages**

**As a direct and proximate result of the statutory conspiracy, Plaintiff suffered:**

- **Loss of income and project-based compensation**

- **Damage to professional reputation and credibility**

- **Loss of advancement opportunities and leadership roles**

- **Emotional distress and long-term psychological harm**

- **Professional instability and diminished career prospects**

**Relief Sought**

**Plaintiff seeks:**

1. **Treble damages as mandated by Va. Code § 18.2-500**

2. Attorneys' fees and costs

3. Pre- and post-judgment interest

4. Any additional relief the Court deems just and proper

162. **COUNT XII — Retaliatory Hostile Work Environment** (Va. Code § 40.1-27.3)

**Incorporation of Prior Allegations**

Plaintiff incorporates by reference all preceding factual allegations set forth above, including the Awareness of Retaliatory Practices in Section I.A, which establishes that Defendant Booz Allen was aware of Plaintiff's protected activity and may have actively participated in retaliatory actions.

**Summary of Allegations**

Plaintiff engaged in protected activity under the Virginia Whistleblower Protection Act by reporting or attempting to stop misconduct. Following this activity, Plaintiff was subjected to a hostile work environment intentionally engineered to punish her for speaking up. Colleagues were influenced or encouraged to obstruct her work, disrespect her authority, and sabotage her professional standing. Plaintiff was excluded from meetings, removed from projects, denied access to essential information, and intentionally isolated from her team.

This pattern of retaliatory isolation and harassment persisted for years and was designed to coerce, humiliate, and ultimately force Plaintiff out of her position.

**Violation / Wrongful Act**

Defendant Booz Allen created, tolerated, and perpetuated a hostile work environment in retaliation for Plaintiff's protected activity, in violation of Va. Code § 40.1-27.3. The retaliatory conduct was deliberate, malicious, and intended to interfere with Plaintiff's employment conditions.

**Legal Basis**

Va. Code § 40.1-27.3 prohibits employers from retaliating against employees who report wrongdoing or refuse to engage in unlawful acts. Retaliation includes harassment, intimidation, coercion, or any adverse action that would dissuade a reasonable employee from engaging in protected activity. Defendant's actions—including orchestrating colleagues to undermine Plaintiff and creating a hostile environment—constitute unlawful retaliation under Virginia law.

**Damages**

As a direct result of Defendant's conduct, Plaintiff suffered:

- Emotional distress and psychological harm

- Loss of professional opportunities and reputational damage

- Interference with her ability to perform her job

- Long-term personal and professional consequences

**Relief Sought**

Plaintiff seeks:

1. Compensatory damages for economic and non-economic harm

2.   Injunctive relief preventing further retaliation

3.   Pre- and post-judgment interest, costs, and reasonable attorneys' fees

4.   Any additional relief the Court deems just and proper

163.   **COUNT XIII– Common-Law Civil Conspiracy**

*(Against Booz Allen Employees, Fairfax County Actors, and Other Government Actors)*

**Incorporation of Prior Allegations**

Plaintiff incorporates by reference all preceding factual allegations set forth above, including the Awareness of Retaliatory Practices in Section I.A, which establishes that Booz Allen employees, Fairfax County actors, and other government actors coordinated actions against Plaintiff.

**Summary of Allegations**

Defendants, Booz Allen employees, Fairfax County actors, and other government actors **combined, agreed, and acted in concert** to intentionally harm Plaintiff by interfering with her employment, damaging her professional reputation, obstructing her career advancement, and destabilizing her family.

The conspirators acted with malice and with the specific intent to retaliate against Plaintiff for her protected activity, to interfere with her employment, and to force her removal from Booz Allen. Their coordinated conduct included blocking Plaintiff from projects, enabling bullying and exclusion, isolating her professionally, and manipulating internal processes to undermine her role. The timing of Plaintiff's termination was deliberately aligned with a critical moment in the long-term plan targeting her daughter's educational trajectory, demonstrating a level of

coordination and retaliatory purpose far beyond ordinary workplace disputes. These actions were undertaken knowingly, intentionally, and with the shared purpose of harming Plaintiff's livelihood, destabilizing her family, and deterring her from exercising her legal rights.

**Unlawful Purpose and Unlawful Means**

The conspiracy was carried out through unlawful and improper means, including:

- retaliation for Plaintiff's protected activity

- dissemination of false or misleading information

- interference with Plaintiff's employment relationship

- coordinated obstruction of Plaintiff's work and responsibilities

- manipulation of internal processes to engineer adverse actions

- malicious acts intended to damage Plaintiff's professional standing

These actions constitute improper and unlawful methods under Virginia common law.

**Legal Basis**

A common-law conspiracy occurs when:

1. Two or more persons

2. Combine, associate, or act in concert

3. For the purpose of willfully and maliciously injuring another

4. And the plaintiff suffers damages as a result

Booz Allen employees, Fairfax County actors, and other government actors acted jointly and maliciously to injure Plaintiff in her profession, employment, and reputation.

**Joint and Several Liability**

All conspirators are **jointly and severally liable** for the full extent of Plaintiff's damages. Each conspirator participated in, enabled, or furthered the coordinated scheme to injure Plaintiff, and under Virginia law, every member of the conspiracy is responsible for all harm caused by the conspiracy, regardless of individual degree of participation.

**Damages**

As a direct and proximate result of the common-law conspiracy, Plaintiff suffered:

- loss of income and professional opportunities

- damage to reputation and credibility

- emotional distress and psychological harm

- long-term professional instability

- harm to family stability and well-being

**Relief Sought**

Plaintiff seeks all damages and remedies available under Virginia common law.

164.    **COUNT XIV— Tortious Interference with Employment Relationship**

(Against Fairfax County Actors and Other Government Actors as Third-Party Interferers

**Incorporation of Prior Allegations**

Plaintiff incorporates by reference all preceding factual allegations set forth above, including the Awareness of Retaliatory Practices in Section I.A, which establishes that employees and agents of Fairfax County and other government entities were aware of Plaintiff's protected activity and intentionally acted to interfere with her employment relationship with Booz Allen.

**Summary of Allegations**

Plaintiff maintained a valid and ongoing employment relationship with Booz Allen. During this period, Fairfax County actors and other government actors, acting wholly outside of Booz Allen and without any legitimate business justification, intentionally interfered with Plaintiff's employment by influencing, pressuring, or encouraging Booz Allen personnel to take adverse actions against her.

These government actors communicated false, misleading, or retaliatory information to Booz Allen employees, and conspired with certain Booz Allen personnel to undermine Plaintiff's professional standing, disrupt her work assignments, and damage her credibility. Their coordinated actions contributed to Plaintiff's removal from projects, exclusion from key responsibilities, denial of advancement opportunities, and eventual termination.

The conduct was malicious, retaliatory, and undertaken with full knowledge that such interference would harm Plaintiff's employment, reputation, and career trajectory.

**Violation/Legal Basis**

Fairfax County actors and other government actors acted as true third-party interferers with no lawful authority or justification to involve themselves in Plaintiff's employment relationship with Booz Allen. Their interference was intentional and carried out through improper methods, including:

- **knowingly providing false or misleading information**

- **retaliatory communications connected to Plaintiff's protected activity**

- **coordinated efforts with Booz Allen employees to undermine Plaintiff**

- **pressure or influence exerted on Booz Allen to remove Plaintiff from assignments**

- **malicious conduct designed to damage Plaintiff's professional reputation**

These actions directly interfered with Plaintiff's ability to perform her job, maintain her professional standing, and advance within Booz Allen.

**Legal Basis**

**Under Virginia law, a claim for tortious interference with a contract or business expectancy requires:**

1. **A valid contractual or business relationship**

2. **Knowledge of that relationship by the interferer**

3. **Intentional interference by a third party**

4. **Use of improper methods**

5. **Resulting damages**

Fairfax County actors and other government actors satisfy all elements. They were not Plaintiff's employer, not Booz Allen's agents, and therefore qualify as true third parties. Their conspiracy with certain Booz Allen employees constitutes an improper method under Virginia law, as do retaliation, misrepresentation, and coordinated obstruction.

Their conduct directly caused harm to Plaintiff's employment relationship and professional opportunities.

**Damages**

As a direct and proximate result of the interference by Fairfax County actors and other government actors, Plaintiff suffered:

- Loss of income and project-based compensation

- Damage to professional reputation and credibility

- Loss of advancement opportunities and leadership roles

- Emotional distress and long-term psychological harm

- Professional instability and diminished career prospects

**Relief Sought**

Plaintiff seeks:

1. Compensatory damages for economic and non-economic harm

2. Punitive damages due to the malicious and intentional nature of the interference

3. Pre- and post-judgment interest, costs, and reasonable attorneys' fees

4.  Any additional relief the Court deems just and proper

165.    **COUNT XV– Wrongful Termination in Violation of Public Policy (Bowman Claim)**

Plaintiff incorporates by reference all preceding factual allegations, fully set forth herein.

**Summary of Allegations**

Plaintiff's termination was directly tied to her protected whistleblower activity and constitutes a wrongful termination under Virginia law. The termination was unjustified, pretextual, and carried out to punish Plaintiff for fulfilling her legal and ethical obligation to report unlawful conduct.

In the period leading up to her termination, Plaintiff was systematically blocked from opportunities and bullied out of projects, with the conduct escalating during the final two weeks of her employment. These actions occurred precisely when Plaintiff had a clear path to success and when her work would have brought increased visibility. Instead of supporting her, supervisors and colleagues coordinated efforts to remove her from assignments, isolate her, and obstruct her ability to perform her job.

Booz Allen leadership was fully aware of the bullying, exclusion, and obstruction carried out by Plaintiff's direct reports. Leadership's refusal to intervene—despite clear knowledge of the misconduct—demonstrates a deliberate strategy to marginalize Plaintiff and force her removal from employment.

The retaliatory termination also inflicted deliberate financial harm on Plaintiff and her family at a critical time, including when her daughter was preparing for highly competitive college

admissions and moving toward Ivy League opportunities. This occurred against the backdrop of a long-term retaliatory plan directed at Plaintiff's children—a plan set in motion by Fairfax County actors in response to Plaintiff's protected activity.

The timing of the termination was not coincidental. It occurred precisely when that long-term plan was reaching a pivotal moment in Plaintiff's daughter's academic trajectory, including her decision not to apply to Virginia schools. The termination and surrounding retaliatory acts were carried out in coordination with Fairfax County actors, reflecting a broader scheme to punish Plaintiff by destabilizing her family and obstructing her daughter's opportunities.

This retaliation was not limited to Plaintiff alone; it extended to her daughter, whose educational prospects were directly targeted as part of the broader effort to harm Plaintiff. These actions were not isolated or accidental. They were part of a coordinated and sustained campaign of retaliation.

Plaintiff's wrongful termination therefore violated not only her individual rights but also the public policy of the Commonwealth of Virginia, which exists to protect individuals who report wrongdoing and to ensure that retaliation does not extend to or harm their children.

**Violation / Wrongful Act**

Defendant's actions constitute wrongful termination in violation of Virginia public policy under the Bowman doctrine. Virginia law prohibits employers from terminating employees for refusing to engage in illegal acts, reporting violations of law, or exercising rights protected by statute. Plaintiff was terminated for engaging in precisely these protected activities.

**Legal Basis**

Under Bowman v. State Bank of Keysville, 229 Va. 534 (1985), and subsequent cases, Virginia recognizes a narrow exception to at-will employment where termination violates public policy expressed in statutes designed to protect employees from being forced to engage in unlawful acts or punished for exercising statutory rights. Plaintiff's termination falls squarely within these protected categories.

**Damages**

As a direct and proximate result of Defendant's wrongful termination, Plaintiff suffered:

- loss of employment, income, and benefits

- damage to professional reputation and career trajectory

- emotional distress

- long-term financial and professional harm

- harm to her family's stability and her daughter's educational opportunities

**Relief Sought**

Plaintiff seeks all relief available under Virginia common law, including:

1. Compensatory damages for lost wages, benefits, and professional opportunities

2. Damages for emotional distress and reputational harm

3. Punitive damages due to the willful and malicious nature of the termination

4.  Attorneys' fees and costs as permitted

5.  Any other relief the Court deems just and proper

## 166.    COUNT XVI — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)

### Incorporation of Allegations

Plaintiff incorporates by reference all of the preceding factual allegations set forth above, including Section I.A, Awareness of Retaliatory Practices, as if fully set forth herein.

### Summary of Allegations

Defendant's conduct toward Plaintiff was extreme, outrageous, and beyond all possible bounds of decency. Defendant, acting through its managers, employees, and agents, engaged in a pattern of retaliatory, malicious, and coordinated actions designed to cause Plaintiff severe emotional distress and to force her out of her position.

This conduct included:

- enabling and encouraging bullying by subordinates

- isolating Plaintiff professionally

- undermining her authority and credibility

- retaliating against her for protected activity

- coordinating with external actors to destabilize her family

- timing her termination to coincide with a critical moment in her daughter's academic trajectory

Defendant's actions were intentional or, at minimum, reckless with respect to the likelihood of causing severe emotional harm.

**Violation/Legal Basis of IIIED**

Defendant's conduct satisfies the elements of IIED under Virginia law:

- The conduct was intentional or reckless

- The conduct was outrageous and intolerable in a civilized society

- The conduct caused Plaintiff severe emotional distress

- The distress resulted in actual, compensable harm

Plaintiff experienced significant emotional suffering, anxiety, humiliation, and distress as a direct result of Defendant's conduct.

**Damages**

Plaintiff suffered:

- severe emotional distress; physical manifestations of stress; reputational harm

- financial and professional losses

**Relief Sought**

Plaintiff seeks all damages available under Virginia law, including compensatory and punitive damages, and any other relief the Court deems just and proper

167. **COUNT XVII – Abuse of Legal Process in Family Court**

Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

Defendants' actions constituted an abuse of process, including the intentional misuse of institutional and legal mechanisms to obstruct Plaintiff's rights and prevent her from obtaining justice. Defendants deliberately manipulated family court proceedings, financial systems, and employment opportunities to inflict harm on Plaintiff and her children.

**Legal Basis:**

- **Virginia Common Law – Abuse of Process:** Defendants used legal process for purposes other than those for which it was intended, including:

  1. Mischaracterizing Plaintiff's testimony and evidence;

  2. Manipulating divorce proceedings to favor Plaintiff's ex-husband despite misconduct;

  3. Deliberately delaying proceedings, causing Plaintiff harm and preventing timely resolution;

  4. Interfering with Plaintiff's employment, property management, and business operations; and

  5. Retaliating against Plaintiff for asserting her legal rights and exercising federally protected activity.

These coordinated actions were undertaken with malicious intent, aimed at punishing Plaintiff, obstructing her legal rights, and destabilizing her family and professional life.

**Damage**

- As a direct and proximate result of this abuse of process, Plaintiff has suffered:

    o Emotional and psychological harm, including stress, anxiety, and humiliation;

    o Financial disadvantage, including loss of income and interference with property and business operations;

    o Disruption of family stability and custody matters; and

    o Delays in moving on with her personal and professional life.

**Relief Sought:**

- Compensatory damages for the misuse of process and the harm suffered by Plaintiff and her children;

- Punitive damages to hold Defendants accountable for the deliberate and malicious nature of their misconduct; and

- Any other relief the Court deems just and proper to fully redress the harms cause

## VIII. PRAYER FOR RELIEF

Plaintiff, on behalf of herself, her children, and her family unit respectfully requests that the Court award the following relief:

**A. Compensatory Damages**

1. For financial losses, including lost income, lost employment benefits, loss of rental and business income, and any other economic harm resulting from Defendants' unlawful conduct.

2. For non-economic damages, including emotional distress, anxiety, humiliation, and psychological trauma suffered by Plaintiff and her children.

3. For harm to family stability, including interference with Plaintiff's ability to provide for her children, support their education, and maintain familial cohesion.

## B. Punitive Damages

To punish Defendants for malicious, willful, and reckless conduct, including intentional violations of Plaintiff's federal and constitutional rights, and to deter similar conduct in the future.

## C. Attorneys' Fees and Costs

Pursuant to 42 U.S.C. § 1988, other applicable statutes, and common law, for all reasonable attorneys' fees, expert fees, and litigation costs incurred in pursuing these claims.

## D. Restitution and Financial Relief

To restore Plaintiff, her children, and her family to the position they would have been in but for Defendants' wrongful acts, including reimbursement for costs incurred as a result of interference with property management, legal remedies, educational opportunities, or essential services.

## E. Declaratory Relief

1. A declaration that Defendants' conduct violated federal and state law, including constitutional rights, civil rights statutes, the ECPA, and common law privacy protections.

2. A declaration that Plaintiff, her children, and her family are entitled to protections against further interference, retaliation, or privacy violations.

   **Count-specific declaratory relief:**

3. For §1985(2)/(3) conspiracies, a declaration that Defendants engaged in a conspiracy to deprive Plaintiff and her children of equal protection and equal privileges under the law.

4. A declaration that Defendants unlawfully surveilled Plaintiff and intruded upon her seclusion.

## F. Injunctive Relief

### 1. Civil Rights Conspiracies (§1985(2)/(3))

- Enjoin retaliation, intimidation, harassment, or coercion against Plaintiff or her family for engaging in protected activity.

- Prohibit interference with Plaintiff's access to courts, attorneys, legal proceedings, or administrative remedies.

- Prevent conspiratorial conduct depriving Plaintiff or her children of equal protection, employment, education, housing, property, or services.

- Stop unauthorized surveillance or monitoring.

- Prohibit interference with employment, business, property, or access to services.

- Preserve familial integrity and Plaintiff's parenting rights.

## 2. Children and Family Protections

- Protect the children's educational opportunities, academic records, college applications, and higher education access.

- Prohibit interference with children's personal relationships, social networks, or life decisions.

- Maintain family life, well-being, and parental autonomy free from intimidation, coercion, or surveillance.

## 3. Community and Reputation Protections

- Cease coordinated character assassination campaigns against Plaintiff or her family.

- Stop assignment of community members, tenants, or coworkers to harass, intimidate, surveil, or discredit Plaintiff or her family.

- Prohibit use of unlawfully obtained information to manipulate community perception.

## 4. Services, Property, and Essential Life Functions

- Prohibit interference with access to employment, property management, tenants, medical, legal, financial, insurance, or professional services.

- Prevent Defendants from coordinating third parties to obstruct or manipulate access to any essential services.

## 5. Reporting and Monitoring

- **Plaintiff may report suspected violations to the Court or designated monitor.**

- **Defendants may report compliance questions or disputes to the Court.**

- **The Court or designated monitor may receive ongoing updates and recommend measures to prevent future harm.**

6. **Privacy and Surveillance**

- **Cease all unauthorized surveillance, interception, or monitoring of Plaintiff and her family.**

- **Prohibit retaliatory interference with professional, legal, medical, educational, or personal services.**

- **Prevent use of any unlawfully obtained information to harass or manipulate Plaintiff or her family.**

- **Stop coordination with third parties (tenants, coworkers, school officials) for harassment or retaliation.**

- **Require compliance reporting to the Court or a designated monitor.**

**G. Pre- and Post-Judgment Interest**

**On all economic and non-economic damages awarded.**

**H. Any Other Relief that the Court deems just and proper to fully redress the harm suffered by Plaintiff, her children, and her family unit, including any future harm traceable to Defendants' ongoing unlawful practices.**

## IX. JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable as a matter of right under the United States Constitution and applicable federal law.

## X. CONCLUSION

Plaintiff has presented detailed factual allegations demonstrating a long-standing pattern of retaliation, unlawful interference, and coordinated misconduct carried out by Defendants across multiple institutions. It is crucial for the Court to understand that the retaliation Plaintiff has faced is not the result of a single incident or a narrow workplace dispute. It is a well-coordinated and ongoing campaign in which individuals with significant institutional power have systematically used their influence across multiple systems, including education, healthcare, financial services, housing programs, employment, and legal services, to suppress Plaintiff's protected activity and exert control over nearly every aspect of her life. This conduct has included persistent violations of privacy, ongoing surveillance, and interference with daily functioning, demonstrating a deliberate effort to destabilize and silence Plaintiff for exposing wrongdoing.

The harm inflicted upon Plaintiff and her children is not merely personal. It represents a profound abuse of authority and a systematic suppression of an individual who attempted to stand against corruption. Defendants' actions have created extreme power imbalances and have hindered Plaintiff's and her children's constitutional rights, including their liberty interests, their right to live free from oppression, and their ability to pursue safety, stability, and happiness. By obstructing Plaintiff's ability to work, maintain financial security, access essential services, and

support her children's futures, Defendants have directly interfered with her freedom to build a meaningful life and to pursue her aspirations.

The breadth and duration of this retaliation, combined with the unlawful intrusion into Plaintiff's private life and the continuous monitoring of her activities, have left her with no meaningful avenues for protection outside of judicial intervention. Given the seriousness, duration, and systemic nature of the wrongdoing described herein, judicial intervention is not only warranted but essential.

Plaintiff respectfully asks the Court to recognize the severity of these actions and to ensure that this ongoing harm is brought to an end, and further submits that this matter must proceed so that the full factual record may be developed, accountability may be imposed where appropriate, and the rights of Plaintiff and her children may finally be protected.

Dated:  February 2, 2024

Respectfully Submitted,

Tegest Tesfaye, Pro se,
7047 Solomon Seal ct.
Springfield, VA 22152
Email: tegestmelu@yahoo.com
Phone :703-980-5318