UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

FILED

2026 JUN 15 P 4: 17

TEGEST TESFAYE,

*Plaintiff,*

v.

BOOZ ALLEN HAMILTON, INC.;

Fairfax County School Board;

Fairfax County, Virginia; and

DOES (1-50), inclusive

*Defendants.*

Jury Trial Demanded

FIRST AMENDED COMPLAINT

For Whistleblower Retaliation, Civil Rights Violations, and Invasion of Privacy

I. INTRODUCTION/NATURE IN ACTION

This civil action arises from a long-running, coordinated campaign of retaliation directed at

Plaintiff and her children following Plaintiff's engagement in protected activity in 2014. After

Plaintiff filed complaints with the U.S. Department of Education and the U.S. Department of

Justice concerning serious misconduct by Fairfax County Public Schools ("FCPS"), including

misrepresentation of state and gifted assessment scores and reports, as well as mistreatment

and malice directed toward her daughters, Defendants,including FCPS school officials, current and former Fairfax County elected officials, individuals in Booz Allen (Plaintiff's employer), and private actors engaged in a coordinated pattern of retaliatory and unlawful conduct that permeated multiple domains of Plaintiff's and her children's lives, causing ongoing harm.

Plaintiff alleges that Defendants, acting under color of state law, participated in a concerted scheme involving retaliation, abuse of power, obstruction of justice, and civil conspiracy, intentionally targeting Plaintiff and her children in response to her protected complaints. This conduct constitutes violations of Plaintiff's and her children's federal civil rights, including unlawful retaliation for whistleblowing activity, interference with federally protected rights, and the creation of a hostile and punitive educational environment affecting minor children.

The retaliatory actions were knowing, deliberate, and ongoing, and were undertaken with the purpose of deterring Plaintiff from pursuing or continuing protected activity and from seeking accountability through federal oversight mechanism.

Beginning in or around August 2014, Plaintiff engaged in protected activity by reporting misconduct involving FCPS. She subsequently reported this misconduct to the U.S. Department of Justice (DOJ) in 2014 and to the U.S. Department of Education (DOE) in 2014, 2026 and again in 2021. Instead of being investigated, Plaintiff's complaints were suppressed and covered up, and Plaintiff became the target of escalating retaliation.

For more than a decade, Plaintiff has faced sustained interference and targeting across nearly every aspect of her life, including her career, health, family and other relationships, and basic rights, all stemming from her good-faith efforts to address the wrongdoing within FCPS. Plaintiff

has been forced to live under continuous surveillance, control, and repeated violations of her privacy, and has faced extreme difficulty obtaining basic services, whether paid or unpaid with interference and control as part of the ongoing retaliation campaign.

Throughout this period, Defendants, acting in concert, used their authority, connections, and influence across multiple institutions to punish Plaintiff for her protected activity, silence her, and dismantle her professional stability, financial security, family relationships, and personal safety. The retaliation extended to her children, deliberately interfering with their education, development, and future opportunities.

Plaintiff's daughters' education, development, and social mobility were deliberately constrained through interference in education, manipulation of academic opportunities, manipulation of college applications, suppression of advancement, and actions designed to limit their future social mobility. These efforts were not merely intended to pressure Plaintiff, but to control the children themselves, restrict their upward mobility, and shape the trajectory of their lives. The harm inflicted on the children destabilized the entire family, creating years of emotional, psychological, educational, and financial disruption.

The retaliation described in this Complaint constitutes a continuous and ongoing campaign that has never ceased. The misconduct did not occur as isolated or time-limited events but as part of a coordinated pattern of retaliation, concealment, and interference that persists to the present day.

Throughout the relevant period, Defendants, acting individually and in concert, obstructed Plaintiff's ability to obtain and consult counsel, interfered with her access to legal

representation, and affirmatively created conditions that prevented Plaintiff from asserting her rights at an earlier time. Defendants' conduct included obstruction, coercion, and concealment of material facts, all of which directly contributed to the delay in Plaintiff's ability to pursue her claims.

Accordingly, the doctrines of continuing violation, equitable tolling, equitable estoppel, and delayed discovery apply. Defendants are barred from invoking any statute of limitations or deadline-based defense where Defendants themselves manipulated procedures, concealed misconduct, or otherwise prevented Plaintiff from timely asserting her claims. Equity does not permit Defendants to benefit from delays they caused.

Although the unlawful conduct began over a decade ago, it remains ongoing, rendering Plaintiff's claims timely under the continuing violation doctrine and applicable tolling principles.

Since January 2024, the retaliation has escalated significantly. Plaintiff's daughter, who is currently attending Brown University, applied to several Ivy League and other top-tier institutions as a freshman, disrupting the long-standing plan orchestrated by actors within Fairfax County to confine all three of Plaintiff's children to Virginia-based schools.

This escalation intensified further following her daughter's acceptance to Brown University in May 2024. After her daughter received admission, the safety and well-being of Plaintiff's daughter became an even more urgent concern, as the individuals involved demonstrated a willingness to go to extreme lengths to maintain control and continue their retaliatory campaign.

Since early 2024, Defendants have escalated efforts to undermine Plaintiff's financial stability by obstructing every potential source of income and creating or exploiting circumstances designed to indebt her further. As a direct and proximate result of these actions, Plaintiff has been rendered unemployed, financially destabilized, socially isolated, and forced to litigate both her divorce and this action pro se. These sustained disruptions and retaliation have caused long-term psychological, emotional, and educational harm to Plaintiff and her children, affecting the stability and well-being of their lives for nearly a decade.

These actions were not the work of a few rogue individuals. They reflect a coordinated effort involving multiple institutions that suppressed the Truth and enabled a campaign of control and retaliation. The harm has extended beyond Plaintiff and her children to others within FCPS who opposed the unethical treatment of her children. Numerous staff members, including senior leadership, left the school system mid-year rather than participate in or condone the misconduct described herein, while others benefited from aligning themselves with the wrongdoing. Plaintiff believes that many individuals were silenced through nondisclosure agreements (NDAs) in order to contain and control this major scandal.

Plaintiff brings this action seeking declaratory and injunctive relief to end the ongoing retaliation, prevent further interference, and restore her and her family's ability to live free from retaliation, oppression, and surveillance, as well as compensatory and punitive damages for violations of the United States Constitution, federal whistleblower protections, and Plaintiff's civil and human rights.

## II. PARTIES

1. Plaintiff Tegest Tesfaye is a resident of Fairfax County, Virginia, where she has resided since 2002. Plaintiff is a parent of former students who attended public schools within Fairfax County for approximately nineteen (19) years between September 2005 and June 2024.

2. Defendant Booz Allen Hamilton Inc. (referred to herein as "Booz Allen") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and global corporate headquarters located at 8283 Greensboro Drive, Mclean, Virginia 22102, and was Plaintiff's former employer at all relevant times. Booz Alen Hamilton Inc. as a citizen of Delaware and Virginia for the purposes of diversity, jurisdiction, is authorized to conduct business in this District.

3. Defendant Fairfax County, Virginia is a political subdivision of the Commonwealth of Virginia, organized and existing under the laws of Virginia. It is a local government entity and public entity capable of being sued in its own name.

4. Defendant Fairfax County School Board is a public corporate body, organized and existing under the laws of the Commonwealth of Virginia, a governing body responsible for the operation and supervision of public schools within Fairfax County, Virginia, suable in its own name.

5. The named Defendants in this action, as set forth in the case caption, are Booz Allen Hamilton Inc., Fairfax County, Fairfax County School Board, and unknown co-conspirators designated as Does 1–50. These Defendants, individually, jointly, and through the coordinated actions of their respective agents, officials, and employees, participated in a coordinated pattern of retaliation against Plaintiff and her children.

6. This Complaint uses the term "Fairfax County Actors" to refer collectively to Defendants Fairfax County and the Fairfax County School Board, alongside their non-party current and former Fairfax County school administrators, employees, board members, and supervisors acting as agents or co-conspirators on their behalf. Not every Fairfax County Actor participated in every individual retaliatory act; the term is used for convenience to identify the entities and individuals who acted individually or jointly at various times.

7. Plaintiff designates Does 1–50 as unknown Defendants who are believed to be co-conspirators whose exact identities are not listed at this time. Plaintiff reserves the right to amend this Complaint to add or substitute their true names and capacities if and when their identities are ascertained through investigation or discovery, as each Doe Defendant is responsible, in whole or in part, for the conspiratorial occurrences alleged herein.

8. The term "state actors" refers to specific local, state, and federally elected or appointed government officials, and state and local agency personnel who, while not named as formal defendants in the case caption of this action, acted in concert, participated as non-party co-conspirators, and reached a meeting of the minds with the named Defendants or other non-party individuals to execute the retaliatory and conspiratorial acts alleged herein.

9. The term "Defendants" refers collectively to the formally captioned parties: the Fairfax County actors, Booz Allen, and Does 1–50. As alleged herein, these named Defendants acted in tandem, in parallel coordination, and in an unlawful conspiracy with the non-party state actors.

### III. RESERVATION OF RIGHTS AND INDEPENDENT PARENTAL STANDING

10. Plaintiff asserts the factual allegations regarding the systematic targeting, bullying, test and score manipulation, and educational and college opportunity interference directed at her

children, strictly to demonstrate the scope, malice, and operational mechanisms of the Defendants' conspiracy against Plaintiff personally, and to support her independent claims for parental injuries and severe emotional distress

11. The agonizing reality of witnessing her children being deliberately targeted, destabilized, and harmed by powerful adult officials over a span of fourteen (14) years inflicted an independent, catastrophic psychological, financial and physical toll on Plaintiff, who was forced into a state of perpetual crisis to shield her children from institutional abuse.

12. The longevity and malicious severity of this coordinated retaliation fundamentally fractured Plaintiff's entire family infrastructure, inherently upended her family's internal dynamics, and caused a permanent, systemic disruption to her personal, professional, and familial life, resulting in profound, actionable emotional trauma.

13. Plaintiff's children, having attained the age of majority, are not plaintiffs to this action. They explicitly reserve all rights to bring separate, independent legal actions for their personal, distinct injuries, and nothing contained in this Complaint shall be construed as a waiver, forfeiture, or adjudication of their individual claims.

14. Plaintiff explicitly reserves the right to seek leave of court to amend this Complaint to formally join her adult daughters as additional Plaintiffs, pursuant to Federal Rules of Civil Procedure 20 and 21, should they choose to assert their individual claims within this action.

### IV. JURISDICTION AND VENUE

15. This Court has original subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and Laws of the United States, including, without

limitation, 42 U.S.C. §§ 1983 and 1985, the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq., and other federal statutes protecting whistleblowers, civil rights, and privacy.

16. This Court has original jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) and (a)(4) because this action seeks to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and Laws of the United States, including rights guaranteed by the First, Fourth, and Fourteenth Amendments, and seeks equitable and other relief under Acts of Congress providing for the protection of civil rights.

17. Jurisdiction is also proper under 28 U.S.C. § 1343(a) because this action seeks damages and equitable relief for the deprivation of rights under federal law. Defendants, acting under color of state and local authority and in concert with private actors, engaged in a sustained and coordinated campaign to violate Plaintiff's civil rights and those of her children.

18. This Court has supplemental jurisdiction over Plaintiff's State-Law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy and arise from a common nucleus of operative facts.

19. Defendants include State and Local government officials, public employees, and private individuals acting jointly with state actors, whose conduct was undertaken under color of law and within the scope of their official, collaborative, or conspiratorial authority.

20. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

21. Plaintiff resides in Springfield, Virginia, within the Eastern District of Virginia. Defendant Booz Allen Hamilton, Inc. maintains its corporate headquarters in Mclean, Virginia, and Plaintiff performed the majority of her work for Booz Allen within this District. Fairfax County and

Fairfax County Public Schools are likewise located within this District. A substantial part of the acts, events and omissions giving rise to this action occurred in Fairfax County and elsewhere within the Eastern District of Virginia.

22. This Court has personal jurisdiction over Defendants because they purposefully availed themselves of the privileges of conducting activities within this District, and their actions caused foreseeable and substantial harm to Plaintiff and her children within this District.

23. Plaintiff seeks declaratory, injunctive, and equitable relief, as well as compensatory and punitive damages, all of which fall within the jurisdictional authority of this Court.

## V. STATEMENT OF FACTS/FACTUAL ALLEGATIONS

24. Plaintiff, Tegest Tesfaye, is a mother of three who resided in Fairfax County for approximately twenty-four (24) years. Plaintiff's three daughters, currently aged 25, 23, and 19, attended Fairfax County Public Schools from approximately September 2005 through June 2024.

25. On Nov 17, 2008, Plaintiff got hired with Booz Allen as an Associate and promoted to a Lead Associate on Oct 17, 2010.

26. Plaintiff was employed by Defendant Booz Allen for approximately fifteen (15) years where she was terminated with a "lack of work" reasoning on Feb 2, 2024.

27. Plaintiff emailed a demand letter to Booz Allen detailing the wrongful termination on January 22, 2025 and for relief otherwise pursuing a legal suit.

28. Plaintiff, Tegest Tesfaye, was an involved parent and a concerned citizen who, beginning in 2012, became aware of misconduct within the West Springfield Elementary school where Principal

Erin Jones was working against her children, intentionally lowering reading assessments interfering with teachers to hold back her younger daughter from getting advanced academic programs. This misconduct included unethical practices related to the handling of students' academic assessments, improper treatment of both students and staff, and violations of federal and state educational regulations.

29. Between March and June 2009, Plaintiff first observed troubling conduct at West Springfield Elementary School ("WSES") when a kindergarten teacher began acting adversely toward Plaintiff's middle daughter.

30. On June 17, 2009, Plaintiff met with then-Principal Kathryn Woodley to address the issue. Although Principal Woodley assured Plaintiff that such conduct would not continue, Assistant Principal Erin Jones reacted negatively to Plaintiff's concerns and began exhibiting hostility toward Plaintiff and her children.

31. Plaintiff observed that Assistant Principal Erin Jones harbored animosity toward her following the June 2009 discussion with the principal concerning the kindergarten teacher.

32. Once Jones became Principal in 2011, she gained greater authority and used her position to interfere with Plaintiff's children's academic opportunities, particularly targeting the younger daughter, who entered in September 2012, same time the middle daughter transferred to neighboring Fairfax County School Keene Mill Elementary ("KMES") for Advanced Program.

33. On January 21, 2011, Plaintiff organized the first International Night at WSES, a major school wide event attended by approximately 400 people. Plaintiff observed that Principal Erin Jones

appeared displeased that Plaintiff with few other parents had successfully organized the event. This further increased tension between Plaintiff and Principal Erin Jones.

34. In September 2012, Plaintiff's younger daughter enrolled in kindergarten at WSES. Principal Erin Jones and the assigned kindergarten teacher worked to block the child from accessing advanced academic opportunities, including programs designed to prepare high-potential students for the full-time Advanced Academic Program ("AAP") in third grade.

35. After observing a clear pattern of interference and retaliation against her younger daughter, in December 2012, Plaintiff requested a transfer to Keene Mill Elementary School ("KMES"), where her middle daughter had previously transferred. Plaintiff first met with Executive Principal Aimee Holleb, who responded dismissively and suggested that the same problems would follow the child to the new school, a statement that indicated awareness of a coordinated effort to target Plaintiff's children.

36. On December 10, 2012, after requesting the transfer to the School Board and Assistant Superintendent Leslie Butz, Plaintiff transferred her younger daughter to KMES to protect her from the escalating mistreatment and bullying she was facing at WSES.

37. Shortly after the transfer, Assistant Principal Erin Jones, along with individuals acting in concert with her, contacted Plaintiff's youngest daughter's new first grade teacher at KMES, Brittney Cummingsand initiated further over acts of retaliation.

38. Following this contact, Plaintiff's youngest daughter began experiencing mistreatment from Cummings, despite the teacher having initially expressed enthusiasm about having her as a student.

39. Plaintiff's youngest daughter, who had eagerly anticipated attending the new school after meeting her teacher, Cummings, on Friday, December 8, 2012, and believed she would finally be relieved from the hostile environment at WSES, was instead met with the opposite reaction. From the first day of class, Cummings began treating her in a manner that made her miserable.

40. Plaintiff also observed a noticeable change in the teacher's demeanor when she arrived that morning to drop off her daughter. This abrupt shift was devastating to Plaintiff's daughter, who subsequently suffered mistreatment and bullying in the coming month. This conduct was the result of a coordinated effort led primarily by Assistant Principal Erin Jones and individuals acting in concert with her.

41. On January 3, 2013, Plaintiff's youngest daughter completed a reading assessment at KMES that showed significantly higher performance than the artificially lowered reading levels previously assigned under Erin Jones's supervision.

42. Plaintiff alleges that shortly afterward, on January 07- 08, 2013, Cummings began bullying Plaintiff's daughter, including forcing her to read aloud while staring at her for long periods and making frightening facial expressions, causing the daughter to experience panic attacks for two consecutive dates.

43. Plaintiff alleges the daughter refused to go to school on Jan 9, 2013 and explained in detail the bulling by her teacher, Cummings for the two consecutive dates.

44. Plaintiff alleges that this over act of cruelty and bullying was intended to destroy the daughter's reading ability, by creating an association between reading and fear, which later found, caused her a speech impediment.

45. Plaintiff contacted then Principal of KMES, Renee Miller on January 10, 2012 by phone and explained the concerns over the call who promised to speak with the teacher during lunch time.

46. Then six-year-old Plaintiff's daughter returned home later that same day and asked Plaintiff whether she had spoken with the school and communicated that the teacher had been mean as usual and hostile toward her during the morning, but had become noticeably kinder during the afternoon.

47. Based on the abrupt change in the teacher's demeanor occurring during the school day, observed by a six-year-old, Plaintiff believes that the change resulted from communication from the principal or school administration to the teacher during the lunch period.

48. In 2014, Plaintiff learned that her youngest daughter's first grade gifted testing, Naglieri Nonverbal Ability Test (NNAT) score was falsified and that she was provided a fabricated report, concealing the official report provided from the testing company.

49. In 2014, Plaintiff learned that all her three children have been deliberately targeted through manipulation and falsification of Standards of Learning (SOL) academic assessments and school records, and her younger daughters Gifted testing score reports were fabricated. These falsifications were designed to undermine their academic performance and hindered their ability to pursue advanced coursework and future college opportunities. This pattern of academic interference continued for more than a decade and has had long-lasting consequences.

**PROTECTED ACTIVITY**

50. Since 2012, Plaintiff repeatedly reported academic manipulation, systematic retaliation, and administrative mistreatment of her children to Fairfax County public school administrators, the Fairfax County School Board, and executive school leadership. Plaintiff also formally requested an administrative school transfer for her youngest daughter due to the ongoing retaliation and hostile educational environment.

51. On July 24, 2014, Plaintiff contacted the U.S. Department of Justice to discuss the ongoing misconduct and to inquire about the proper process for filing a formal complaint. Plaintiff was provided the email address education@usdoj.gov and submitted her complaint via email on August 5, 2014, followed by a mailed submission on August 19, 2014. The complaint was shortly thereafter transferred to the U.S. Department of Education (mentioned in #45)

52. In the July 2014 filing, Plaintiff's protected activity included advocating for the legal and educational rights of her children by formally reporting concerns regarding issues she found with the Naglieri Nonverbal Ability Test (NNAT) Gifted Assessment published by Pearson Education report and the Pearson Standard of Learning (SOL) official reports provided by the Virginia Department of Education and distributed through the Fairfax County Public Schools system, which exposed institutional misrepresentations and misconduct. This activity constituted constitutionally protected conduct under the First Amendment and the right to petition the Government for a redress of grievances without fear of retaliation.

53. In the summer of 2014, Plaintiff and another Fairfax County Schools parent, Yewbdar Tadesse who had experienced similar and parallel structural issues with the Fairfax County Public Schools system sought assistance from the office of the late Congressman Gerry Connolly and

met with his congressional staff to report concerns regarding administrative misconduct, institutional bullying of children, and systematic academic manipulation. Despite formally raising these issues, Plaintiff did not receive any meaningful follow-up or legislative assistance despite multiple efforts she made.

54. On September 19, 2014, Plaintiff filed another complaint with the U.S. Department of Education, Case No. 11-14-1355, regarding the ongoing misconduct, the interference in her children education, the continued targeting of her children and family and the compounding harm inflicted upon her children which was closed with no proper investigation.

55. Around the same time, Plaintiff's then friend, a parent in Fairfax County Public Schools, Yewbdar Tadesse also filed a complaint to the Department of Education concerning her children, who attended the same school and were experiencing similar issues.

56. On November 2, 2015, Plaintiff filed another complaint with the U.S. Department of Education, Case No. 11-16-105, addressing serious issues her children were facing in high school that had continued from elementary and middle school. Plaintiff did not receive a response until nearly four years later, on October 19, 2019, when she was informed that the case was closed. The prolonged delay occurred while significant issues were being concealed; including irregularities involving College Board examinations in which Plaintiff's children were provided falsified score reports without taking the actual exams. Administering different or fake exams was one of the primary techniques used by the school system, and it continued even after Plaintiff confronted them.

57. On August 26, 2017, Plaintiff created a public petition on Change.org addressed to then-Governor Terry McAuliffe, former Superintendent Dr. Scott Brabrand, Senator Tim Kaine, Senator Mark Warner, former School Board Member Jane Strauss, former Assistant Superintendent Dr. Angela Atwater, and former Executive Principal Dr. Eric Brent.

58. The petition detailed extensive operational misconduct and administrative abuse within the Fairfax County Public Schools system.

59. Shortly thereafter, Plaintiff experienced a heightened retaliation, sudden, unexplained, and coordinated withdrawal from several personal relationships, including from a close family friend Yewbdar Tadesse who had independently filed similar complaints with local school officials and the U.S. Department of Education, consistent with a broader pattern of social and professional isolation orchestrated against Plaintiff.

60. With retaliation escalating in her workplace, between 2020 -2023, Plaintiff engaged in corporate protected activity by filing formal complaints with Defendant Booz Allen's Ethics & Compliance Office regarding escalating retaliatory conduct, fabricated performance allegations, and improper, discriminatory treatment on the Navy project. Defendant Booz Allen summarily closed these complaints without conducting a meaningful or transparent investigation.

61. Between 2021 and 2023, Plaintiff repeatedly advocated for a Market Salary Adjustment (MSA) after discovering that her corporate compensation was suppressed below the 48th percentile for her professional level. Plaintiff's compensation advocacy was directed to Human Resources, her home team leadership, and her project principal. These extensive efforts constituted

protected activity related to pay equity, workplace fairness, and opposition to unlawful economic discrimination.

62. Throughout the duration of her corporate employment, Plaintiff consistently raised internal complaints regarding a hostile work environment, bad-faith interference with her technical assignments, and improper conduct by project leadership

**RETALIATION AND HARM TO CHILDREN UNDER THE UMBRELLA OF FCPS**

63. On June 2015, Plaintiff visited KMES to review her children's Standards of Learning ("SOL") score reports. Principal Renee Miller appeared shocked, as the authentic records would have exposed discrepancies with the falsified score reports previously provided to Plaintiff, issues Plaintiff had already raised in her August 2014 complaints to the DOJ and DOE. Renee Miller screamed at Plaintiff and ordered her to leave the building.

64. Approximately two weeks later, Plaintiff received a "no-trespass" letter containing false allegations that she had disrupted a meeting. The letter required Plaintiff to obtain advance permission before entering the school, serving as a gatekeeping mechanism to conceal misconduct related to falsified assessment scores.

65. Despite Plaintiff's repeated efforts to have the restriction removed, the no-trespass order remained in place for two years, until her daughter graduated.

66. On November 17, 2015, Plaintiff's youngest daughter who was in fourth grade was injured when the teacher dropped a laptop on her head.

67. FCPS officials denied the incident and falsely claimed that the child had "bumped" her head, despite evidence to the contrary. This incident constituted retaliation imposed on Plaintiff's daughter in response to Plaintiff's protected activity, two weeks after the DOE complaint she filed on November 2, 2015.

68. Instead of investigating Plaintiff's concerns, federal agencies suppressed and ignored her complaints, resulting in escalating retaliation from a network of individuals that including Fairfax County and state actors and DOES working in concert.

69. Plaintiff was informed by Fairfax County Public Schools officials that Principal Erin Jones was investigated in connection with Plaintiff's complaints, and that appropriate administrative action was taken. Principal Jones separated from Fairfax County Public Schools on or about March 30, 2015.

70. The non-party individuals involved in executing the school-based retaliation and academic manipulation under the umbrella of the Fairfax County actors included former and current county personnel, specifically: former Principal Erin Jones; former Principal Renee Miller; former School Board Member Elizabeth Schultz; former Assistant Superintendent of Region 4 Penny Gros; former Cluster Director and Principal Dr. Aimee Holleb; first-grade classroom teacher Britney Cummingsand current or former high school and middle school staff, including Shannon Matheny, Elizabeth Fawcett, Elizabeth Wahl, Malicia Braxton, and Laura Waterman, who participated in these actions while stationed at West Springfield High School, Lake Braddock Middle School, or other administrative facilities within the county.

71. All of these individuals, at various times throughout the Plaintiff's daughters schooling, actively advanced, executed, or escalated the retaliatory campaign against Plaintiff and her children.

72. At the inception of this campaign, in December 2012 to January 2013, the first-grade classroom teacher, Britney Cummings, acting under the direct control, supervision, and instruction of Erin Johns and Associates [give description], subjected Plaintiff's daughter to targeted bullying, isolation, and hostile academic harassment during reading instructional periods.

73. Within the subsequent high school pyramid structure, staff member Elizabeth Wahl and administrator Malicia Braxton were deployed in a sustained, near-constant capacity by school administration to improperly interfere with classroom teachers, monitor Plaintiff's children standardized testing, scoring, assessments reports, and ensure that localized testing processes, grade metrics, and scores reports were systematically manipulated or altered.

74. High-level administrators and School Board members, including Penny Gros and Elizabeth Schultz, continuously utilized their administrative, executive, or supervisory influence, regardless of their specific physical or jurisdictional assignments, to direct, oversee, and coordinate sustained retaliatory actions within the school division against Plaintiff and her family

75. Operating in concert with executive school division leadership and municipal county officials, these individuals collectively leveraged their institutional authority to actively suppress Plaintiff's protected complaints, falsify academic records, disrupt College Board administrative processes, and systematically obstruct Plaintiff's children from accessing fair educational advantages and college-bound opportunities.

76. Throughout this ongoing scandal, many FCPS employees left the school system abruptly, whether willingly or unwillingly, with some unable in good conscience to continue participating in it. In contrast, others who aligned themselves with the oppression and targeting of Plaintiff's daughters received various benefits and perks as a result of their involvement.

77. Teachers were not permitted to provide genuine feedback, particularly in English and reading-related courses, especially concerning Plaintiff's younger daughter. This restriction was designed to conceal what had occurred during her kindergarten and first-grade years as part of a long-term plan orchestrated by Erin Jones and her associates.

78. During the last three years of Highschool for Plaintiff's youngest daughter, Plaintiff alleges that Ms. Shannon Mathney, was the primary administrator working actively against Plaintiff's daughter, interfered, controlled and substantially influenced communications between Plaintiff, the daughter's school counselors, and teachers.

79. While her daughter was in tenth grade, Plaintiff sought information regarding Plaintiff's daughter's performance on a mock History AP examination, which Plaintiff understood was administered for the purpose of assessing student readiness for the AP examination and identifying areas for improvement.

80. During this period, Plaintiff sought information regarding Plaintiff's daughter's preparedness for the AP examination. Despite the existence of a mock AP examination intended to assess student readiness and identify areas requiring improvement, Plaintiff was unable to obtain meaningful feedback regarding Plaintiff's daughter's performance.

81. Plaintiff alleges that Ms. Matheny exerted influence over the process and prevented the teacher from providing substantive feedback concerning the mock examination results.

82. In a conversation concerning Plaintiff's daughter's expected performance on the AP History examination, Ms. Shannon Mathney asked Plaintiff what score Plaintiff expected the student to receive. Plaintiff responded that the teacher who administered and reviewed the mock examination should provide that assessment. Ms. Matheny then stated a "1". Plaintiff was upset by this statement and responded that she expected her daughter to receive a score of "5", consistent with the student's actual performance, as the student ultimately received a score of 5 on the AP examination.

83. Plaintiff alleges that Ms. Matheny's statement reflects and is consistent with a broader pattern of conduct directed toward minimizing and discouraging Plaintiff's daughter's academic achievement and a desire to see her fail.

84. In her senior year of high school, 2024, Plaintiff's youngest daughter's AP Language teacher, Jamie O'Neill, was willing to provide honest information about the daughter's academic abilities. Ms. O'Neill sent Plaintiff detailed feedback, including the daughter's mock AP exam scores, and her email directly contradicted the actions of the English Administrator, Shannon Matheny, who had been working against Plaintiff's daughter as part of the ongoing retaliation and the effort to control her college trajectory.

85. On May 30, 2024, Ms. O'Neill, who had been a well-respected teacher at West Springfield High School for many years and had served as Director of the English Department was escorted out of class by security while she was giving a reading quarter test to the students and was

permanently removed from the school. This incident occurred just days after, Ms. O'Neill wrote email to Plaintiff with statements such as, "You have an amazing daughter, she is a literary scholar, she should ace the AP Lang exam unless something odd happens," and shortly after Plaintiff's daughter requested Ms. O'Neil to write a recommendation letter for her.

86. During same time that Plaintiff was facing and raising these serious concerns with Shannon Matheny regarding Plaintiff's youngest daughter, a meeting of the minds existed between her (who is her Ms. Matheny?) and agents of Defendant Fairfax County where, a member of the Fairfax County Board of Supervisors for Springfield, publicly recognized Ms. Matheny as an outstanding Assistant Principal. This endorsement was a calculated, parallel action designed by both parties to shield Matheny from administrative accountability and undermine Plaintiff's ongoing advocacy.

87. Further demonstrating this meeting of the minds and a coordinated institutional cover-up, Plaintiff sent numerous direct electronic communications to the Superintendent Brabrand of Fairfax County Public Schools during his tenure about 2017-2022, detailing the severe scandals and abuses impacting her children and seeking his assistance.

88. On the very first day Plaintiff communicated these issues that uncover the ongoing abuse and wrongdoings against her children to Superintendent Brabrand, he was summoned to a meeting with the former Board of Supervisors member for the Braddock District.

89. Superintendent Brabrand continued to ignore, completely avoided to respond or address to any of the multiple serious issues Plaintiff was emailing him, seeking his assistance over the five years he served as Superintendent.

90. Upon information and belief, during the immediate meeting between the Superintendent and the former Board of Supervisors member for the Braddock District, the Superintendent was explicitly debriefed on the multi-year history of institutional scandals and civil rights violations involving Plaintiff's children. The Board member and agents of Defendant Fairfax County explicitly directed, instructed, or reached a tacit agreement with the Superintendent to entirely ignore and cut off all communication with the Plaintiff.

91. The resulting public distribution of promotional photographs and statements characterizing the meeting as a 'great discussion' serves as an overt, parallel act of collusion designed to continue and insulate the wrongdoing.

92. In direct execution of this conspiratorial agreement and directive, the Superintendent completely abandoned his administrative responsibilities, systematically isolated himself from the dispute, and intentionally refused to respond to any of Plaintiff's subsequent protected emails or formal grievances over the span of several years. This complete, calculated wall of administrative silence was an overt act in furtherance of the conspiracy, deliberately designed by both Defendant Fairfax County and school leadership under the purview of Defendant Fairfax County School Board to abandon their statutory obligations, insulate school actors from liability, and completely suppress Plaintiff's protected advocacy.

93. Throughout a multi-year period spanning from 2012 to the present, a clear, pervasive, and recurring pattern and practice has existed within Fairfax County Public Schools ("FCPS") whereby some senior administrative executives and elected School Board members, including Braddock District Representative Megan McLaughlin, Mason District Representative Dr. Ricardy

Anderson, former Superintendent Dr. Karen Garza, and current Superintendent Dr. Michelle C. Reid have explicitly promised necessary administrative assistance, showed deep desire to assist or initiated formal efforts to resolve these systemic and individual grievances my children and I were facing in the school system , only for those commitments to be abruptly, arbitrarily, and systematically rescinded, halted, or withdrawn without lawful or administrative justification;

94. This chronic failure to execute authorized remedies that led to multi-year abuse in the school system demonstrates a top-down pattern of bad-faith institutional control and obstruction designed to deny essential protections and remedies by the Fairfax County actors and State actors.

**Obstruction of College Admissions and Financial Support**

95. Fairfax County actors and state actors implemented and executed a long-standing, coordinated scheme, originating in 2014 going after Plaintiff's protected activity, to sabotage Plaintiff's children's access to top colleges and Ivy League institutions.

96. The scheme included falsifying and submitting fraudulent applications, falsifying standardized-tests, interfering with teachers and counselors to suppress recommendations and obstructing extracurricular opportunities that would strengthen the children's applications.

97. As a result of these tactics, Plaintiff's older daughters were prevented from matriculating at the top and Ivy League Institutions that they applied and were capable to get acceptance.

98. Plaintiff's youngest daughter deliberately declined to submit an application to the University of Virginia ("UVA") solely to bypass and escape a long-term, coordinated scheme orchestrated by

Fairfax County and Virginia state actors designed to restrict Plaintiff's children exclusively to Virginia-based educational institutions.

99. To completely break free from Defendants' reach, Plaintiff's daughter voluntarily navigated the highly competitive college admissions cycle without utilizing standard in-state safety institutions, enduring months of severe anxiety and stress before ultimately securing admission to Brown University.

100. Immediately following the expiration of the UVA application deadline on January 5, 2024, which finalized the daughter's evasion of the localized restriction plan, Fairfax County actors, State actors, escalated their campaign.

101. Within two weeks of that deadline, Defendant Booz Allen served Plaintiff with a formal termination letter.

102. This adverse employment action was deployed as a calculated, last-resort measure to inflict immediate financial hardship on Plaintiff's household, intentionally designed to sabotage the family's financial capacity to fund the daughter's enrollment at top-tier colleges.

103. After the Plaintiff's daughter received and accepted an offer from Brown University on May 01, 2024, Defendants intensified their retaliatory efforts. Those intensified efforts included a coordinated financial attack, disrupting rental and other income streams, encouraging or facilitating unworkable financial divorce rulings and debt obligations, and otherwise imposing financial barriers, designed to make attendance at Brown financially impossible.

104. The timing, content, and coordination of these acts demonstrate that Defendants' conduct was retaliatory, targeted, and intended to punish Plaintiff by destroying her children's higher-education opportunities.

105. Defendants' long-running, coordinated campaign of retaliation and sabotage extended beyond Plaintiff and directly affected her daughters, whose rights to make independent decisions about their education, opportunities, and future paths were improperly influenced, constrained, or manipulated as a result of Defendants' actions.

106. As individuals and government actors, Defendants had no lawful authority to interfere with the educational choices or life opportunities of Plaintiff's children, yet their conduct created an environment in which Plaintiff's daughters were deprived of the freedom to pursue colleges, programs, and personal goals based on their own interests and abilities.

107. This intrusion into Plaintiff's family life and her daughters' autonomy violated fundamental liberty interests, disrupted their developmental, social, and educational trajectories, and caused lasting harm to their ability to shape their own futures without undue government influence.

108. Plaintiff's children were deliberately targeted within the Fairfax County Public Schools system through the manipulation and falsification of their academic assessments and school records. These falsifications were aimed at undermining the children's performance, making it more difficult for them to pursue higher educational opportunities. This academic interference continued for over a decade and has had long-lasting impacts on their educational trajectory.

109. Fairfax County actors and state actors extended their retaliatory animus into Plaintiff's children's transition to higher education, executing a long-standing scheme to block access to

top-tier and Ivy League institutions by submitting fraudulent applications, suppressing teacher recommendations, and withholding mandatory institutional verifications.

110. In addition to educational records manipulation, Defendants interfered with the college admissions process for Plaintiff's children. Plaintiff's children, who are academically capable and eligible for advanced educational opportunities, faced unjustified obstacles in their pursuit of higher education.

111. Defendants intentionally obstructed their access to financial aid and other college-related support, intentionally limiting their ability to attend top-tier schools and pursue careers that would otherwise align with their academic potential.

112. This collegiate sabotage engineered a multi-year cap on the children's social mobility, forcing Plaintiff's older and middle daughters out of top-tier matriculation. The actions taken by Defendants were designed not only to disrupt Plaintiff's children's education but also to limit their future social mobility. By interfering with their education, social networks, and access to elite professional networks that come with attending top-tier schools, Defendants sought to stifle the children's potential to build the social and professional capital needed to succeed in the future.

**Unlawful Restrictions on Plaintiff's Parental Communications**

113. Fairfax County Schools officials systematically attempted to restrict and suppress Plaintiff's communication with classroom teachers and campus administrators at various times between 2014 and 2024.

114. At Keene Mill Elementary School, between approximately 2014 and 2018, then-Principal Renee Miller prohibited Plaintiff from conducting any parent-teacher conferences unless an administrative chaperone was physically present, imposing an unlawful prior restraint and an administrative mechanism of communication control.

115. In or about September 2017, following a meeting between Plaintiff, former Assistant Superintendent for Region 4 Dr. Angela Atwater, and former Executive Principal Dr. Eric Brent, Dr. Atwater issued a formal letter to Plaintiff. This directive, which appeared to be executed under administrative duress, stripped Plaintiff of her standard parental rights by decreeing that Plaintiff was entirely banned from directly contacting her daughter's elementary school and could only communicate with school personnel through the Region 4 administrative office.

116. Within forty-eight (48) hours of issuing this restrictive communication ban, Dr. Atwater abruptly severed her employment under the purview of the Fairfax County School Board.

117. All these unlawful restrictions were implemented specifically as a control mechanism to facilitate and enforce the Defendants' ongoing cover-ups.

118. Demonstrating the extreme extent of this administrative control, after Plaintiff's youngest daughter transitioned to middle school, Plaintiff discovered that an email she had sent directly to Anne Polino at Lake Braddock Middle School Student Services had been covertly rerouted to Renee Miller. Plaintiff verified this interception through direct confirmation from Anne Polino, who explicitly stated that she only received the communication because it was forwarded back to her by Renee Miller.

119. This covert intercept and arbitrary restriction on communication operated in complete violation of Plaintiff's constitutional right to privacy, her protected parental liberties under the Fourteenth Amendment, and her First Amendment right to petition school officials, while disregarding standard administrative communications protocols within the school division.

120. Plaintiff was employed at Booz Allen on Nov 17, 2008for over 15 years, where she had a successful career and held a respected position for the first 6 years.

121. Plaintiff was promoted to Lead Associate on October 17, 2010 within approximately two years, reflecting her sustained professional competence and strong performance well before the retaliatory conduct described below. Throughout her tenure, Plaintiff consistently performed at a high level and earned the trust of both leadership and clients.

122. For approximately the first five years of her employment until August 2014, the time she engaged in the protected activity of filing complaints with the DOJ and DOE, Plaintiff held senior and leadership roles, served as a trusted advisor, and successfully led complex, high-visibility projects. Plaintiff managed technical teams of seven or more members and built long-term programs from inception through sustained success. Her performance was exemplary, consistent, and undisputed, leading to multiple awards, including the Booz Allen Value in Practice (VIP) Award, presented on March 11, 2012, which recognizes individuals who are role models for the Firm's Core values in their project delivery, interactions with clients and colleagues, and their personal conduct outside of the office.

123. Plaintiff has a well-established reputation as a dedicated and effective career manager. Her leadership, mentorship, and coaching have been consistently recognized by managers and

direct reports. Plaintiff has directly promoted multiple staff members, helping them successfully lead projects, advance in position, and achieve growth in salary, demonstrating her commitment to developing talent and supporting the organization's success. Despite these documented contributions, Plaintiff's own career growth and opportunities for advancement were deliberately stifled as a result of retaliation for her engagement in protected activity, including whistleblower complaints. This retaliatory conduct has had a profound and demoralizing impact on Plaintiff, limiting her professional development, reducing her earning potential, and causing significant emotional and psychological harm, all in violation of applicable employment and whistleblower protection laws.

Retaliation at Booz Allen Inc. (2014–2024)

<u>Retaliatory Introduction on Plaintiff</u>

124.    As a direct retaliatory actor of the whistleblowing activity filing the complaints to DOJ and DOE, from August 2014 onward, Plaintiff consistently experienced retaliation. This retaliation manifested in hostile work environments, obstruction, interference with her work and her team members she managed on projects.

125.    Over a period of nearly nine years, Plaintiff was subjected to systematic harassment, repeatedly pushed out of projects that offered professional visibility, shuffled from project to project, systematically blocked from leadership opportunities, and assigned to positions below her level of experience and qualifications. In contrast, when Plaintiff was placed in low-visibility or short-term developer roles, she experienced comparatively better treatment, demonstrating a pattern of conduct designed to suppress her professional advancement. As a result, Plaintiff's

workplace environment at Booz Allen became increasingly hostile. On multiple occasions, direct reports on her project teams were turned against her, and repeated efforts were made to keep Plaintiff invisible and confined to more junior roles. Whenever Plaintiff's projects showed signs of success or increased visibility, her work was interfered with or blocked, and she was isolated from meaningful assignments.

126. Plaintiff, while employed by Defendant Booz Allen Hamilton, primarily worked on defense-related projects within the company's Defense Sector.

127. At all times relevant, Judi Dotson served as the Executive Lead and President of the Defense Sector, maintaining ultimate executive-level oversight, corporate decision-making authority, and total control over operations, project, and personnel within the Defense sector.

128. Prior to the events described below, Plaintiff had no personal interaction with Ms. Dotson due to Ms. Dotson's high-level position within the corporate hierarchy.

129. Shortly after Plaintiff began experiencing workplace adversity, which directly followed her protected whistleblower activity in August 2014, Plaintiff approached Ms. Dotson for a brief, routine professional introduction at an internal corporate networking event.

130. Upon hearing Plaintiff's name and introduction, Ms. Dotson immediately became visibly upset, acted overtly dismissive, and refused to engage in any professional conversation with Plaintiff.

131.    Given that Plaintiff had never previously interacted with Ms. Dotson, Ms. Dotson's immediate hostility and refusal to engage signaled that she was already fully aware of Plaintiff's identity, and her protected activity,

132.    Throughout the subsequent years, Plaintiff experienced an escalating pattern of adverse treatment in the workplace by Defendant Booz Allen Hamilton, including but not limited to negative changes in project assignments, the systematic stripping of professional responsibilities, and the creation of an intolerable, hostile work environment that rendered the performance of her job duties impossible.

133.    To repeatedly put the corporation on formal notice of this escalating retaliatory blowback, Plaintiff subsequently submitted multiple internal corporate complaints through authorized compliance channels including Chief Executive Officer Horacio Rozanski, Chief Legal Officer Nancy Laben, Chief People Officer Betty Thompson, Defense Sector President Judi Dotson, and other high-ranking senior executives.

134.    These formal internal complaints detailed the ongoing workplace mistreatment, adverse environment and the deliberately manufactured adverse environment designed to end Plaintiff's career at the company.

135.    Under established principles of agency law, because Chief Executive Officer Horacio Rozanski, Chief Legal Officer Nancy Laben, Chief People Officer Betty Thompson, and Sector President Judi Dotson acted as authorized agents, managing officers, and top executive decision-makers for Defendant Booz Allen Hamilton, their early and ongoing awareness of

Plaintiff's protected activities and complaints establishes actual corporate knowledge by, Defendant Booz Allen Hamilton.

136. With the ongoing challenges and workplace hostility Plaintiff continued to face, at different times Plaintiff explicitly communicated her belief to corporate personnel that the multi-year challenges she was facing with her projects, along with the overall workplace hostility, was driven directly by the retaliatory control exerted over her employment by Ms. Dotson in concert with Fairfax County actors.

137. On January 22, 2025, Plaintiff formally served Defendant Booz Allen Hamilton with a detailed legal demand letter outlining the statutory retaliation and unlawful workplace practices, providing the corporation with explicit, external actual notice of the ongoing retaliation.

138. In close proximity to Defendant Booz Allen Hamilton's receipt of the January 22, 2025 legal demand letter, Ms. Dotson abruptly announced her retirement and stepped down from her operational role as President of the Defense Sector within a couple of months.

139. Within six months of stepping down from her operational role, Ms. Dotson departed the company entirely, ending thirty-six years of corporate service.

140. The highly unusual timing of Ms. Dotson's abrupt operational step-down and total corporate departure, occurring immediately after the corporation was served with a formal legal demand regarding her executive overreach, is consistent with, and reflective of, a broader systemic and structural pattern of corporate concealment, retaliation, and active efforts by Defendant Booz

Allen Hamilton to insulate itself, bury evidence of executive-level knowledge, and evade legal accountability.

141.     The hidden conspiratorial nexus, shared corporate knowledge, and "meeting of the minds" driving this systemic retaliation openly manifested a mere six months after Plaintiff's forced departure from the company.

142.     In October 2024, the exact corporate leadership operating under Ms. Dotson stood side-by-side with members of the Fairfax County Board of Supervisors, including Chairman Jeffrey C. McKay, in a public celebration opening the joint Lorton Flagship Engineering Facility.

143.     As set forth more fully above, Defendant Booz Allen Hamilton possessed actual, express, and imputed corporate knowledge of Plaintiff's protected whistleblower activities, internal complaints, and the concurrent retaliatory conduct of its executives acting in concert with Fairfax County actors.

144.     When Plaintiff repeatedly reported these misconducts to project-team leadership and home-team leadership, and thereafter filed formal complaints, her reports were ignored, demonstrating that the forces behind the misconduct originated within leadership itself. The conduct violated the firm's stated core values, yet it was not merely tolerated when directed at Plaintiff; it was effectively empowered by leadership's silence and inaction. This institutional acquiescence permitted continued retaliation, obstructed remediation, and amplified the adverse effects on Plaintiff's career, reputation, and family.

**Projects Treatment**

145.     After engaging in protected whistleblower activity in August 2014 by reporting fraudulent practices within Fairfax County Public Schools to the U.S. Department of Education and the U.S. Department of Justice, Plaintiff's career advancement at Booz Allen was derailed. From that point forward, she was subjected to a sustained pattern of retaliation that directly followed her disclosures.

146.     Immediately after her protected activity, Plaintiff was removed from the long-term Bureau of Navy Medicine project she had built and successfully led for many years. She was blocked from leadership roles commensurate with her experience and forced into low-visibility, single-resource assignments, stripping her of leadership responsibilities, professional visibility, and opportunities for advancement. The project Plaintiff built had generated significant business growth for Booz Allen and enabled the placement of numerous employees, further underscoring the retaliatory nature of her removal.

147.     For years thereafter, Plaintiff faced ongoing obstruction in obtaining projects aligned with her seniority. She was repeatedly moved from one project to another, often placed on single-resource teams or in roles with significantly reduced visibility and responsibility. Despite this, Plaintiff persistently sought assignments that would restore her to leadership roles appropriate for her seniority and expertise. She succeeded in securing such roles only briefly— in September 2019, September 2021, and February 2023—before being pushed out again under retaliatory circumstances.

148. In the project Plaintiff secured in September 2019, which aligned with her experience and seniority, she performed strongly and contributed to the project's success. Nevertheless, she soon faced resistance. After returning from an overseas trip that included medical care, and while she had approved medical leave, Plaintiff was removed from the project in April 2020 and replaced by another employee. Her manager claimed the removal was due to funding concerns and suggested that additional team members might also be removed; however, no other team members were displaced, and Plaintiff was the only individual removed. This incident caused Plaintiff severe emotional distress and contributed to a serious medical condition after that she suffered for many months. Due to prior interference with her medical care, Plaintiff relied primarily on telehealth services. Her physician diagnosed her condition and recommended diagnostic imaging; however, because of the ongoing retaliation and her previous negative experiences involving interference with her medical providers and treatment, Plaintiff did not feel safe undergoing in-person procedures at that time. Plaintiff endured the condition for approximately eighteen months before ultimately achieving relief in mid-2021 through non-invasive, holistic methods and dietary adjustments.

149. In September 2021, Plaintiff joined a Navy defense project aligned with her expertise and experience. Although she was not leading a team, the role provided meaningful opportunities for impact, expansion of work, and the potential to bring in additional resources. However, Plaintiff soon encountered intentional obstruction that impeded the project's success, particularly while she was pursuing a market salary adjustment with her home-team leadership. Despite leadership's prior insistence that she secure a project to support this adjustment; Plaintiff was systematically held back from success in a hostile environment and ultimately

pushed out. Project Manager Carlicia Cobbin falsely accused Plaintiff of receiving complaints from "three government employees," even though Plaintiff had interacted with only one, who had offboarded her and sent a thank-you email. Ms. Cobbin further escalated the hostility by threatening to send the police if Plaintiff did not return her laptop, while simultaneously obstructing proper offboarding procedures. These actions created a retaliatory, intimidating environment directly tied to Plaintiff's protected whistleblower activity and her salary advocacy. Ms. Cobbin's conduct, including threats, false accusations, and interference with offboarding, was consistent with a coordinated pattern of retaliation orchestrated or condoned by Booz Allen leadership and the broader retaliatory network.

150.    After many attempts to secure a leadership role commensurate with her experience and skills, in February 2023, Plaintiff served as the Job Leader and Project Lead on the Defense Threat Reduction Agency (DTRA) IMAX MIT project.

151.    During the final three months of this contract (July through September 2023), Plaintiff was suddenly subjected to an aggressive campaign of insubordination, hostility, and professional sabotage by a senior developer, Isaac Sogunro who was her direct report under the project as well as her administrative team.

152.    Following the successful completion of a landmark SharePoint migration segment by Plaintiff, Isaac Sogunro abruptly shifted from a professional demeanor to open hostility, which included screaming at Plaintiff, refusing to attend daily scrum and task planning meetings, and cutting off essential communication channels during critical client release windows.

153. Isaac Sogunro actively sabotaged the contract timeline by introducing repetitive coding bugs, refusing to follow Plaintiff's strategic prioritization, and walking out of operational meetings when Plaintiff accurately estimated development tasks.

154. Plaintiff repeatedly and systematically escalated these severe core value and operational violations to immediate project management, including Sub-Task Lead and Job Leader Quinton Martin.

155. Reflecting the top-down domination of middle management by upper executives, Job Leader Quinton Martin explicitly admitted the extremity of the hostility Plaintiff faced, stating directly to Plaintiff that she had put her "blood, sweat, and tears" to finish the project and overcome an unprecedented onslaught of engineered operational obstacles.

156. Despite Quinton Martin's explicit, documented acknowledgment of Plaintiff's agonizing professional struggle, Overall Task Lead Nolan Albarelli overrode standard mitigation protocols and refused to issue mandatory written compliance warnings to the insubordinate developer.

157. In a highly irregular corporate maneuver designed to strip Plaintiff of operational authority, upper project leadership altered standard reporting structures by forcing upper-tier executives, including Vice President and Program Manager Jim Hurst and Executive Andrea Bernocco, into Plaintiff's routine daily scrum meetings to actively undermine her leadership.

158. When Plaintiff explicitly confronted Overall Task Lead Nolan Albarelli to ask why project leadership routinely ignored the severe compliance issues she reported regarding Isaac Sogunro, and reaffirmed her dedication to the contract, Nolan Albarelli explicitly dropped all professional pretexts and stated directly to Plaintiff that the project was "ending you."

159. Plaintiff immediately escalated Nolan Albarelli's retaliatory statement to her Job Leader, Quinton Martin, who expressed immediate confusion and explicitly stated to Plaintiff that Albarelli's claim was false, confirming that the IMAX MIT project was a secure, long-term contract and that the firm had specifically brought Plaintiff onto the team for long-term delivery, not just for the initial migration task.

160. Despite Quinton Martin's explicit administrative confirmation of the contract's long-term stability, the upper-tier meeting of the minds to eliminate Plaintiff was finalized a mere matter of days later, when management abruptly removed Plaintiff from the project on October 6, 2023, under the completely manufactured, pretextual guise that her role had "ended."

161. The retaliatory nature of this removal was conclusively established by the fact that Booz Allen intentionally maintained every other contractor and team member on the project active, targeting Plaintiff exclusively for removal.

162. On November 8, 2023, following this forced, pretextual offboarding, Plaintiff filed a comprehensive, formal corporate complaint through the company's official secure compliance platform (SpeakUp.com).

163. On that same day, November 8, 2023, Plaintiff sent a direct, explicit follow-up email to the Company's core Ethics Team and explicitly included the firm's Chief Legal Executive Officer, Nancy Liben, putting the highest levels of corporate command on actual notice of the severe core values violations and leadership collusion.

164.    In the formal disclosure, Plaintiff explicitly detailed the hostile treatment, the failure of Quinton Martin, Nolan Albarelli, Jim Hurst, and Andrea Bernocco to remedy the environment, and the systematic undermining of Plaintiff's professional role.

165.    Plaintiff had previously reported this recurring project-to-project harassment and offboarding obstruction to Ethics and Compliance and Human Resources in April 2021 and on February 23, 2022; however, every single case was closed without any substantive investigation, proving institutional acquiescence.

166.    On January 19, 2024, Plaintiff was presented with a two-week termination notice during a virtual meeting attended by Principal Alex Chapman and Plaintiff's manager, ParisaHashmaniwho remained silent throughout the meeting. During this meeting, Booz Allen offered Plaintiff a severance payment of $26,000, a practice Plaintiff understands the firm began implementing approximately six months prior. Plaintiff did not accept or sign the severance offer because the years of abuse and retaliation she endured could not be resolved or silenced by the proposed payment.

167.    Following her October 2023 removal and throughout the two-week termination period, every project for which Plaintiff applied, and which initially appeared promising, either received no response, was abruptly canceled, was placed "on hold," or was converted into a more junior role. These explanations were pretextual. Given Plaintiff's long tenure, her active participation in recruitment, and her extensive experience placing both team members and herself on projects, it was clear that these repeated denials and cancellations were deliberate and part of a targeted plan to terminate her employment. Plaintiff communicated this pattern to Kate

Brunst, the Talent Acquisition representative assigned to her, who provided no support. Plaintiff's employment was terminated on February 2, 2024.

168.    After being displaced from projects, Plaintiff consistently found subsequent roles on her own. Neither her project managers, her leadership team, nor the Talent Acquisition representative made any effort to assist her or showed any interest in placing her on new projects. Instead, they merely asked whether she had found a project—a passive inquiry starkly inconsistent with the proactive assistance Plaintiff herself provided to her direct reports. This failure to act deprived Plaintiff of employment continuity and advancement opportunities and constituted an adverse employment action within the ongoing retaliatory campaign.

169.    During the two-week notice period, Plaintiff was eligible to participate in internal sessions designed to assist employees seeking new project placements; however, she was never invited to any such sessions. After independently learning of one session, Plaintiff contacted Amy Price, one of the program facilitators, and attended the virtual session titled *"Finding Your Next Role"* on January 23, 2024. During the session, Plaintiff discovered that the chat function was disabled for her, while other participants were able to view and engage freely. Only after Plaintiff raised the issue was her chat access restored. Despite this correction, Plaintiff was excluded from the follow-up email sent to other attendees. Ms. Price later attributed the omission to a "computer issue."

170.    These events, combined with Defendants' longstanding and repeated retaliatory actions, including their exclusion of Plaintiff from internal mobility resources, their complete failure to make any effort to place her on a project despite her strong skills and high-demand credentials,

and their repeated pretextual project removals, underscore Defendants' intent to hinder Plaintiff's ability to secure continued employment and to force her separation from the company. This conduct constitutes a materially adverse employment action and further evidences the ongoing retaliatory campaign that ultimately culminated in Plaintiff's termination. The two-week termination period was extremely traumatic for Plaintiff, and when combined with nearly nine years of ongoing retaliation, harassment, and interference, it caused severe professional and personal distress, leaving Plaintiff with no viable path to continue her employment. As a direct result of Booz Allen's retaliatory actions, Plaintiff's employment was formally terminated on February 2, 2024.

171. Plaintiff tolerated nine and a half years of abuse because she understood that the external interference she faced would follow her regardless of where she worked. The same actors who pursued the retaliation showed no indication that they would cease their conduct.

172. Plaintiff rejected Booz Allen's $26,000 severance offer because she reasonably believed it was intended to buy her silence and conceal the years of retaliation, obstruction, and hostile treatment she had endured. Plaintiff further believed the offer was grossly inadequate to address the extensive harm caused by Defendants' unlawful actions. Plaintiff did not seek a severance payment; she sought the basic right to work with dignity and respect, free from retaliatory conduct—something she attempted to obtain for nine and a half years without success.

**Displacement Following Medical Leave and Resulting Medical Impact**

173. In April 2020, Plaintiff returned from an approved medical leave and an authorized short-term absence for medical reasons.

174. Within approximately one week of her return, Plaintiff's position had been replaced, leaving her without a defined role or responsibilities.

175. Plaintiff sought clarification from the Project manager, Laura Haring, who stated that Plaintiff needed to be removed from the project due to funding concerns and suggested that additional team members might also be removed. In practice, no other team members were displaced; Plaintiff was the sole individual removed from the project.

176. As a result of this unfair treatment, Plaintiff suffered severe emotional distress, including heightened stress and frustration, which directly contributed to the onset of a physical medical condition diagnosed by a medical doctor.

177. Plaintiff suffered from the medical condition for approximately eighteen months and ultimately achieved relief in mid-2021 through holistic treatment and dietary modifications.

### Complaints Ignored

178. Plaintiff filed formal complaints on three occasions, April 2021, February 23, 2022, and October 18, 2023, concerning recurring offboarding problems she routinely encountered on multiple projects. The February 23, 2022 and October 18, 2023 complaints additionally reported severe mistreatment by a manager and a direct report within Booz Allen's reporting structure. Plaintiff also notified firm leadership of these issues on the date of her separation. Plaintiff's complaints were not genuinely investigated; HR twice gave the appearance of

addressing her concerns but took no substantive action, and on multiple occasions matters were administratively closed without any investigation. This demonstrated a pattern of willful indifference and deliberate inaction by the firm.

**Denial of Market Salary Adjustment and Interference**

179. Plaintiff inquired about a market salary adjustment (MSA) for the last two and half years before her termination, but was consistently denied, despite being below the average for her level. This was confirmed by her previous manager, Keith Smith, who noted that her salary was below the 48th percentile for her level and qualifications.

180. On November 5, 2021, Plaintiff contacted Keirsten Sayles from HR, who handles matters for employees in her home team, to discuss receiving a market salary adjustment, which she had never received during her 13-year tenure at Booz Allen. Plaintiff highlighted that her salary was below the 48th percentile for her level. At that time, Keirsten was supportive and indicated that she would conduct a salary analysis, discuss the matter with Plaintiff's principal, Sean McDonald, and follow up. However, Keirsten never responded to Plaintiff's initial inquiry nor to a follow-up email sent five days later.

181. Plaintiff sent an additional follow-up on November 15, 2021, which also went unanswered. At this point, Plaintiff perceived that the lack of response indicated an unjustifiable barrier to her request.

182. On December 2, 2021, Plaintiff sent another email noting that it was unusual for Keirsten not to respond and expressed concern that something was amiss. Keirsten immediately replied, stating that she did not have the authority to make decisions regarding MSAs and that such

matters should be discussed with administrative leadership, who are the ultimate decision-makers. Subsequent discussions with Plaintiff's immediate and senior managers revealed that there was a deliberate roadblock preventing her from receiving a market salary adjustment.

183.    On or about May 2023, Plaintiff participated in a virtual salary discussion with the team's new HR representative, Mr. Henry Cleveland. During the meeting, Plaintiff observed the same recurring pattern she had experienced in prior virtual sessions: the proceedings were effectively controlled by an off-camera individual who orchestrated demeaning, interruptive, and undermining conduct directed at Plaintiff. This action aimed to control the salary discussion and deny Plaintiff rightful compensation, thereby advancing a campaign of retaliation and financial oppression.

**Privacy Violations at Booz Allen and Continuous Challenges with Proper Onboarding and Offboarding process**

184.    Plaintiff experienced repeated privacy violations and improper handling of access credentials, computer systems, and government-issued equipment during and after her employment. These incidents occurred across multiple periods of her employment and separation and involved failures to properly secure accounts, deactivate access, document equipment returns, and follow established onboarding and offboarding procedures. Plaintiff understood these actions, taken together, as part of an ongoing pattern of interference, control, and retaliation connected to her protected whistleblowing activities.

185.    Plaintiff alleges that she experienced privacy violations during her employment. On November 29, 2023, Plaintiff reported to the Booz Allen helpdesk that on multiple occasions

during 2023 she was unable to log into her work computer because the system displayed a message indicating that another user was logged into the device, preventing her from signing in.

The helpdesk ticket documented the incident as "someone else is still using this PC," which prevented Plaintiff from shutting down or logging into the computer. The incident record noted that the issue had occurred several times during the year, most recently on November 29, 2023, at approximately 1:38 p.m. EST.

Plaintiff did not receive a resolution to this issue. In light of the ongoing pattern of retaliatory conduct she had experienced, Plaintiff understood this incident to be part of the retaliation and targeting directed at her and therefore ceased further follow-up, concluding that further efforts would be futile.

186. Plaintiff also experienced another privacy violation after her employment ended. After she left the company, returned her CAC card (which should have been deactivated), and submitted her laptop for shipping, Plaintiff learned from another employee that three days later, her account was still logged in on Microsoft Teams. Typically, an employee's accounts are deactivated immediately upon separation. In Plaintiff's case, however, not only her account remained active, but someone apparently accessed data while logged in under her credentials. Plaintiff did not authorize this access and had no ability to control it.

187. Plaintiff experienced a hostile and intimidating treatment during her exit process at the CAC control office on Feb 2, 2024. On the Plaintiff's final day of employment, she returned her laptop and CAC card as required. When she requested written confirmation of the CAC card return, access control personnel Antonio Pitt refused to provide any receipt. When the Plaintiff

requested email confirmation, he sent an email containing only a subject line and no body text, and when she requested proper written acknowledgment, Pitt threatened to call security to have her escorted out, despite her full compliance with asset-return requirements.

For an employee who had served the company for approximately fifteen years, being treated in this manner during her exit was humiliating, degrading, and professionally distressing. Plaintiff reasonably expected a respectful and orderly separation process, and instead was subjected to hostility and intimidation.

As a result of this conduct, Plaintiff suffered significant emotional distress, hostility, lasting trauma, and the cumulative retaliation, which she understood to be part of a broader pattern ofwhistleblower retaliation, of which intimidation of this kind had been a recurring and defining characteristic of this retaliation over the years.

188.     Plaintiff experienced unauthorized handling of her government-issued laptop and related equipment during her employment. On November 6, 2015, while offboarding from the government agency contract, she was assigned to, Plaintiff was asked to return her laptop and badge to a team member, Jessenia Gonzales, who was also on the contract. Plaintiff expressed that, having received the laptop directly from the government agency, she would feel more comfortable submitting it herself and obtaining a proper receipt. Despite Plaintiff's repeated concerns, she was instructed that it was urgent and that she had to hand the laptop to Gonzales. Plaintiff's concerns were heightened because Gonzales and another team member, Alou Golden, who worked closely on the contract, exhibited conduct consistent with being

controlled or directed by others in ways that affected Plaintiff, consistent with patterns Plaintiff had repeatedly observed as a result of whistleblower retaliation.

189.    Plaintiff was instructed that the only alternative she has was to submit the laptop to her Career Manager, Keith Smith, for delivery to Gonzales. Plaintiff, left with no other choice, submitted the laptop through her Career Manager, feeling significant discomfort and concern over what would happen to the device.

190.    Upon following up for verification on November 19, 2015, Gonzales forwarded an email from the government representative indicating that the laptop had been received two weeks after submission. The "receipt" consisted only of a handwritten note. The proper Contractor separation form, which lists returned equipment and requires signatures, was never completed. Plaintiff's attempts to clarify the issue were met with futility and hostility, causing her to stop questioning.

191.    Approximately nine months later, when Plaintiff was onboarding to another project with the same agency on August 7, 2016, the Booz Allen point of contact (POC) and the Contracting Officer Representative (COR) from her previous assignment reported that no laptop or badge was indicated as returned on her separation form and no record of it could be found in the system. The COR for the new contract was initially unable to locate the returned laptop and badge.

192.    After nearly a month of back-and-forth communications, Plaintiff was informed that Booz Allen had worked with the prior COR to submit the necessary paperwork, confirming that she had returned the government equipment, and she was able to onboard successfully.

193. Plaintiff understood that being forced to submit her laptop despite her discomfort, the conduct of J. Gonzales and Alou. Golden, and the intentional, improper onboarding and offboarding process she was subjected to, were part of a broader pattern of interference, control, and retaliation directed at her in connection with her protected whistleblowing activities.

194. On the Navy project that Plaintiff was on between September 2021 to March 2022, during offboarding process, the project manager, Carlicia Cobbin, explicitly threatened Plaintiff that police would be involved if she did not return her laptop, while simultaneously obstructing proper offboarding procedures.

195. These incidents, together with the prior unauthorized account access, threats, and related conduct described above, demonstrate a continuing pattern of interference with Plaintiff's professional systems and unauthorized access to her work accounts and devices. Plaintiff understood that the repeated privacy violations, unauthorized account access, forced and improper handling of government-issued equipment, hostile exit treatment, and the intentional, improper actions taken during onboarding and offboarding were not isolated incidents. Taken together, these acts reflect a deliberate course of interference, control, intimidation, and retaliation directed at Plaintiff in response to her protected whistleblowing activities.

**Obstruction of New Employment Opportunities**

196. Following her termination, for many months Plaintiff applied for numerous positions out of financial desperation, but despite her credentials and years of experience, she was consistently rejected. Under normal circumstances for someone who has worked for Booz Allen andwith

having her credentials, finding a job should not be hard. However, hers was coming back with rejection after rejection and not even having a chance for interview. Defendants' actions had successfully undermined Plaintiff's professional reputation and standing, making it virtually impossible for her to secure new employment.

197. The only interview Plaintiff received during the relevant period occurred near the finalization of her divorce. The timing was significant, as the divorce proceedings were structured in a manner that deprived Plaintiff of any financial support for one year, while simultaneously requiring her to remain solely financially responsible for preserving substantial marital assets and assuming all related financial obligations.

198. These obligations had previously been made more difficult by the actions of the Defendants in or around 2020. Although similar interference did not occur during this later period, Plaintiff deliberately avoided pursuing refinancing because prior refinancing efforts at the end of 2019 had been rendered extremely challenging and exhausting due to substantial interference and serious legal issues affecting the transactions. As a result, Plaintiff sought to avoid re-exposing herself to the same risks and complications.

199. The prospective employer was a direct competitor of Booz Allen. Plaintiff was initially informed that she would be hired for a senior leadership position, and the interview process appeared to proceed favorably. However, following the interview, the narrative abruptly changed. Plaintiff was informed that the only available position was a different role with significantly lower seniority and compensation. This pattern mirrored the same conduct Plaintiff had previously experienced at Booz Allen.

200. During one round of interviews, Plaintiff observed that the interviewer appeared distracted and was actively communicating through chat messages, seemingly receiving real-time guidance during the interview. Plaintiff recognized this conduct as consistent with patterns of interference and control she had experienced in prior retaliatory contexts.

201. Plaintiff subsequently emailed the company seeking clarification regarding the unexplained change in role and salary. She received no response.

202. Ultimately, Plaintiff declined the position. Plaintiff also concluded that her rehiring and continued employment without interference or retaliation was effectively impossible. Although Plaintiff had long been aware of this reality, she nonetheless pursued the opportunity out of financial desperation resulting from her financial circumstances at the time.

**Judicial and Corporate Conspiracy to Exploit Divorce Proceedings and Influence Judicial Outcomes**

203. In the divorce case, the Plaintiff in this case was the Defendant while the Plaintiff's former spouse was the Plaintiff.

204. A meeting of the minds and a coordinated agreement among Booz Allen, Fairfax County actors and state actors, the Plaintiff's former spouse, and the presiding domestic relations judge is explicitly inferred through parallel conduct, discriminatory timing, and overt judicial intervention that directly benefited the corporate Defendant:

205. During the course of Plaintiff's divorce proceedings, the divorce court engaged in conduct that interfered with Plaintiff's ability to pursue legal action against Booz Allen and materially influenced the outcome of the divorce rulings.

206. The court was aware that Plaintiff had sent a formal demand letter to Booz Allen on January 22, 2025, demonstrating her intent to pursue legal claims, and further understood that Plaintiff, who was proceeding as Pro se, could not reasonably pursue two complex legal actions simultaneously.

207. During the domestic relations proceedings, the presiding judge abandoned judicial neutrality and explicitly advised Plaintiff not to pursue legal action against Booz Allen. This advice directly aligned with Booz Allen's corporate interest in suppressing its looming protected activity and retaliation liability.

208. Immediately after Plaintiff rejected this advice and stated on the record her clear intent to pursue her legal rights against Booz Allen, the judge executed a series of sudden, uncharacteristic reversals of prior court rulings.

209. These targeted reversals of prior rulings and the malicious prosecution operate in tandem with the Defendants' ongoing manipulation of State-Court divorce proceedings in Fairfax County to systematically drain Plaintiff's financial resources, with the explicit goal of forcing her into artificial insolvency and bankruptcy

210. The specific, unlawful purpose of creating this financial crisis was to render it impossible for Plaintiff to fund, sustain, or simultaneously pursue her complex civil rights and whistleblower claims against Booz Allen and the county actors.

211. The judge intentionally protracted and dragged out the domestic relations proceedings. This manufactured delay was designed to exhaust Plaintiff's time, energy, and remaining financial

resources while she was proceeding *pro se*, ensuring she was too overwhelmed to meet federal filing deadlines.

212. The conspiracy's onset is further evidenced by the Plaintiff's former spouse filing for divorce on May 2, 2024, less than twenty-four hours after Plaintiff's youngest daughter was accepted to Brown University. This timing was orchestrated to maximize emotional and financial leverage, targeting her daughters' Ivy League educational opportunities.

213. The systemic adverse rulings defying all established Virginia equitable distribution codes, the manufactured tactical delays, and the sudden, retaliatory reversals of prior orders were not independent exercises of domestic relations discretion. Instead, they represent the operational execution of the meeting of the minds and illicit agreement among the presiding judiciary, the Plaintiff's former spouse and his legal counsel, the Fairfax County actors, state actors, and Booz Allen. These entities functioned as a single, coordinated enterprise to weaponize the State Court's statutory powers, strip Plaintiff of her legal protections, and enforce the unlawful objectives of the conspiracy.

214. This corporate-judicial alliance successfully weaponized the state court machinery to cause Plaintiff financial ruin, with unworkable structure where all marital debts of about $800,000, all responsibilities of real properties, imposed on the Plaintiff and required Plaintiff to pay $656000 in monetary cash as well as refinance two jointly real properties in six months while still unemployed.

215. The domestic relations court's drastic deviation from established Virginia equitable distribution mandates was explicitly designed to force Plaintiff into bankruptcy, insulate Booz

Allen Hamilton and the Fairfax County actors from whistleblower retaliation and civil rights exposure, and maliciously obstruct Plaintiff's constitutional right of access to the federal courts.

216. As a direct and proximate result of this extrajudicial conspiracy and the systematic corruption of the tribunal, Plaintiff has suffered catastrophic, independent financial losses, the near-total destruction of her personal credit and estate, and severe, ongoing emotional and physical distress.

217. In further execution of this continuous conspiratorial agreement, the trial judge intentionally delayed and suppressed Plaintiff's motion for a stay of enforcement. This bad-faith obstruction was specifically calculated to run out the clock on Plaintiff's active Virginia appellate court proceedings, thereby rendering her appeal moot, forcing the immediate forfeiture of her real properties, and finalizing the conspirators' fraudulent objective of absolute financial ruin.

218. To completely insulate the unlawful trial court orders from meaningful judicial review, the conspiracy has expanded into the Virginia Court of Appeals registry. Operating in willful concert with the Corporate and County Defendants, the appellate clerks have systematically withheld, delayed, and blocked Plaintiff's emergency Motion to Stay from being presented to the appellate judges. This intentional, extrajudicial administrative blockade acts as a physical barrier to the court system, explicitly designed to let the trial court's destructive six-month liquidation and refinancing deadlines expire before an appellate judge can intervene, causing immediate, irreparable forfeiture of Plaintiff's real estate holdings.

**PERSONAL LIFE HARM AND RETALIATION TO CHILDREN**

**Targeted Retaliation Against Minor and Dependent Children.**

219. The conspiratorial agreement directly expanded its scope to target Plaintiff's children, utilizing calculated maneuvers to destabilize their academic futures, emotional well-being, and personal development as a direct mechanism of reprisal against Plaintiff for her protected whistleblowing and civil rights activities.

**Intentional Interference with Ivy League Educational Opportunities.**

220. As a direct manifestation of the meeting of the minds between Booz Allen, Plaintiff's former spouse, his legal counsel, trial judge, county and state actors, the co-conspirators intentionally disrupted the educational opportunities of Plaintiff's youngest daughter following her acceptance to Brown University. This included the strategic timing of the domestic relations filing and subsequent weaponization of financial constraints to intentionally jeopardize tuition funding, enrollment security, and institutional access.

221. In operational execution of their shared illicit objective, the Co-Conspirators specifically directed the Plaintiff's former spouse to withhold tuition payments for Plaintiff's daughter's education at Brown University. This deliberate non-payment was calculated to create an immediate, artificial barrier to the daughter's academic retention and standing.

**Intentional Infliction of Chronic Emotional Distress.**

222. By systematically blocking tuition infrastructure, the Co-Conspirators subjected Plaintiff's daughter to a continuous, two-year campaign of extreme psychological stress and academic insecurity. This protracted financial coercion forced the daughter to live under the constant threat of administrative withdrawal, institutional holds, and the sudden termination of her Ivy League education, causing profound personal life harm to both Plaintiff and her children.

**Manufactured Familial and Emotional Destabilization**

223.   The co-conspirators systematically weaponized the domestic relations machinery to sever familial stability, intentionally inflicting severe emotional distress upon the children. By orchestrating a manufactured financial crisis and defying Virginia statutory protections, the corporate, private, and state actors deliberately disrupted their support systems, and sought to compromise their long-term personal growth and security.

**Narrow Escape from Brown**

224.   After the retaliation Plaintiff endured in connection with her youngest daughter's enrollment at Brown University, Plaintiff's daughter narrowly escaped a mass-casualty shooting at Brown University on December 13, 2025. The shooting occurred in a classroom that Plaintiff's daughter was scheduled and expected to attend as part of a study session.

225.   Plaintiff's daughter avoided the incident only because she changed her mind at the last minute and decided to remain in her dormitory and study independently rather than attend the study session. As a result, she was not present in the classroom when the shooting occurred. Two students were killed in the attack, and multiple others were injured. Plaintiff alleges that, had her daughter attended the study session as planned, she could have been directly exposed to the lethal danger posed by the shooter.

226.   This traumatic event compounded Plaintiff's deepened fear for her children's safety, particularly within the context of the ongoing and escalating retaliation Plaintiff and her children had already been enduring.

227. The intentional interference in their lives, combined with the threat of violence, added to the pervasive sense of danger and vulnerability that has plagued Plaintiff's family for years. The impact of this near-tragedy further escalated Plaintiff's concern for the safety of her children, exacerbating the emotional toll already imposed by years of systemic retaliation and targeted harassment.

228. As a result of this life-threatening incident, coupled with the ongoing retaliatory conduct directed at them, Plaintiff and her children have suffered severe emotional distress.

229. This has created a long-term sense of insecurity that has significantly affected their health and quality of life. The constant fear of danger, both from the sustained retaliation they face and the uncertainty surrounding their safety, has left Plaintiff and her children grappling with significant and lasting psychological harm. The constant targeting, harassment, and instability have caused lasting emotional distress and trauma.

230. Plaintiff's children, in particular, have been forced to witness the deterioration of their family life, the ongoing struggles to access basic services, and the financial and professional hardships imposed upon their mother. This toxic environment has affected their emotional well-being and their prospects for a stable future.

**Severe Emotional Trauma Inflicted by Retaliatory Incarceration**

231. The campaign of intimidation reached its apex when the Co-Conspirators utilized the weaponized tenant/landlord relations machinery to subject Plaintiff to a retaliatory incarceration. Forcing the children to witness their mother subjected to unlawful imprisonment, financial destitution, and systemic judicial abuse caused severe, permanent psychological

trauma, profound emotional havoc, and deep developmental distress within the family unit.

**Irreparable Personal Harm to the Children**

232. The downstream effects of this orchestrated havoc directly compromised the children's independent personal and professional trajectories. The constant state of crisis forced the children to divert their vital focus, energy, and developmental years away from higher education and personal growth, instead requiring them to function in a state of survival to mitigate the financial and emotional emergencies inflicted upon their mother.

**A. Interference with Children Medical and Related Services**

233. After Plaintiff engaged in the protected activity filing with the department of education in 2015 and 2016, Defendants also extended their retaliatory campaign to Plaintiff's children medical care interfering with their medical care providers

**B. Children Expelled from Pediatrics Office:**

234. With the continuing retaliation for Plaintiff engaging in protected activity, in 2018, Plaintiff received an unsigned letter from her children's long-time Pediatrics office stating that her children could no longer receive care there and were being expelled from the practice. Plaintiff's children had been patients of this provider since birth, approximately eighteen years. This expulsion occurred immediately after a visit in which Plaintiff raised concerns about a laptop incident in which a device was dropped on her daughter's head, as well as broader concerns about her daughter's safety. The provider involved had previously documented the 2012 bullying incident and had consistently treated the children during their annual checkups. During the final visit, however, the doctor behaved unusually, suggesting that she was under external

pressure or influence. Plaintiff was then prevented from speaking with the doctor or any provider to understand the basis for the expulsion, which was outrageous and without justification. Following this incident, Plaintiff significantly limited medical visits for her children and did not secure a primary care provider for them for many years, further compounding the harm caused by Defendants' interference

## C. Interference with Private Therapy Service for Youngest Daughter

235.    At age of six, Plaintiff's youngest daughter was subjected to harsh bullying by her first-grade teacher which is detailed in sections above. This was an atrocious plan coordinated by then Principal Erin Jones and school officials to intentionally damage the child's reading ability.

236.    In third grade, the child's teacher, Mr. Walrod, brought up to Plaintiff if she ever noticed issues with her daughter's speech. While Plaintiff was concerned, she initially thought the child would outgrow it.

237.    At the age of twelve, with Plaintiff's daughter own initiative, requested to get a speech therapy to address herspeech issue. In response to her daughter's request, Plaintiff contracted and scheduled a private speech therapy service with "Exceptional Services," an independent provider outside of the school system.

238.    However, Fairfax County actors interfered with her ability to obtain appropriate evaluation and support, creating significant obstacles for Plaintiff in securing proper services and an accurate assessment.

239.    The evaluating provider appeared hesitant to issue a complete report and withheld critical findings being under control.

240.    The full speech reports finally obtained after much struggle and multiple requests by Plaintiff, confirm that the specific phonetic sounds and letters her daughter struggled with were supposed to be developed precisely at age six, the exact year she was bullied by the first-grade teacher Cummings, and experienced panic attacks for two consecutive days.

241.    Plaintiff alleges that the developmental damage from this trauma manifested in speech impediments.

242.    Although the practice initially appeared professional and caring, it became evident that the providers were operating under the influence of exerted power by powerful external actors.

243.    To cover up the systemic damage inflicted by the first-grade teacher, Fairfax County Actors actively interfered with the private speech therapy contract. This interference made it impossible for Plaintiff's daughter to receive the necessary therapy.

244.    Over the next two years, when Plaintiff attempted to schedule follow-up visits for her daughter, she was repeatedly and indirectly denied access to appointments, being told on multiple occasions that the schedule was full for extended periods.

245.    After numerous unsuccessful attempts, Plaintiff was effectively forced to give up seeking the service. As a result, her daughter was never able to obtain the necessary support, causing long-term harm.

246. These transparent excuses from the speech provider indicate that the Fairfax County actors dominated, influenced, and manipulated the private speech service provider to ensure they would not provide service to Plaintiff's daughter.

**D. Youngest Daughter Expelled from ADC College Access Program**

247. Plaintiff's younger daughter was enrolled in a college preparation program African Diaspora College Access (ADC), which assists students with college applications and has historically helped students gain admission to Ivy League and other top-tier universities.

248. During the time of Plaintiff's older daughters, who remained in Virginia schools, ADC facilitated their applications, but Plaintiff later discovered that one application, submitted on behalf of her older daughter to Duke University, was entirely falsified and never processed. This demonstrated early interference and a pattern of misleading actions intended to restrict her daughters' educational mobility.

249. On August 19, 2023, the first day of the program, Plaintiff's youngest daughter was abruptly removed from participating in the ADC program, and returned back fromthe parking lot.

250. Matheos Mesfin, the founder and the Executive Director of this nonprofit foundation, ADC, was on the phone in the parking lot, and appeared to be receiving instructions from another authority not to accept her.

251. When Plaintiff's daughter requested to speak with Matheos Mesfin directly, he continued the discussion with the other authority and refused to allow any direct conversation with Plaintiff or her daughter.

252. The removal was traumatic and emotionally devastating for then 17-year-old, who was denied participation alongside approximately 100 of her peers pursuing advanced college opportunities in their senior year of School.

253. Plaintiff alleges that this overt act arose from the concern that Plaintiff would continue to actively monitor and question her daughter's college applications, which would make it more difficult to carry out any plan to prevent access to top-tier colleges outside of Virginia and to influence the outcomes of the college admissions process.

254. Plaintiff alleges that this interference was an over act orchestrated by Fairfax County actors and state actors directing Matheos Mesfin to prevent the younger daughter from attending Ivy League or other top out-of-state colleges, continuing a long-standing plan to keep all daughters in Virginia schools.

**PERSONAL HARM AND RETALIATION TO PLAINTIFF**

255. After Plaintiff engaged in whistleblowing activity in August 2014 and formally reported misconduct within Fairfax County Public Schools by filing complaints with the U.S. Department of Education and the U.S. Department of Justice, the Fairfax County Defendants escalated their retaliation to a pervasive and intrusive level intended to punish, silence, and destabilize Plaintiff's life. The targeting extended far beyond interference with Plaintiff's daughter's education and expanded into efforts to obstruct her children's future college opportunities.

256. Over time, the retaliation intensified and began affecting multiple unrelated areas of Plaintiff's life. Plaintiff experienced interference with her employment, personal relationships, and access to essential services, including mortgage and financial services, insurance matters,

medical-related processes, legal services, and additional services across her daily life, with a volume of incidents too numerous to list individually. Even obtaining unemployment benefits became unusually difficult and was only resolved after Plaintiff sought assistance from the Governor's office in mid-2024.

### Retaliatory Flagging, Blacklisting, and Immediate Interference Triggered by Plaintiff's Protected Activity

257. As a direct result of Plaintiff's protected activity, including her reports to FCPS, the U.S. Department of Justice, and the U.S. Department of Education, Plaintiff reasonably believes that her name and identifying information were placed on internal or external watchlists, databases, or retaliatory flagging systems used by government agencies, contractors, or affiliated entities. This retaliatory designation appears to have been implemented to punish Plaintiff for her whistleblowing, restrict her mobility, and limit her access to opportunities.

Following her protected disclosures, Plaintiff began experiencing consistent, immediate, and unexplained interference whenever attempting to access services, employment opportunities, or routine support. These disruptions include abrupt changes in treatment after her identity is disclosed, sudden withdrawal of services, stalled processes, and coordinated obstacles that occur in real time. The timing and uniformity of these incidents strongly suggest the existence of an automated or manual alert associated with Plaintiff's name that triggers adverse action upon recognition.

The presence of derogatory or misleading internal labels, such as being flagged as a "non-investigative subject," "security concern," or similar designation, has likely contributed to

the obstruction of Plaintiff's career progression, professional standing, and access to basic services. This retaliatory flagging and blacklisting have caused severe and ongoing harm and form a central component of the broader pattern of retaliation, control, and interference described throughout this Complaint.

**Unlawful Surveillance and Invasion of Privacy**

258. Throughout the period of retaliation, Plaintiff's privacy was continuously violated. Defendants engaged in unlawful surveillance of Plaintiff's personal life, including monitoring her communications, tracking her movements, and accessing her private records without consent or legal authority. These actions were designed to intimidate Plaintiff, invade her privacy, and gather information to use against her in the retaliation campaign.

259. Plaintiff was repeatedly blocked from securing legal representation, encountering unexplained withdrawals, refusals, and disruptions that prevented her from filing this retaliation case earlier and ultimately forced her to represent herself in a complex divorce proceeding and in this federal action while Defendants continued actions adverse to her interests in both matters.

**A. Retaliatory Rumor-Spreading and Character Assassination by Doe Defendants**

Plaintiff became aware over time that Defendants, acting through Doe Defendants 1–5, had long been assigning individuals within her network to spread rumors and circulate false narratives about her. These Doe agents, acting at Defendants' direction, engaged in tactics commonly used in whistleblower retaliation, including false accusations, character-assassination techniques, and the deliberate dissemination of misleading information designed to undermine

Plaintiff's credibility. Such conduct is widely recognized as a retaliatory strategy used to isolate whistleblowers, damage their professional reputation, and create a false basis for further adverse actions. The sustained involvement of these Doe actors, who were specifically assigned by Defendants to carry out these acts, further demonstrates a coordinated effort to discredit Plaintiff and justify the ongoing pattern of retaliation following her engagement in protected activity.

**B. Deprivation of Prime Years, Life Opportunities, and Community Contribution**

Defendants' prolonged retaliation deprived Plaintiff of the prime years of her life—years in which she should have been advancing personally and professionally, contributing more fully to her community, and pursuing long-held goals and dreams. Instead, Plaintiff was forced to devote her time, energy, and resources to navigating continuous harassment, interference, and reputational harm. This sustained misconduct disrupted not only her career trajectory but her overall quality of life, limiting her ability to participate in community activities, support others, and pursue meaningful opportunities that would have enriched her life and the lives of those around her. Defendants' actions robbed Plaintiff of irreplaceable years, derailed aspirations she had worked toward for decades, and left lasting consequences that continue to affect her daily life and future prospects.

260. The targeting also extended to day-to-day services connected to Plaintiff's residential and other real-estate properties, which worsened significantly after 2024.

261. Plaintiff experienced immediate and unexplained interference when attempting to secure contractors, handymen, and maintenance providers, as well as disruptions involving tenants and

government agencies responsible for tenant-related payments. These actions formed part of a broader pattern of coordinated targeting that reached into areas wholly unrelated to Plaintiff's original complaints and caused substantial financial, emotional, and professional harm to Plaintiff and her family.

262. The real-time nature of the interference Plaintiff experienced could only have occurred through access to information that Plaintiff communicated privately, including through her phone conversations, emails, and other personal communications.

263. Plaintiff and her children were subjected to those repeated violations of their privacy. Plaintiff repeatedly observed for many years disruptions that aligned precisely with matters she discussed in private, indicating that her confidential communications were being accessed, monitored, or used without authorization.

264. These privacy breaches enabled Defendants or individuals acting in concert with them to anticipate Plaintiff's actions, interfere with her efforts to obtain services, and obstruct her ability to secure legal representation, thereby amplifying the retaliatory impact

**C. Interference and Falsification of Medical Records**

265. Sometime toward the end of 2017, after Plaintiff requested her medical records from her primary Physician, Plaintiff discovered that Defendants had interfered with her primary care physician and got her medical record tampered, where medical Information from her prior visits, including her most recent visit in July 2017, had been altered to create a fabricated medical history that supported a narrative favorable to Defendants.

266. Plaintiff reasonably believes these alterations were made to damage her credibility and construct false narratives to be used against her. Plaintiff requested her medical records following her July 2017 visit because she observed that her physician was acting unusually and attempting to introduce medical topics that were out of place and unrelated to the purpose of the appointment.

267. As a direct and foreseeable result of Defendants' interference with Plaintiff's medical care, combined with the sustained retaliation and efforts to exert control over her life following her protected activity, Plaintiff developed a profound and reasonable fear of seeking medical treatment after she learned of the interference with her provider and the tampering of her medical records in 2017.

268. During those years, despite having comprehensive federal health insurance coverage through her former spouse, Plaintiff avoided medical checkups and visits and did not secure a primary care physician since that time.

269. Defendants' conduct effectively deprived Plaintiff of access to routine and necessary medical care, stripped her of the basic right to access medical care without interference, forced her into prolonged self-neglect, and caused significant deterioration in her physical and emotional well-being.

270. The constant stress of knowing she could not safely seek medical attention if a serious illness or emergency arose inflicted immeasurable emotional harm. The impact of this interference was severe, long-lasting, and directly attributable to Defendants' retaliatory actions.

**D. Manipulation of Tenants and obstruction of Rental Property Business.**

271.   Since 2017, Defendants continued their campaign of retaliation by intentionally manipulating tenants in Plaintiff's rental properties.

272.   These efforts involved influencing tenants to damage property, break their leases, vacate properties randomly, or refuse to pay rent.

273.   Defendants coordinated with tenants to create instability and to deliberately interfere with Plaintiff's rental income, exacerbating her financial distress. These actions, including the manipulation of tenants and agencies such as DC Housing Authorities to withhold or abate rent payments, further restricted Plaintiff's ability to generate income and maintain her properties, which were vital sources of financial support.

274.   In 2017, one of Plaintiff's rental properties in Baltimore was unlawfully taken 'by the city' from her, part of the ongoing retaliation targeting her financial stability. The property was removed from Plaintiff's control under suspicious circumstances that pointed to an intentional effort to financially destabilize Plaintiff and remove her sources of income. This action was part of a broader effort to cripple Plaintiff's financial independence.

275.   While Plaintiff sought to stabilize her financial situation, she encountered further retaliation when attempting to use housing programs, such as DC Housing.

276.   In January 2024, Plaintiff was informed that a payment of $15,000, which she was supposed to receive for housing assistance, was mysteriously reduced to zero due to intentional delays and coercion designed to disrupt her ability to maintain stable housing. This interference was

part of an ongoing, coordinated effort to make Plaintiff's financial survival as difficult as possible.

277.    In a further example of retaliatory conduct, Plaintiff experienced a situation with a long-term tenant in her Baltimore property. This tenant, who had lived in the rental for over six years and had recently signed a new lease, unexpectedly informed Plaintiff via text message that they had vacated the property without notice. The tenant left the keys in the mailbox and informed Plaintiff that she could use the deposit as rent for the final month. This sudden and unexplained vacancy created further financial hardship for Plaintiff, who was already struggling to stay afloat due to the ongoing retaliation.

**E. Retaliatory Isolation, Community Interference, and Forced Removal From EEAE**

**Retaliatory Isolation and Community-Level Interference**

278.    As part of the broader pattern of retaliation following Plaintiff's protected activity, Plaintiff experienced systematic isolation within her own community and professional network. Defendants' actions, directly and through individuals acting in concert with them, resulted in Plaintiff being excluded from community spaces, prevented from contributing to organizations she helped build, and denied opportunities for leadership and visibility. These actions were intended to suppress Plaintiff's voice, diminish her credibility, and isolate her from sources of support.

**F. Systemic Removal from the Ethiopian Eritrean Alliance for Education (EEAE)**

279.    In 2015, Plaintiff co-founded the Ethiopian Eritrean Alliance for Education ("EEAE"), a nonprofit organization created by five community members to help parents navigate the school

system and support their children's educational needs. The organization was formed in direct response to the traumatic experiences Plaintiff endured within Fairfax County Public Schools ("FCPS"), and Plaintiff played a central role in shaping its mission and early work.

280. Beginning in 2016 and escalating in 2017, Plaintiff was subjected to sustained bullying, exclusion, and targeted hostility from individuals within the organization, including those who had originally built EEAE alongside her. This conduct was inconsistent with the organization's mission and occurred despite Plaintiff's foundational role and ongoing contributions.

281. One of the EEAE board members involved in pushing Plaintiff out was a former FCPS principal. Shortly after Plaintiff's removal, this individual was rehired by FCPS and later elevated to the position of Chief Equity Officer. The timing, context, and alignment of interests strongly suggest that FCPS and Fairfax County actors influenced or encouraged Plaintiff's removal as part of a broader effort to silence her, suppress her visibility, and undermine her credibility within her own community.

I. Retaliatory Suppression of Plaintiff's Community Participation and Leadership

282. Plaintiff's right to contribute to her own community was stripped away as a direct result of her protected activity, undermining the mission of the organization she worked tirelessly to build over four years. The betrayal by trusted community members who were controlled by Fairfax County actors, the loss of an organization Plaintiff helped create, and the coordinated effort to isolate her caused profound emotional harm. Plaintiff's removal from EEAE not only damaged her reputation and community standing but also deprived her of a vital platform for advocacy, leadership, and healing. This community-level retaliation further entrenched the

isolation and suppression that Defendants sought to impose and forms a significant component of the ongoing harm described throughout this Complaint.

**J. Retaliatory Interference with Constitutional Liberty, Educational Freedom, and Familial Integrity**

283. Defendants' prolonged and targeted retaliation struck at the core of Plaintiff's fundamental rights to life, liberty, and the pursuit of happiness, principles recognized in the nation's founding charter and protected through the Constitution's guarantees of autonomy, due process, and personal freedom. Defendants' conduct deprived Plaintiff of the prime years of her life, years in which she should have been free to pursue her goals and dreams, contribute to her community, and build the personal and professional stability that every individual is entitled to enjoy without private or government interference. Instead, Plaintiff was forced to navigate continuous harassment, reputational harm, and manufactured obstacles that constrained her ability to live her life on her own terms. These government-linked actions intruded upon Plaintiff's freedom to make personal and professional choices without coercion or intimidation, undermining her dignity, autonomy, and ability to pursue the opportunities and dreams that define a meaningful and self-directed life. The harm inflicted was not limited to her career; it permeated every aspect of her existence and continues to impose lasting and compounding consequences.

284. Defendants' retaliatory conduct, carried out by individuals and government-linked actors, extended beyond Plaintiff and unlawfully intruded into her daughters' educational and developmental opportunities by influencing, constraining, and manipulating their academic and life paths. Despite having no lawful authority to interfere with the daughters' independent educational decisions, Defendants falsified records, interfered with college applications, and

obstructed extracurricular and academic opportunities. These actions dismantled the daughters' access to top tier peer cohorts, influential faculty mentors, alumni sponsors, fellowship placements, networks essential for advancement into competitive fields and top graduate programs.

285. The resulting loss of opportunity, combined with reputational and psychological harm, materially altered the daughters' career trajectories, reduced their lifetime earning potential, and diminished their long-term social mobility. These actions were part of the same retaliatory campaign triggered by Plaintiff's protected activity and furthered Defendants' long-term objective of inflicting generational harm and obstructing the family's ability to pursue opportunities without unlawful interference. Through this conduct, Defendants deprived the daughters of constitutionally protected liberty interests, including their rights to educational freedom, personal autonomy, equal access to opportunity, and the ability to pursue meaningful life paths and happiness free from retaliatory intrusion by government-linked actors.

**A CONTINUED RETALIATORY CAMPAIGN AND COVERT CONSPIRATORIAL OPERATIONS POST-FEDERAL FILING (APRIL 2025 – PRESENT)**

286. Defendants, operating in concert as private and state actors, initiated a coordinated, covert retaliatory campaign explicitly designed to punish Plaintiff for exercising her First Amendment right to petition this Court, and to deter the continued prosecution of this federal lawsuit.

**A. Pretextual Termination of LegalShield Membership**

287.    On March 31, 2026, as an initial overt act in furtherance of this conspiracy, LegalShield— with whom Plaintiff maintained an active, unblemished membership for three (3) years— abruptly terminated Plaintiff's membership, issuing a nominal three-dollar ($3.00) refund.

288.    LegalShield's termination was a bad-faith, pretextual maneuver executed to deprive Plaintiff of contractually secured legal protection immediately prior to the execution of a planned legal ambush. LegalShield's reliance on its contractual cancellation clause—citing a member's purported inability to "accept or understand legal advice"—was a fraudulent subterfuge designed to isolate Plaintiff from legal counsel.

**B. Conspiracy with Tenant and Unlawful State Court Incarceration**

289.    Six days after the removal of Plaintiff's LegalShield membership, on April 6, 2026, in a coordinated next step of the conspiracy, a tenant, Ms. Roseboro, acting as a willing tool, agent, and co-conspirator of the Defendants, filed a vexatious, bad-faith lawsuit against Plaintiff in the Superior Court of the District of Columbia.

290.    Between April 15, 2026, and May 27, 2026, three successive judges of the D.C. Superior Court knowingly entered into the conspiratorial matrix. Abandoning all judicial neutrality, these judges acted as state-actor components of the covert retaliatory operation, subjecting Plaintiff to systematic constitutional deprivations.

291.    On April 15, 2026, a day after Booz Allen was served with the federal court complaint, the DC Superior Court Judge, Judge O'Connell tormented the Plaintiff with a complete retaliatory action, in structural violation of Plaintiff's Fourteenth Amendment Due Process rights, categorically refused to consider Plaintiff's testimonies, completely barred Plaintiff from

introducing exculpatory evidence, and accepted the unverified falsehoods of Ms. Roseboro without judicial scrutiny.

292. This pattern continued with another hearing set with Judge Okun on April 20, 2026.

293. On May 13, 2026 hearing, the presiding Superior Court judge, Judge Crowell also refused to look at any evidence the Plaintiff asked to present, threatened the Plaintiff with Jail while refusing to see any evidence and listen to any of her testimonies.

294. On May 27, 2026, the presiding Superior Court judge, Judge Crowell acting in the clear absence of all jurisdiction and in direct furtherance of the conspiracy, unlawfully ordered the summary detention of Plaintiff. Plaintiff was incarcerated for thirty (30) hours from May 27 to May 28, 2026.

295. Within couple of weeks of being served with the federal lawsuit, the Defendants conspired with state actors in this covert operation of severe retaliation of incarceration against the Plaintiff

296. During these sham proceedings, Plaintiff explicitly put the state court on notice, communicating on the record that the local litigation was a retaliatory mechanism manufactured solely to deter, obstruct, and punish the filing of her federal civil rights action.

297. This unlawful detention was to degrade, humiliate, and inflict severe psychological trauma upon Plaintiff and her dependent children.

298. To facilitate and track this unlawful incarceration, the court generated an internal case tracking number within its Criminal Division designated as "CNC Type."

299. As a direct and proximate result of this state-orchestrated entrapment, Plaintiff's lifelong record of personal and professional excellence was irreparably tarnished by an unlawful, overnight criminal incarceration executed without legal authority.

300. Upon her release from custody on May 28, 2026, Plaintiff was forced to face the presiding judge under continued threats of intimidation and silencing. In flagrant violation of the Sixth and Fourteenth Amendments, the court did not appoint defense counsel to represent Plaintiff, overriding explicit statutory mandates.

301. The joint retaliatory actions of the private defendants and the D.C. Superior Court judges constitute a classic "joint action" conspiracy under *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) and *Dennis v. Sparks*, 449 U.S. 24 (1980), wherein private parties who corruptly conspire with a judge act "under color of state law" for purposes of 42 U.S.C. § 1983 liability.

**C. Conspiratorial Sabotage of Property Title and Retaliatory Termination of Coverage**

302. In June 2025, Plaintiff initiated a formal insurance claim with her title insurance carrier, Stewart Title Guaranty Company ("Stewart Title"), concerning a critical defect discovered in the original deed of one of her rental properties executed twenty (20) years prior. Plaintiff sought the issuance and recording of a legally valid Corrective Deed to cure the title defect.

303. Rather than fulfilling their contractual and fiduciary obligations to defend and clear Plaintiff's title, Stewart Title and the legal counsel retained by the company to represent Plaintiff intentionally obstructed the curing process. The Title company and its attorney adamantly insisted on executing the correction via unlawful, legally deficient mechanisms.

304. Specifically, Stewart Title and the legal counsel retained by the company to represent Plaintiff attempted to compel Plaintiff to accept a process wherein original text within the twenty-year-old recorded deed would be physically stricken out and re-recorded. Alternatively, the Title Company and its attorney proposed the execution of a Quitclaim Deed. As experienced title professionals, Stewart Title and its legal counsel knew these mechanisms would fail to cure the defect and would intentionally manufacture severe future clouding of Plaintiff's title.

305. When Plaintiff raised legitimate legal objections to these deficient methods, the Title Company and its attorney shifted to active coercion. They repeatedly threatened Plaintiff that if she refused to accept their legally flawed and hazardous mechanisms, Stewart Title would immediately terminate her claim, cancel her legal representation, and strip her of insurance coverage.

306. To protect her property interests from this bad-faith duress, Plaintiff drafted a legally sound Corrective Deed independently. Although the Stewart Title's  retained attorney ultimately accepted the form of Plaintiff's drafted deed, they weaponized the execution process to further sabotage the title.

307. Despite possessing the direct, verified telephone number of the original Grantor, with whom they had previously spoken, the Title Company and its Attorney bypassed direct verification. Over Plaintiff's explicit objections, they mailed the Corrective Deed to three unverified addresses, subsequently returning to Plaintiff a signed document bearing a signature that was completely and visibly disparate from the Grantor's signature on the Original Deed.

308. Recognizing the severe risk of deed fraud, forgery, and future title litigation, Plaintiff immediately flagged the fraudulent signature discrepancy. Because all relevant parties were local, Plaintiff requested that the retained attorney arrange a brief, secure, in-person meeting with the Grantor to legally and safely execute the Corrective Deed.

309. Instead of executing this standard, low-cost professional step, the Title Company and its Attorney utilized Plaintiff's fraud-prevention request as a pretext to finalize their retaliatory objective. On May 14, 2026, Plaintiff received a formal "Termination of Representation Letter" from Stewart Title.

310. This abrupt termination of representation and bad-faith denial of insurance coverage was an intentional act of retaliation, synchronized with the broader state-and-private conspiracy detailed herein. The termination was designed to strip Plaintiff of property protections, leave her rental property title permanently compromised, and inflict severe financial distress to deter her from prosecuting her civil rights claims.

### VI. ALLEGATIONS SUPPORTING THE APPLICATION OF DEFENSE-BARRING DOCTRINES: CONTINUING VIOLATION, EQUITABLE TOLLING, AND EQUITABLE ESTOPPEL

311. Plaintiff explicitly realleges and incorporates by reference all prior paragraphs as though fully set forth herein. Doctrine, Equitable Tolling, Fraudulent Concealment, and Equitable Estoppel.Plaintiff asserts that Defendants are legally and equitably barred from raising or relying upon any statute of limitations defense under the doctrines of the Continuing Violation.

**A. The Continuing Violation Doctrine Applies to This Unbroken 13-Year Campaign**

312.   Under controlling Fourth Circuit and federal precedent, the statute of limitations does not begin to run on an ongoing, multi-year campaign of retaliation and harassment until the unlawful conduct completely ceases.

313.   The 13-year timeline of retaliation, surveillance, economic warfare, and harassment detailed in this Complaint does not consist of isolated, discrete, or disconnected incidents. Instead, it constitutes a single, continuous, and ongoing pattern and practice of retaliatory animus executed by a joint corporate-state alliance.

314.   Because the Defendants' overt acts, ranging from the original whistleblower suppression to the recent manipulation of state-court divorce proceedings and the engineered proxy arrest, are part of a unified, uninterrupted retaliatory operation that continues through the present day, the Continuing Violation Doctrine applies. Under the framework established in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), because at least one contributing retaliatory act occurred within the statutory filing window, the entirety of the 13-year narrative is fully actionable.

315.   Furthermore, because post-employment retaliation explicitly constitutes an actionable adverse event under Title VII—see *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997)—Defendants' recent escalated acts of harassment, property sabotage, and engineering a fraudulent arrest pull the full 13-year continuous timeline directly within this Court's active jurisdiction.

**B. Equitable Tolling Controls Due to Fraudulent, Covert Concealment**

316.   To the extent that any individual retaliatory act occurred outside the standard statutory window, the limitations period must be equitably tolled in the interest of justice.

317. The Defendants utilized highly sophisticated, covert operations, defense-sector resources, state-actor networks, and third-party proxies to intentionally shield their coordinated agreement and "meeting of the minds" from public view.

318. Because the Defendants actively, fraudulently, and successfully concealed the true nature, operational mechanisms, and explicit state-action nexus of their interconnected conspiracy, Plaintiff was systematically prevented from discovering the vital facts necessary to establish a federal cause of action earlier, despite exercising maximum diligence under extreme duress. It would be a profound miscarriage of equity to reward the Defendants with a statute of limitations defense when their own fraudulent concealment created the initial filing delay.

**C. Application of Fourth Circuit Equitable Estoppel to Defeat Statute of Limitations**

319. Under governing Fourth Circuit precedent, a defendant is legally estopped from relying on a statute of limitations defense if their own wrongful, deceptive, or obstructive conduct prevents a plaintiff from filing a timely claim. See *Martineau v. Wier*, 934 F.3d 385 (4th Cir. 2019).

320. Defendants are barred from invoking any timing defenses—including the 300-day Equal Employment Opportunity Commission (EEOC) administrative filing window—because they engaged in affirmative misconduct, active coercion, extreme duress, and deliberate interference with Plaintiff's access to legal counsel from 2014 through 2026. This systemic, bad-faith obstruction forced Plaintiff to proceed *pro se* to vindicate her constitutional and statutory rights despite exercising maximum diligence under extraordinarily hostile conditions.

321. Defendants actively compromised and dismantled Plaintiff's structural ability to retain legal representation. Defendants utilized constant, sophisticated, and unauthorized monitoring of

Plaintiff's private communications, including electronic mail, telephonic records, and confidential legal consultations. By intercepting and interfering with Plaintiff's outreach to private law firms and civil rights attorneys, Defendants intentionally disrupted the absolute privacy required to form an attorney-client relationship. This operational containment directly blocked Plaintiff from securing legal counsel, forcing her to stand as a *pro se* litigant in this major federal civil conspiracy case.

322.  To exhaust Plaintiff's remaining financial resources, inflict maximum emotional duress, and actively obstruct her from finalizing and filing this federal civil rights action, Defendants engineered, manipulated, and dragged Plaintiff into multiple highly demanding parallel legal battles. This coordinated multi-forum campaign includes the bad-faith manipulation of state-tribunal divorce proceedings, subsequent exhausting appellate court battles, and a retaliatory lawsuit in the D.C. Superior Court. These parallel proceedings were explicitly weaponized by the joint corporate-state alliance as tactical distractions to fracture Plaintiff's attention and bleed her resources, ensuring she could not timely consolidate her core federal claims.

323.  The Defendants' recent act of engineering a fraudulent arrest and a 30-hour jailing of a *pro se* litigant constitutes the ultimate physical obstruction of access to the courts. Defendants cannot legally or equitably argue that a litigation timeline has expired while they are actively deploying state power to throw Plaintiff in a jail cell to disrupt, delay, and sabotage this federal action.

**D. Plaintiff Exercised Extraordinary and Continuous Diligence Under Extreme Duress**

324.  Despite the overwhelming structural, financial, legal, and physical obstacles systematically deployed against her, Plaintiff exercised continuous, maximum, and extraordinary diligence at all times to expose the ongoing conspiracy and seek institutional remedies.

325. Exhausting all possible non-judicial avenues for relief, Plaintiff repeatedly sought direct intervention from high-level federal authorities. In 2018 and 2019, Plaintiff personally traveled to Capitol Hill and spent hours waiting directly in front of the offices of various United States Congressmen and Senators to secure meetings and formally report the corporate-state surveillance, civil rights violations, and whistleblower suppression.

326. Despite the fact that Defendants actively utilized their state-actor networks and administrative influence to restrict, complicate and hinder Plaintiff's physical and administrative access to these legislative offices over a period of several days, Plaintiff persistently stood her ground to blow the whistle to federal lawmakers.

327.  Because Plaintiff actively and exhaustively sought help from corporate executives, federal lawmakers, law enforcement agencies, and private legal counsel—only to be systematically blocked, monitored, legally attacked, and physically jailed at every turn by the Defendants—any delay in filing this action is entirely attributable to Defendants' active obstruction, and equity demands that all statute of limitations defenses be barred.

### E. ACTUAL INSTITUTIONAL NOTICE, MEETINGS OF THE MINDS, AND THE CORPORATE EVASION OF RESPONSIBILITY

328.  Former Global Defense Sector President Judi Dotson and Executive Vice President and Chief Legal Officer Nancy Laben, alongside other core executive committee members, possessed actual, long-term, and institutional notice of the ongoing retaliation for several

years. Top operational and corporate legal leadership did not merely learn of these structural violations recently. Plaintiff directly transmitted multiple formal complaints from approximately 2020 through 2024, detailing civil rights violations and retaliation via electronic mail directly to various members of the corporate Executive Board, including former President Judi Dotson and former Chief Legal Officer Nancy Laben.

329.    To ensure absolute institutional awareness at the moment of separation, Plaintiff transmitted a comprehensive, detailed legal notice to multiple corporate executive members, including Judi Dotson and Nancy Laben, mere minutes prior to Plaintiff's official, forced exit from the corporation on February 02, 2024. Despite these repeated formal notifications spanning multiple years, the executive leadership team failed to launch an honest investigation, implemented zero corrective actions, and consciously permitted the retaliatory campaign to continue unabated.

330.    Plaintiff alleges that the ongoing retaliatory conspiracy, pretextual, adverse actions, and hostile environment were intentionally authorized, maintained, and carried out by successive levels of leadership within Defendant Booz Allen Hamilton, in a clandestine, operational meeting of the minds and concert of action with Fairfax County and other state actors. This operational oversight and execution specifically included former Global Defense Sector President Judi Dotson, who governed corporate actions up until her departure in mid-2025.

331.    Defendants are legally and equitably estopped from relying on a statute of limitations defense because they actively and fraudulently concealed the material facts, operational conflicts of interest, and underlying state-action agreements that directly triggered Plaintiff's

termination. Defendant's high-level executive and legal leadership adjustments occurred in direct, immediate chronological proximity to Plaintiff's formal notification of a Legal Demand Letter sent to numerous executives on January 22, 2025, and the Federal Civil suit notification issued on March 30, 2026.

332.    Specifically, former Global Defense Sector President Judi Dotson, whom Plaintiff had previously identified to other employees as the executive principally responsible for targeting her and engineering challenges in the defense projects under her organization, abruptly announced her retirement, and stepped down from her operational role approximately in close proximity after Plaintiff formally served Defendant Booz Allen Hamilton with the January 22, 2025 detailed legal demand letter. Following, in six months she departed from the company after thirty-six years of service. The timing of Ms. Dotson's departure is consistent with, and reflective of, a broader systemic and structural pattern of corporate concealment, retaliation, and active efforts to evade legal accountability.

333.    The hidden conspiratorial nexus of this meeting of the minds openly manifested a mere six months after Plaintiff's forced departure from the company. In October 2024, the exact same corporate leadership under Judi Dotson stood side-by-side with the Fairfax County Board of Supervisors, including Chairman Jeffrey C. McKay, in a public celebration opening the joint Lorton Flagship Engineering Facility. While the physical facility was public, the behind-closed-doors commercial negotiations and corporate-state coordination required to secure that multi-million-dollar regional partnership were intentionally hidden from Plaintiff during her termination steps to mask the corrupt state-action motive.

334. Further demonstrating this ongoing pattern of evasion, a mere five (5) days after receiving the formal notice of the federal complaint filing, Executive Vice President and Chief Legal Officer Nancy Laben abruptly separated and retired from the corporation on April 2, 2026. The flawlessly synchronized alignment of these dates, where the top legal executive of the Company, Nancy Laben, who had personally received several internal complaints filed by Plaintiff over the years and took zero corrective action, left the firm a mere three days after being personally appended to the federal lawsuit notice, completely rules out any plausible assertion of a standard, coincidental retirement.

335. These synchronized executive exits demonstrate that the Company and its highest-ranking operational and legal executives were fully aware of the illegal conspiracy, failed to act when notified internally over a multi-year period, and actively took steps to evade corporate liability, conceal their meeting of the minds, and distance themselves once federal judicial oversight was explicitly triggered.

336. For all the reasons stated above, Defendants acted in close, synchronized joint action under color of state law to systematically dismantle Plaintiff's livelihood, limit College opportunity of her children, limit social mobility, corrupt her access to legal counsel and other services, violate her privacy, weaponize parallel state-court forums, and conceal their conspiratorial meeting of the minds. Because Defendants deployed their high-level executive infrastructure and state-actor networks to actively obstruct Plaintiff from seeking timely legal remedies while simultaneously engineering a fraudulent arrest to physically disrupt her access to the courts, equity will not reward their bad-faith evasion. Consequently, under the doctrines of the Continuing Violation Doctrine, Equitable Tolling,

Fraudulent Concealment, and Fourth Circuit Equitable Estoppel, Defendants are legally

barred from asserting or relying upon any statute of limitations defense, and Plaintiff's

claims must be heard on their full merits.

## VII. CAUSE OF ACTION

337. **COUNT I: VIOLATION OF 42 U.S.C. § 1983 – FIRST AMENDMENTRETALIATION**

*(Retaliation for Protected Whistleblower Speech on Matters of Public Concern)*
*(Against All Defendants)*

Plaintiff realleges and incorporatesby reference all preceding paragraphs as though fully set

forth herein.

**Protected Speech on Matters of Public Concern:** Plaintiff engaged in constitutionally

protected speech and whistleblowing under the First Amendment to the United States

Constitution by questioning, and formally reporting systemic misconduct, falsifications, and

potential corruption within the Fairfax County Public Schools and related institutional

entities. This protected speech explicitly addressed matters of public concern, including the

systemic manipulation of standardized testing scores and reports (such as the Virginia

Standard of Learning, Naglieri gifted testing), the alteration of official educational records,

and institutional cover-ups.

**Defendants' Knowledge of Protected Activity:** As set forth more fully above, Defendant

Booz Allen Hamilton possessed actual, express, and imputed corporate knowledge of

Plaintiff's protected whistleblower activities, internal complaints, and the concurrent

retaliatory conduct of its executives acting in concert with Fairfax County actors.

**The Joint Campaign of Adverse Actions:** Immediately following and in direct response to

Plaintiff's protected whistleblowing activity, Defendants, acting in a synchronized joint

concert of action under color of state law, initiated a continuous, multi-year campaign of severe adverse employment and administrative actions against Plaintiff. This coordinated retaliation was executed in close temporal proximity to her protected activities and included:

- **Professional Isolation:** Pretextually removing Plaintiff from high-visibility defense contracts beneath the Judi Dotson operational pyramid and intentionally restricting her access to professional advancement and corporate recognition.

- **Financial Penalization:** Intentionally suppressing Plaintiff's compensation by refusing to apply companywide and individual market salary adjustments over a consecutive three-year period, keeping her compensation artificially depressed at the 48th percentile compared to similarly situated peers despite stellar performance.

- **Workplace Hostility:** Authorizing, encouraging, and enabling an environment of systemic workplace disrespect, administrative bullying and targeted sabotage by colleagues and direct reports to render Plaintiff's professional standing untenable.

- **Economic Neutralization:** Executing a bad-faith, pretextual, and wrongful termination of Plaintiff's employment on February 02, 2024, to completely strip her of her financial livelihood.

- **Post-Employment Evasion:** Fabricating a false administrative record claiming Plaintiff "left voluntarily" or "failed to utilize resources" to actively conceal their retaliatory animus and evade legal accountability.

**Retaliatory Animus as the Motivating Factor:** Plaintiff's protected First Amendment speech was the motivating and substantial factor behind Defendants' adverse actions. The continuous pattern of harassment, structural compensation suppression, and ultimate discharge on February 02, 2024, were deliberately designed to punish Plaintiff for exposing institutional misconduct, obstruct her ability to seek legal redress, and silence her ongoing public advocacy.

**Joint Action Under Color of Law:** Defendant Booz Allen Hamilton, though a private corporation, willfully participated as a joint actor with Fairfax County actors and state actors to execute these adverse actions. Driven by a mutual financial and political motive to safeguard their shared regional defense-hub initiatives, corporate leadership leveraged its employment authority to accommodate state-actor demands. Consequently, all Defendants acted under color of state law within the meaning of 42 U.S.C. § 1983.

**Monell Municipal Policy and Custom:** The severe restrictions, surveillance, and retaliatory measures deployed by Defendants were authorized, maintained, and ratified by final municipal policymakers, including the governing School Board, with deliberate indifference to Plaintiff's Constitutional Rights. This continuous custom, pattern, and practice represent an official municipal policy, rendering the county and school board directly liable under *Monell v. Department of Social Services.*

**Causation and Harm:** As a direct and proximate result of Defendants' joint unconstitutional retaliation, Plaintiff was deprived of her fundamental First Amendment rights, suffered permanent devastation to her career trajectory, lost substantial income, benefits, and long-

term earning capacity, and suffered severe emotional distress, mental anguish, and

profound personal trauma.

330.  **COUNT 2: Civil Conspiracy, Malicious Child Bullying, and Tortious Interference withPrivate Medical Care**

*(42 U.S.C. § 1983 / State Common Law — Fourteenth Amendment Due Process)*
*(Against Fairfax County School Board and Fairfax County Administrative Cover-Up Actors — EXCLUDING Corporate Defendant Booz Allen Hamilton and the Individual School Principal)*

Plaintiff realleges and incorporatesby reference all preceding paragraphs as though fully set

forth herein.

This Count is based on a distinct, malicious phase of the conspiracy executed exclusively by

Fairfax County public school administrators and county employees. This claim seeks

independent, non-duplicative compensatory and punitive damages for the intentional,

extrajudicial childhood bullying campaign, the destruction of Plaintiff's private medical

contracts, the suppression of vital developmental services, and the severe emotional

distress inflicted directly upon Plaintiff as a target of county-level retaliation.

**I. The Conspiratorial Agreement to Inflict Domestic Distress**

- **The school-Level Collusion:** A Fairfax County public school principal entered into an

  illicit agreement and meeting of the minds with a public school teacher located at an

  external educational institution.

- **Malicious Target Selection:** The specific, shared objective of this agreement was to

  weaponize the educational environment to systematically bully, isolate, and terrify

  Plaintiff's then-six-year-old daughter.

- **The Motive of Collective Retaliation:** This targeted bullying campaign was deployed by county personnel as a calculated campaign to inflict severe psychological distress on Plaintiff by breaking her young child's sense of safety and intentionally disrupting her cognitive development and reading ability.

## II.Joint Action Under Color of Law and Entity Liability

- **Abuse of Educational Authority:** The school principal and the conspiring teacher utilized their official titles, state-mandated control over children, and the physical facilities of Fairfax County Public Schools under color of law to execute this abusive bullying scheme.

- **School Board Execution:** The Fairfax County School Board is liable for the systemic failure to protect the student and for the subsequent administrative decisions used to conceal the bullying.

## III. Overt Acts of Extrinsic Interference and Contract Sabotage

- **Sabotage of Private Medical Treatment:** Upon learning that Plaintiff sought professional medical intervention to treat her child's newly induced speech and cognitive injuries stemming from the bullying, Fairfax County administrative actors intentionally stepped outside their lawful employment to intervene in Plaintiff's relationship with her private speech therapy provider.

- **The Administrative Blockade:** County officials used extrajudicial pressure and administrative leverage to intimidate, disrupt, and corrupt the private provider's

assessment, directly causing a severe deprivation of necessary clinical services for the child.

- **Obstruction of Justice:** This interference was an explicit, bad-faith cover-up designed by county actors to suppress medical evidence of the school's malicious bullying, alter clinical records, and prevent Plaintiff from obtaining the evidence necessary to seek legal redress.

## IV. Constitutional Injury and Tortious Interference

- **Interference with Business and Medical Relationships:** Plaintiff had a valid, binding relationship and contract with a private medical provider. County actors intentionally, improperly, and maliciously interfered with that relationship, causing a direct breach in the integrity of the medical treatment.

- **Intentional Infliction of Emotional Distress:** The defendants' targeted weaponization of a malicious bullying campaign against Plaintiff's young child was extreme, outrageous, and went beyond all bounds of human decency, deliberately causing Plaintiff to suffer severe mental anguish and helplessness.

## V. Proximate Causation and Severe Damages

- **The Non-Economic Parental Toll:** The absolute blockade of medical care and the forced disruption of speech services following the bullying caused Plaintiff immense psychological suffering, profound helplessness, and ongoing anxiety regarding the long-term, permanent effects this trauma will manifest in her daughter's adult life.

- **The Collateral Source Value:** Under the collateral source rule, the values of all medical, speech, and therapeutic treatments rendered—regardless of insurance coverage—constitute a direct financial liability against the defendants due to their intentional subversion of the contract.

**331. COUNT 3: FIRST AND FOURTEENTH AMENDMENT VIOLATIONS UNDER 42 U.S.C. § 1983**

*(Unlawful Restraint from school, Access Restriction, and Interference with Parental Liberty)*
*(Against Defendants Fairfax County, The Fairfax County School Board, and Does 1–15)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

**Protected Liberty Interests:** Under the First and Fourteenth Amendments to the United States Constitution, Plaintiff possesses a protected liberty interest in directing the education and welfare of her children, a fundamental right to petition the government and school officials for a redress of grievances, and a constitutionally protected right to privacy in her personal communications.

**Constitutional Violations:** Defendants Fairfax County, the Fairfax County School Board, and their agents, operating under color of state law, knowingly and systematically violated these constitutional protections by implementing arbitrary communication bans, requiring administrative chaperones for standard parent-teacher conferences, and imposing absolute prior restraints on Plaintiff's ability to contact her children's educational providers. These restrictions culminated in an extreme, retaliatory, and continuous three year no-trespass order issued by the school principal, which unconstitutionally banned Plaintiff from entering school grounds or accessing campus facilities without advance administrative permission.

**Unlawful Administrative Interception:** The Fairfax County Public Schools under the purview of the Fairfax County School Board, further executed an unlawful and covert system of surveillance and administrative interception by intentionally rerouting Plaintiff's private communications away from Student Services and into the hands of antagonistic administrators, in complete disregard of standard administrative protocols and constitutional privacy boundaries.

**Monell Municipal Liability:** The governing School Board and the division Superintendent possessed actual, explicit knowledge of these violations. Plaintiff formally petitioned them to lift these restrictions; however, these final policymaking authorities deliberately refused to intervene or take corrective action. This willful inaction was executed with a specific intent to maintain administrative control over Plaintiff, silence her advocacy, and conceal the school division's ongoing misconduct. Consequently, this continuous custom and deliberate indifference represents an official policy, pattern, or practice authorized by final municipal decision-makers, rendering Defendants directly liable under *Monell v. Department of Social Services.*

**Causation and Harm:** As a direct and proximate result of these municipal constitutional deprivations, Plaintiff suffered an independent, catastrophic psychological toll, severe personal trauma, financial strain, and a continuous, systemic disruption to her fundamental parental liberties and familial life.

332. **COUNT 4 : VIOLATION OF 42 U.S.C. § 1983 – DEPRIVATION OF FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS RIGHTS**

*(Against All Defendants)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

Under the Fourteenth Amendment to the United States Constitution, a citizen cannot be deprived of liberty or property interests by the state, including fundamental parental liberties, freedom of movement, and protected employment status, without due process of law, which strictly guarantees the right to fair notice, an opportunity to be heard, and a neutral administrative adjudication.

Defendants, acting under color of state law or in a coordinated joint concert with state actors, intentionally and maliciously deprived Plaintiff of her constitutionally protected liberty and property interests without a shred of due process. State actors, including Fairfax County officials, school board personnel, and other municipal employees, actively participated in, enabled, and executed this retaliatory scheme by providing administrative support and shared intelligence to private corporate actors beneath the Judi Dotson operational pyramid.

**Concrete Overt Acts of Due Process Violations:** In direct violation of the Fourteenth Amendment, Defendants executed severe, life-altering administrative deprivations against Plaintiff without providing her with formal notice, an administrative hearing, or any meaningful opportunity to contest the actions, including:

- **Arbitrary Physical Ban:** Issuing and enforcing a continuous, punitive **three-year no-trespass order** that physically barred Plaintiff from entering public school grounds or accessing campus facilities, directly infringing upon her parental liberties.

- **Clandestine Interception:** Constructing a covert administrative mechanism to intentionally intercept and reroute her private parental communications away from Student Services, bypassing standard municipal protocols without disclosure.

- **Joint Employment Sabotage:** Coordinating back-channel state influence to corrupt Plaintiff's employment status at Booz Allen Hamilton, utilizing fabricated administrative pretexts to execute a sudden project removal and ultimate termination on February 02, 2024, without standard internal corporate review.

**Joint Corporate-State Action:** Private corporate Defendants who jointly engaged with these municipal officials willfully aligned their employment authority with state power to carry out the challenged conduct. Because Booz Allen Hamilton acted in concert with Fairfax County networks to enforce these administrative and economic deprivations in exchange for localized commercial goodwill and contract security, all private participants acted under color of law for the purposes of 42 U.S.C. § 1983.

**Causation and Harm:** As a direct and proximate result of Defendants' unconstitutional and malicious deprivation of her Fourteenth Amendment due process rights, Plaintiff has suffered significant and catastrophic harm, including severe emotional distress, deep mental anguish, permanent damage to her personal and professional reputation, substantial economic losses, the total destruction of her long-term career trajectory, and a profound loss of personal safety and security.

333. **COUNT 5: VIOLATION OF 42 U.S.C. § 1983 – CIVIL RIGHTS CONSPIRACY**

*(Phase II: Municipal Retaliation, School System Suppression, and Parental Liberty Interference)*
*(Against Defendants Fairfax County, The Fairfax County School Board, and Does 1–50)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

**The Municipal-Administrative Agreement:** Plaintiff alleges that the municipal Defendants, including Fairfax County, the Fairfax County School Board, and local administrative actors, reached a distinct, separate meeting of the minds and continuous agreement to weaponize local administrative systems against Plaintiff's household. The explicit objective of this conspiracy was to penalize Plaintiff for her 2014 disclosures regarding systemic public school corruption and assessment falsification.

**Overt Acts of Broad Administrative Harassment:** In furtherance of this distinct municipal conspiracy, the county and school actors coordinated an unconstitutional pattern of non-employment overt acts, including implementing arbitrary communication bans, enforcing a retaliatory three-year no-trespass order to physically bar Plaintiff from school grounds, and constructing an unauthorized system to digitally intercept and reroute Plaintiff's private parental emails.

**Causation and Harm:** As a direct and proximate result of this continuous municipal conspiracy, Plaintiff suffered a catastrophic psychological toll, severe personal trauma, and an ongoing, unconstitutional disruption to her fundamental parental liberties and familial security.

### 334. COUNT 6: VIOLATION OF 42 U.S.C. § 1983 – CIVIL RIGHTS CONSPIRACY

*(Phase III: Multi-Forum Litigation Abuse, Judicial Sabotage, and Proxy Arrest)*
*(Against All Defendants)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

**The Multi-Forum Obstruction Agreement:** Plaintiff alleges that the Defendants, acting in a continuous joint concert of action, expanded their conspiratorial meeting of the minds to weaponize outer judicial and administrative tribunals. The explicit objective of this phase of the conspiracy was to create severe personal distractions, deplete Plaintiff's remaining financial resources, and physically obstruct her from finalizing and maintaining this federal civil rights action.

**Overt Acts of Litigation Abuse and Proxy Enforcement:** In furtherance of this obstruction conspiracy, Defendants coordinated back-channel legal and administrative processes to drag Plaintiff into parallel, highly exhausting legal battles across multiple jurisdictions. These coordinated overt acts included the bad-faith manipulation of state-tribunal divorce proceedings, subsequent appellate court battles, and a retaliatory lawsuit in the D.C. Superior Court. This phase of the conspiracy culminated in the engineering of a fraudulent proxy arrest and a 30-hour physical jailing of Plaintiff to disrupt her access to the courts.

**Causation and Harm:** As a direct and proximate result of this ongoing obstruction conspiracy, Plaintiff suffered a total disruption of her federal litigation access, extreme financial exhaustion, acute physical fear, a total violation of her liberty interests, and profound trauma to her household.

335. **COUNT 7: VIOLATION OF 42 U.S.C. § 1983 – FIRST AMENDMENT RETALIATORY HOSTILE WORK ENVIRONMENT VIA JOINT CORPORATE-STATE CONSPIRACY**

*(Against All Defendants)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

The Constitutional Framework: Under the First Amendment to the United States Constitution and 42 U.S.C. § 1983, a citizen has an absolute right to be free from an ongoing, systemic, and retaliatory hostile work environment engineered by state actors, or private entities acting in concert with state actors, designed to penalize and silence them for exercising protected speech on matters of public concern.

Protected Speech on Systemic Educational Fraud: Plaintiff engaged in protected First Amendment speech by reviewing, objecting to, and formally exposing systemic corruption within the Fairfax County Public Schools, specifically including the institutional fabrication of standardized assessment reports, the alteration of testing scores (such as Naglieri gifted testing), and the falsification of official academic data. Exposing the systemic manipulation of public educational data and subsequent administrative cover-ups constitutes speech on a matter of core public concern.

**The Long-Term Conspiratorial Design and Motive**: Plaintiff alleges that immediately following her disclosures, Fairfax County and state actors entered into a long-term, calculated conspiratorial design with Defendant Booz Allen Hamilton's Global Defense Sector leadership under Judi Dotson. Driven by a mutual desire to suppress Plaintiff's protected speech and protect their shared regional commercial initiatives, the conspirators sought to systematically destroy Plaintiff's financial security. The explicit, long-term objective of this corporate-state alliance was to financially incapacitate Plaintiff to ensure she could not afford to secure Ivy League higher education and top-tier academic opportunities for her children, thereby limiting her family's social mobility and punishing her advocacy.

Execution of the Retaliatory Hostile Work Environment: To execute this long-term design, Fairfax County and state actors actively conspired with and interfered inside Plaintiff's workplace at Booz Allen Hamilton to manufacture a continuous, multi-year hostile work environment. Operating under color of law, the joint conspirators executed an unbroken pattern of workplace containment and professional sabotage, which included:

**The April 2020 Pretextual Target**: Executing a sudden adverse action a mere one week after Plaintiff returned from approved medical leave in April 2020, stripping her of leadership responsibilities and removing her from her high-visibility assignment under the fabricated pretext of "funding concerns" to immediately isolate her.

**Compensation and Salary Suppression**: Intentionally blocking and delaying Plaintiff's qualified individual market salary adjustments for over two consecutive years, actively keeping her pay artificially depressed below the 48th percentile of the expected pay range to orchestrate her financial collapse.

Destabilization of Leadership and Visibility: Systematically blocking Plaintiff from accessing high-profile defense projects, restricting her professional visibility, and stripping her of leadership roles essential to her career advancement.

**Workplace Sabotage:** Influencing, encouraging, and manipulating colleagues, team members, and direct reports to actively obstruct Plaintiff's technical deliverables, ignore her authority, and exclude her from mission-critical communication channels.

**The Final Culmination on February 02, 2024:** This multi-year, joint corporate-state harassment campaign was deliberately sustained to wear down Plaintiff's resources, isolate her professionally, and strip her of her livelihood. The retaliatory hostile work environment

completed its trajectory on February 02, 2024, when Defendant Booz Allen Hamilton, acting in concert with and to appease its municipal partners, executed her formal wrongful termination.

**Causation and Harm:** As a direct and proximate result of Defendants' joint unconstitutional retaliation, Plaintiff suffered a catastrophic destruction of her 15-year career trajectory, total loss of professional income, benefits, and long-term defense-sector earning capacity, the complete devastation of her family's financial security, severe emotional distress, the profound exacerbation of an existing medical condition, and extreme professional isolation, entitling her to full compensatory damages, punitive damages, and reasonable attorney's fees and costs under 42 U.S.C. § 1988

336.  **COUNT 8:  VIOLATION OF 42 U.S.C. § 1983 – CIVIL RIGHTS CONSPIRACY TO DEPRIVE LIBERTY INTERESTS IN PROFESSION (_"STIGMA-PLUS"_)**

*(Against All Defendants)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

**The Federal Constitutional Framework:** Under 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment, a citizen possesses a constitutionally protected liberty interest in their professional reputation, trade, and livelihood. When state actors, or private entities acting in concert with state actors under color of law, conspire to circulate false, stigmatizing, and defamatory statements about an individual **(the Stigma)** in direct conjunction with a retaliatory deprivation of employment or physical liberty **(the Plus)**, they commit an actionable federal constitutional violation.

**The Covert Meeting of the Minds:** Plaintiff alleges that Booz Allen Hamilton executives, acting under color of law, reached an operational meeting of the minds and conspiratorial agreement

with Fairfax County municipal actors and state proxies. The explicit objective of this federal conspiracy was to launch a coordinated campaign of character assassination, judicial manipulation, and economic neutralization to suppress Plaintiff's protected whistleblower speech and completely ruin her standing in her industry.

**Overt Acts of Coordinated Stigmatization (The Stigma):** In furtherance of this federal civil rights conspiracy, Defendants executed a coordinated cross-agency smear campaign to generate a highly damaging "Stigma" against Plaintiff. This character assassination relied on three fabricated, non-retaliatory narratives designed to professionally isolate her:

- **The "Voluntary Departure" Stigma:** Circulating the false administrative claim across corporate and tribunal records that Plaintiff "left the corporation voluntarily" and "refused corporate support," explicitly to mask a bad-faith retaliatory firing.

- **The "Uncooperative Employee" Stigma:** Documenting that Plaintiff "failed to utilize internal resources to find assignments," while corporate leadership was actively blocking her visibility and project placement from the inside.

- **The "Unstable Harasser" Stigma:** Fabricating administrative and local school records to falsely paint Plaintiff as a "disruptive," "unstable" parent who "harassed" or "personally attacked" officials, weaponizing these slurs to justify a 3-year notice of trespass, the digital interception of her emails, and to poison her evidentiary credibility before the D.C. Superior Court and parallel tribunals.

**The Tangible Execution of Career and Physical Deprivation (The Plus):** Concurrently, Defendants paired this multi-forum Stigma with the "Plus"—executing tangible, severe

deprivations of liberty and property under color of state law. These overt acts included stripping Plaintiff of her leadership roles beneath the Judi Dotson pyramid, freezing her market salary adjustments below the 48th percentile, executing her wrongful termination on February 02, 2024, and actively sabotaging her rental business. This campaign culminated in **June 2026** when conspirators weaponized a local housing forum to engineer a fraudulent criminal record, resulting in Plaintiff being unlawfully arrested and **incarcerated in a jail cell for thirty (30) consecutive hours** to forcefully disrupt her federal litigation deadlines.

**Joint Action Under Color of Law:** Private-sector corporate Defendants willfully participated as joint actors with Fairfax County state officials to execute this professional and personal destruction. Driven by a mutual financial and political motive to protect their shared regional partnerships and upcoming commercial initiatives (including the Lorton facility), corporate leadership leveraged its employment authority to accommodate state-actor demands, rendering all Defendants liable as joint state actors acting under color of state law.

**Causation and Harm:** As a direct and proximate result of this joint federal civil rights conspiracy under 42 U.S.C. § 1983, Plaintiff suffered an absolute deprivation of her constitutional liberty interests in her profession. Plaintiff suffered an absolute loss of corporate and independent real estate income, benefits, and earning capacity causing permanent devastation.

337. **COUNT 9: VIOLATION OF 42 U.S.C. § 1985(2) – CONSPIRACY TO OBSTRUCT JUSTICE THROUGH WITNESS INTIMIDATION AND RETALIATION**
*(Against All Defendants)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

**The Federal Statutory Framework:** Under 42 U.S.C. § 1985(2), it is unlawful for two or more persons to conspire to injure, harass, threaten, or intimidate a party or witness in any Court of the United States, or to retaliate against a party on account of their having attended or testified in a federal proceeding.

**The Clandestine Retaliatory Conspiracy:** Plaintiff alleges that Defendants—including Booz Allen Hamilton executive leadership within the Judi Dotson defense sector pyramid, Fairfax County municipal actors, and associated private proxies—entered into an ongoing, multi-layered conspiracy and meeting of the minds. The specific, unlawful objective of this conspiracy was to obstruct justice by deploying extrajudicial, non-employment harassment across multiple life domains to terrorize, exhaust, and financially deplete Plaintiff, thereby forcing her to abandon her protected federal civil rights disclosures and formal petitions to the Department of Justice and the Department of Education.

**Overt Acts of Extralegal Harassment and Containment:** In furtherance of this conspiracy to obstruct justice and intimidate a federal witness, Defendants coordinated an unbroken pattern of overt acts designed to destabilize Plaintiff's financial security, personal stability, and ability to function in daily life, including:

- **The June 2015 Keene Mill Elementary Execution:** Initiating the conspiratorial campaign at Keene Mill Elementary School (KMES) by fabricating false allegations of "disruption" against Plaintiff and issuing a bad-faith notice of trespass immediately after she requested her children's academic assessment data, directly attempting to conceal discrepancies between online and paper reports.

- **Coordinated Service and Financial Sabotage:** Leveraging corporate influence and state-actor administrative networks to covertly interfere with Plaintiff's access to essential personal and professional services, including targeted disruptions of her medical care, insurance providers, title companies, real estate transactions, and independent contractors.

- **Exploitation of Property Management and Tenants:** Actively manipulating Plaintiff's property management operations by weaponizing tenants and manufacturing artificial property-related obligations to intentionally engineer financial instability.

- **Malicious Family and Educational Interference:** Interceding in Plaintiff's household structure by manipulating children's educational milestones and college application processes, explicitly targeting and attempting to restrict her daughter's access to Ivy League and top-tier higher education opportunities (including her subsequent admission to Brown University) to inflict catastrophic emotional duress and limit long-term familial social mobility.

**Misdirection of Tribal and State Proceedings as an Overt Act:** Defendants furthered their federal obstruction conspiracy by feeding falsified records, fabricated performance metrics, and perjured characterizations into outer state court tribunals and parallel divorce proceedings. Conspirators intentionally weaponized these external legal battles as administrative shields, utilizing them to drain Plaintiff's financial reserves and manipulate the state-court record to falsely assert that Plaintiff "left her employment voluntarily" or "refused corporate support,"

explicitly aiming to sabotage her credibility before federal judicial oversight could be fully triggered.

**Actual Malice and Intent to Obstruct:** The multi-domain targeting of Plaintiff's personal, financial, and family life was executed with actual malice and reckless disregard for her civil rights. These actions were not isolated personal disputes, but rather a sophisticated, synchronized campaign of intimidation designed to punish a federal whistleblower and physically and financially deter her from vindicating her constitutional rights in a federal forum.

**Joint Action Under Color of Law:** Private-sector corporate Defendants and their third-party proxies willfully participated as joint actors with Fairfax County state officials to execute this multi-domain harassment campaign. By sharing intelligence, coordinating timelines, and utilizing state machinery alongside corporate surveillance resources, all Defendants acted in concert and under color of state law within the meaning of the Civil Rights Act.

**Causation and Harm:** As a direct and proximate result of Defendants' ongoing conspiracy to obstruct justice under 42 U.S.C. § 1985(2), Plaintiff suffered an acute deprivation of her right to unhindered access to federal remedies, permanent disruption to her property and business operations, catastrophic financial trauma, severe physical and psychological duress, and a profound, ongoing destruction of her family's safety and personal securityto her industry reputation and credibility within the defense sector and broader community, severe emotional distress, and deep, long-term psychological and familial trauma, entitling her to full compensatory damages, punitive damages, and reasonable attorney's fees and costs under 42 U.S.C. § 1988.

338. **COUNT 10: COUNT III: VIOLATION OF 18 U.S.C. § 2520 – ILLEGAL INTERCEPTION OF ELECTRONIC COMMUNICATIONS (ECPA)**

*(Against All Defendants)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

**The Statutory Framework:** Under the Electronic Communications Privacy Act (ECPA), 18 U.S.C. § 2511 and § 2520, it is a federal violation for any person or entity to intentionally intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, wire, oral, or electronic communications without proper legal authorization.

**The Unauthorized Surveillance Operation:** Plaintiff alleges that over an extended multi-year period culminating in and continuing through her termination timeline, Defendants—including Fairfax County actors, municipal officials, Booz Allen Hamilton corporate agents within the Judi Dotson defense sector pyramid, and private proxies acting in concert—intentionally and unlawfully intercepted, monitored, and recorded Plaintiff's private electronic communications without her consent or legal authorization. This unauthorized interception targeted Plaintiff's wire and electronic communications, including personal electronic mail (emails), cellular telephonic records, text messages, and secure digital communications.

**Tactical Use of Intercepted Data:** The coordination, precise timing, and execution of Defendants' multi-domain harassment campaign could only have been accomplished through the real-time utilization of this unauthorized electronic surveillance. Defendants utilized the intercepted data as a tactical tool to anticipate Plaintiff's movements, discover her legal strategies, and proactively obstruct her access to essential services and legal remedies.

Specifically, Defendants deployed the intercepted communications to execute the following overt acts:

- **Administrative Interception:** Covertly rerouting Plaintiff's private parental emails away from standard Student Services channels and directly into the hands of antagonistic school administrators to sabotage her academic advocacy.

- **Workplace containment:** Monitoring Plaintiff's private outreach to private law firms and civil rights attorneys to systematically disrupt the confidentiality of her legal consultations, ensuring she remained unrepresented and isolated prior to her February 02, 2024 termination.

- **Extralegal Sabotage:** Exploiting intercepted logistical details to coordinate bad-faith disruptions of her property management operations, tenant relationships, medical appointments, and her daughter's Ivy League higher education application processes.

**Joint Action and Willful Participation:** Private corporate Defendants and municipal state actors willfully participated in a joint enterprise to execute this illegal electronic interception network. Conspirators pooled state actor administrative surveillance capabilities and defense-sector electronic resources to maintain an information asymmetry over Plaintiff, acting in a coordinated concert of action under color of law to violate the ECPA.

**Actual Malice and Continuous Violation:** The unauthorized electronic intercept was not an isolated or incidental event. It constituted a calculated, ongoing pattern and practice of electronic warfare designed to intimidate, control, and manipulate Plaintiff through fear and the

total destruction of her personal privacy. Defendants executed these interceptions with actual malice and full knowledge of the unlawfulness of their wiretapping activities.

**Causation and Harm:** As a direct and proximate result of Defendants' intentional violation of the Electronic Communications Privacy Act under 18 U.S.C. § 2520, Plaintiff's personal security and operational autonomy were completely destroyed. Plaintiff suffered a total disruption of her daily functioning, professional blacklisting, severe financial hardship from property interference, intense psychological trauma, acute anxiety, and a persistent, justified fear for her family's physical safety and security, entitling her to statutory damages, punitive damages, and reasonable attorney's fees and costs.

### 339. COUNT 11:  VIOLATION OF 31 U.S.C. § 3730(h) – RETALIATION UNDER THE FALSE CLAIMS ACT (ANTI-WHISTLEBLOWER REPRISAL)

*(Against Defendant Booz Allen Hamilton)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

**The False Claims Act Framework:** The Anti-Retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h), protects employees who are discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee in furtherance of efforts to stop, report, or prevent what they reasonably believe constitute fraudulent misrepresentations involving federal government funds.

**Protected Activity Regarding Educational Fund Fraud:** Plaintiff engaged in protected activity under the False Claims Act by reviewing, objecting to, and formally reporting systemic

misconduct within the Fairfax County Public Schools—a municipal school division that relies heavily on federal educational grants, Title I subsidies, and federal funding. Plaintiff maintained an objectively reasonable belief that the county's systemic fabrication of standardized assessment reports, manipulation of gifted testing scores (such as Naglieri testing), and falsification of official data constituted a fraudulent misrepresentation to the federal government to unlawfully secure and maintain federal educational funding allocations.

**Covert and Circumstantial Corporate Knowledge:** As detailed extensively through the circumstantial evidence set forth in the Factual Allegations of this Complaint, Defendant Booz Allen Hamilton possessed actual and constructive corporate notice of Plaintiff's protected disclosures and her ongoing disputes with Fairfax County officials. While Defendant actively sought to maintain a layer of covert concealment regarding its internal awareness, its corporate knowledge is conclusively established by the immediate, synchronized, and adverse temporal proximity of its actions. Furthermore, because Defendant Booz Allen Hamilton's Global Defense Sector leadership under Judi Dotson was deep in high-stakes, non-public negotiations with the Fairfax County Board of Supervisors regarding the joint Lorton Flagship facility, notice is legally imputed to the corporation. It is highly plausible that county actors communicated Plaintiff's whistleblower identity to corporate executives during these back-channel partnership alignments, creating a shared institutional motive to economically isolate and terminate Plaintiff to safeguard their impending multi-million dollar regional deal.

**The April 2020 Adverse Action:** Driven by this institutional desire to protect its multi-million-dollar regional partnership and upcoming development deals with Fairfax County leadership, corporate management initiated an escalating campaign of adverse actions to penalize her.

Specifically, **in April 2020**, a mere one week after Plaintiff returned from an approved medical leave, corporate management executed a sudden adverse action by stripping Plaintiff of her leadership responsibilities and removing her from her assigned project under the fabricated, false pretext of "funding concerns." No other team member on the contract was subjected to removal.

**Unbroken Retaliatory Hostile Work Environment:** To circumvent statutory limitations and force Plaintiff out, Defendant Booz Allen Hamilton utilized this April 2020 project removal to accelerate an ongoing retaliatory hostile work environment. Corporate leadership orchestrated a broader campaign of professional isolation and technical sabotage by:

- Influencing, encouraging, and manipulating colleagues and team members to obstruct Plaintiff's technical deliverables and undermine her authority.

- Intentionally excluding Plaintiff from mission-critical briefings, removing her from collaborative digital channels, and withholding the essential resources required to perform her duties.

- Systematically blocking her from accessing alternative project listings and refusing to apply standard individual market salary corrections, keeping her pay artificially depressed at the 48th percentile.

**The Long-Term Design and Culmination:** This calculated marginalization was deliberately sustained as part of a 9-year continuous hostile work environment spanning from 2014 through 2024 to wear down Plaintiff's resources, ruin her professional standing, and force her out of the defense sector. Conspirators intentionally deployed this workplace hostility to run down her

finances so she could not afford to send her daughter to an Ivy League university, matching a long-term design to penalize her advocacy. This 9-year retaliatory trajectory completed its course on February 02, 2024, when Defendant Booz Allen Hamilton executed her formal, wrongful termination as the final retaliatory act to punish her for attempting to prevent fraud and institutional misconduct.

**Causation and Harm:** As a direct and proximate result of Defendant Booz Allen Hamilton's intentional violation of the False Claims Act anti-retaliation provision, Plaintiff suffered a catastrophic destruction of her 15-year career trajectory, total loss of professional income, benefits, and long-term earning capacity, severe emotional distress, the profound exacerbation of an existing medical condition, and extreme professional isolation, entitling her to double back-pay, interest, special damages, and litigation costs under 31 U.S.C. § 3730(h).

340. **COUNT 12: VIOLATION OF 31 U.S.C. § 3730(h) – RETALIATORY HOSTILE WORK ENVIRONMENT IN REPRISAL FOR FALSE CLAIMS ACT PROTECTED DISCLOSURES**

*(Against All Defendants)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

**The FCA Hostile Work Environment Framework:** The Anti-Retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h), explicitly safeguards whistleblowers against all forms of discriminatory harassment, professional isolation, systemic intimidation, or the creation of a hostile and abusive workplace environment executed in response to lawful acts done by an employee to stop, report, or prevent what they reasonably believe constitute fraudulent misrepresentations involving federal government funds.

**Protected Whistleblowing Linked to Federal Grant Fraud:** As detailed in this Complaint, Plaintiff engaged in protected activity under the False Claims Act by reviewing, objecting to, and formally reporting systemic compliance failures and data manipulation within the Fairfax County Public Schools—a municipal division that relies heavily on federal educational grants, Title I subsidies, and federal funding allocations. Plaintiff maintained an objectively reasonable belief that the county's systemic fabrication of standardized assessment reports and manipulation of gifted testing scores (such as Naglieri testing) constituted a direct fraud to unlawfully secure and maintain federal educational funding under false pretenses.

**Coordinated Implementation of Workplace Hostility:** Immediately following her disclosures, and acting with actual and constructive corporate notice passed via back-channel executive alignments with Fairfax County officials, Defendant Booz Allen Hamilton—operating within its Global Defense Sector pyramid governed by Judi Dotson, knowingly created, tolerated, and perpetuated a severe and pervasive retaliatory hostile work environment. Conspirators intentionally deployed this workplace hostility as an extrajudicial tool to punish Plaintiff, ruin her professional standing, and financially incapacitate her household, systematically executing an unbroken pattern of intimidation and harassment that included:

**Orchestrated Professional Isolation:** Turning team members, direct reports, and colleagues against Plaintiff by influencing, encouraging, or directing them to actively obstruct her technical deliverables, ignore her authority, and undermine her professional standing.

- **Administrative Exclusion:** Purposely excluding Plaintiff from mission-critical briefings, removing her from collaborative digital channels, and intentionally cutting her off from

the essential tools and corporate resources necessary to perform her duties and lead her team effectively.

- **Targeted Career Deprivation:** Pretextually removing Plaintiff from high-visibility defense sector projects—including the sudden, adverse project displacement executed in April 2020 within one week of her return from approved medical leave, and continuously blocking her from accessing alternative assignments.

**The Long-Term Conspiratorial Objective:** This retaliatory hostile work environment persisted continuously for a multi-year duration from 2014 through 2024. It was deliberately designed by the joint corporate-state alliance to break Plaintiff's financial stability, inflict extreme emotional duress, and force her completely out of the defense sector to satisfy a long-term design to penalize her public advocacy and prevent her from affording Ivy League higher education opportunities for her children.

**Causation and Harm:** As a direct and proximate result of Defendants' intentional and malicious creation of a retaliatory hostile work environment in violation of 31 U.S.C. § 3730(h), Plaintiff suffered substantial economic and non-economic harm, including severe emotional distress persisting for years during employment and continuing after termination, total disruption to her professional growth, permanent reputational harm within the defense sector and broader community, and compounded psychological stress that severely fractured her personal and family life, entitling her to compensatory damages, double back-pay interest, special damages, and reasonable litigation costs.

341.   **COUNT 13: Civil Conspiracy to Obstruct Justice and Interfere with State Judicial Divorce Proceedings (42 U.S.C. § 1983 / § 1985(3) - Fourteenth Amendment Due Process & Access to Courts)**

*(Against Defendants Booz Allen Hamilton and Fairfax County/State Actors)*

Plaintiff realleges and incorporates by reference all preceding allegations as if fully set forth herein.

This Count relies strictly on the defendants' extrajudicial actions that directly corrupted the state court environment and improperly influenced the financial outcome of Plaintiff's divorce. This claim seeks recovery for independent, non-duplicative economic and psychological injuries completely separate from any employment-based claims pled elsewhere in this Complaint.

**I. The Conspiratorial Agreement (Meeting of the Minds)**

- **Targeting of Personal Assets:** Defendants Booz Allen Hamilton and Fairfax County/State actors entered into a calculated, coordinated agreement to target Plaintiff outside the workplace by infiltrating her domestic relations proceeding.

- **Coordinated Objective:** Defendants formed a specific meeting of the minds to leverage extrajudicial influence, ensuring a catastrophic, inequitable financial outcome for Plaintiff to force her into artificial insolvency and bankruptcy.

- **The Litigious Motive:** The shared, corrupt purpose of this alliance was to completely deplete Plaintiff's financial resources, rendering it impossible for her to fund, sustain, or pursue her complex civil rights and whistleblower claims against Booz Allen Hamilton and the county actors.

**II. Joint Action Under Color of Law and Private Concert**

- **Weaponization of Public Power:** County and State Defendants utilized the prestige, authority, and official connections of their public offices to poison the tribunal environment and influence the judicial process.

- **Willful Private Participation:** Private Corporate Defendant Booz Allen Hamilton acted as a willing joint participant with these state actors, blending private corporate malice with public authority to execute an extrajudicial assault on a state proceeding.

- **The Conspiratorial Nexus:** The continuous, intertwined communication and parallel conduct between the private employer and the state actors establish a functional link, rendering all actions taken during this phase a joint state action under 42 U.S.C. § 1983.

### III. Overt Acts and Direct Interference with the Divorce Outcome

- **Suppression of Claims:** Following Plaintiff's formal January 22, 2025 demand letter, Defendants coordinated to inject extrajudicial pressure into the divorce case, causing the presiding judge to abandon neutrality and command Plaintiff to drop her corporate claims against Booz Allen Hamilton.

- **Retaliatory Reversals:** Upon Plaintiff's explicit refusal to drop her legal rights, Defendants influenced the court to execute sudden, uncharacteristic, and legally baseless reversals of prior court rulings to maximize tactical duress.

- **The Manufactured Debt Trap:** Defendants successfully weaponized the state court machinery to defy all established Virginia equitable distribution codes, engineering an unworkable layout that shifted approximately $800,000 in marital debt entirely onto Plaintiff,

ordered a $656,000 cash execution, and mandated the refinancing of two joint properties within six months while knowing Plaintiff was unemployed.

- **Tactical Delay and Obstruction:** Defendants engineered systemic, protracted delays to exhaust the Pro Se Plaintiff's time, energy, and remaining financial resources, intentionally trying to run out the clock on her federal filing deadlines.

## IV. Constitutional Injury and Extrinsic Fraud

- **Denial of Due Process:** Defendants' extrajudicial manipulation constitutes severe extrinsic fraud that stripped Plaintiff of a meaningful opportunity to fairly present her equitable distribution case, violating her Fourteenth Amendment right to procedural and substantive Due Process.

- **Independent Source of Injury:** The economic and emotional injuries claimed herein stem directly from the *Defendants' fraudulent, extrajudicial conduct* in corrupting the process, rather than an inherent judicial error by the state court itself, bypassing the federal jurisdictional limits of the Rooker-Feldman doctrine.

## V. Proximate Causation, Severe Emotional Distress, and Forfeited Benefits

- **Direct Economic Ruin:** As a direct and proximate result of the Defendants' corrupted subversion of the tribunal, Plaintiff was stripped of her lifelong personal estate and thrown into severe financial distress.

- **Severe Emotional Anguish:** The targeted, calculated weaponization of Plaintiff's family court proceedings—including the deliberate timing to disrupt her youngest daughter's Ivy

League educational security—was intentionally designed to cause maximum psychological harm. As a direct result, Plaintiff suffered intense, continuous mental suffering, extreme anxiety, and profound emotional distress.

- **Permanent Deprivation of Federal Entitlements:** The conspiracy directly and proximately caused the absolute forfeiture of Plaintiff's legal rights to federal ex-spouse retirement benefits, survivor annuities, and health insurance, transforming a standard statutory division of marital property into a tool of absolute financial stripping.

342.    <u>**COUNT 14: VIOLATION OF 29 U.S.C. § 2615 – FAMILY AND MEDICAL LEAVE ACT (FMLA) INTERFERENCE AND RETALIATION**</u>

*(Against Defendant Booz Allen Hamilton)*

Plaintiff realleges and incorporatesby reference all preceding allegations, including Defendant Booz Allen Hamilton's actual awareness of her approved medical leave and her documented need for medically necessary time away from work, as if fully set forth herein.

**Summary of Allegations:** Plaintiff requested, was formally approved for, and took protected medical leave under the FMLA in early 2020 to treat a serious medical condition. Within approximately one week of her return to active employment in April 2020, Plaintiff discovered that her leadership position had been replaced and she had been abruptly removed from her assigned defense sector project under the fabricated, false pretext of "funding concerns." No other similarly situated team members or contractors on the project were removed or subjected to funding adjustments.

**Statutory Violation:** Defendant Booz Allen Hamilton intentionally used Plaintiff's utilization of protected FMLA medical leave as a negative and determining factor in its employment

decisions, actively interfered with her statutory right to resume her prior position and responsibilities, and subjected her to immediate professional isolation and career stagnation in direct violation of 29 U.S.C. § 2615.

**Causation and Harm:** As a direct and proximate result of Defendant's unlawful FMLA interference and retaliation, Plaintiff suffered severe emotional distress, the acute exacerbation of an existing medical condition, prolonged physical and emotional suffering, permanent reputational harm, and a total disruption to her professional stability, career trajectory, and financial well-being.

### 343. COUNT 15: VIOLATION OF 42 U.S.C. § 12203 – AMERICANS WITH DISABILITIES ACT (ADA) RETALIATION

*(Against Defendant Booz Allen Hamilton)*

Plaintiff realleges and incorporates by reference all preceding allegations as if fully set forth herein.

**Pleading of Qualified Disability and Protected Activity:** At all times relevant to this action, Plaintiff possessed a physical or mental impairment that substantially limited one or more of her major life activities, constituting a qualified disability under the ADA. Plaintiff engaged in protected activity under the ADA by requesting and utilizing medically necessary leave as a reasonable accommodation for her condition, of which Defendant Booz Allen Hamilton had actual corporate notice.

**Summary of Allegations:** Immediately after Plaintiff exercised her protected rights under the ADA, Defendant Booz Allen Hamilton initiated an adverse campaign of targeted retaliation by stripping her of responsibilities, removing her from her core assignments, isolating her professionally, and actively obstructing her technical work deliverables. The April 2020 removal

from her project occurred in immediate temporal proximity to her return from protected medical leave and was based on a false, pre-textual justification of "funding concerns," executed despite the fact that no other team members were displaced from the contract.

**Statutory Violation:** Defendant Booz Allen Hamilton intentionally, maliciously, and discriminatorily retaliated against Plaintiff for exercising her protected rights and seeking reasonable accommodations under the Americans with Disabilities Act, in direct violation of 42 U.S.C. § 12203.

**Causation and Harm:** As a direct and proximate result of Defendant's intentional ADA retaliation, Plaintiff suffered severe emotional distress, the serious aggravation of an existing medical condition, prolonged physical and emotional suffering, severe reputational harm, and a total destruction of her professional standing and well-being.

344.  **COUNT 16: VIOLATION OF 29 U.S.C. § 794(d) – REHABILITATION ACT RETALIATION**

*(Against Defendant Booz Allen Hamilton)*

 Plaintiff realleges and incorporatesby reference all preceding allegations, including Defendant Booz Allen Hamilton's status as a premier federal contractor receiving massive federal funds and subsidies, thereby subjecting it to the strict mandates of the Rehabilitation Act, and its actual awareness of Plaintiff's disability-related rights, as if fully set forth herein.

**Summary of Allegations:** Defendant Booz Allen Hamilton deliberately retaliated against Plaintiff for exercising her protected rights under the Rehabilitation Act by removing her from her established assignments, systematically obstructing her technical work, and forcing her into a state of professional isolation. The April 2020 removal from her project was executed in immediate chronological proximity to her return from approved medical leave and was based

on a false, fabricated pretext of "funding concerns," despite the factual record showing that no other team members were displaced or suffered funding cuts.

**Statutory Violation:** Defendant Booz Allen Hamilton's adverse conduct, systemic workplace isolation, and targeted career obstruction against a qualified individual with a known impairment constitute direct and prohibited retaliation under the Rehabilitation Act, 29 U.S.C. § 794(d).

**Causation and Harm:** As a direct and proximate result of Defendant's unlawful conduct in violation of the Rehabilitation Act, Plaintiff suffered severe emotional distress, a profound exacerbation of her underlying medical condition, prolonged physical symptoms, severe and permanent reputational harm, and long-term emotional, financial, and physical strain.

### 345. Count 17: REPRISAL FOR WHISTLEBLOWER DISCLOSURES UNDER APPLICABLE FEDERAL LAW

*(Against Defendant Booz Allen Hamilton)*

Plaintiff realleges and incorporatesby reference all preceding paragraphs as though fully set forth herein.

**Protected Disclosures:** Plaintiff engaged in protected whistleblower activity by formally communicating multiple complaints regarding structural civil rights violations, surveillance, and retaliation directly to corporate executives, including former President Judi Dotson and former Chief Legal Officer Nancy Laben, between 2020 and 2024.

**Retaliatory Discharge:** Defendant Booz Allen Hamilton took immediate, adverse employment action by terminating Plaintiff on February 02, 2024. Plaintiff's protected internal complaints and external public-interest disclosures were a contributing and motivating factor in Defendant's decision to terminate her.

**Causation and Harm:** As a direct and proximate result of this statutory reprisal, Plaintiff suffered a catastrophic loss of professional status, total economic disruption, and severe emotional distress.

346. **COUNT 18: VIOLATION OF VA. CODE § 40.1-27.3 – RETALIATION UNDER THE VIRGINIA WHISTLEBLOWER PROTECTION ACT (VWPA)**

*(Against Defendant Booz Allen Hamilton)*

Plaintiff realleges and incorporatesby reference all preceding factual allegations, including the allegations supporting the application of defense-barring doctrines set forth , as if fully set forth herein.

**The Statutory Framework:** Under the Virginia Whistleblower Protection Act (VWPA), Va. Code § 40.1-27.3, an employer is strictly prohibited from discharging, disciplining, threatening, discriminating against, penalizing, or taking other retaliatory action regarding an employee's compensation, terms, conditions, or privileges of employment because the employee reports in good faith a violation of any federal or state law or regulation to a supervisor or governmental body.

**Protected Internal Disclosures Under the VWPA:** Following the July 1, 2020 effective date of the VWPA, Plaintiff continuously engaged in protected activity by transmitting multiple formal internal complaints via electronic mail directly to corporate supervisors, high-level operational leadership, and internal corporate legal leadership, including Executive Vice President and Chief Legal Officer Nancy Laben. In these good-faith disclosures, Plaintiff explicitly reported the severe, systemic workplace harassment, administrative hostility, professional blacklisting, and

the manufactured pretext of a "lack of work" that she was facing. Plaintiff explicitly put corporate leadership on notice that she was actively being targeted, marginalized, and unlawfully forced out of the organization in violation of basic employment laws and internal corporate policies.

**Covert Corporate Knowledge of External Disclosures:** While Plaintiff did not directly disclose to Booz Allen Hamilton executives the nature of her external whistleblower filings against Fairfax County Public Schools (FCPS) regarding state assessment and score fraud, Defendant Booz Allen Hamilton possessed actual and constructive corporate notice of those external disputes. As substantiated by the extensive circumstantial evidence set forth in this Complaint, this notice was passed covertly via the back-channel administrative and executive communications required to establish their joint multi-million-dollar commercial defense partnerships with the Fairfax County Board of Supervisors. Defendant's covert awareness of the root cause of her targeting is conclusively established by the immediate, synchronized, and adverse temporal proximity of its actions.

**Implementation of Statutory Retaliation:** Rather than launching an honest internal investigation or implementing corrective actions when notified of the workplace abuse, Defendant Booz Allen Hamilton utilized Plaintiff's internal complaints as a roadmap to accelerate her professional destruction. To appease its municipal public-private partners in Fairfax County and protect their upcoming regional defense-hub initiatives, corporate leadership penalized Plaintiff in her terms and conditions of employment by:

- **Sustained Compensation Suppression:** Intentionally blocking, withholding, and delaying her qualified individual market salary adjustments, thereby keeping her compensation artificially depressed below the 48th percentile of her expected pay range.

- **Professional De-escalation:** Systematically stripping Plaintiff of her leadership responsibilities, removing her from high-visibility defense sector assignments under the Judi Dotson pyramid, and excluding her from professional growth opportunities essential to her career advancement.

- **Orchestration of Workplace Hostility:** Authorizing, encouraging, and tolerating an abusive and isolating environment where colleagues and direct reports were actively influenced to undermine and obstruct Plaintiff's technical deliverables.

**Culmination via Retaliatory Discharge:** This continuous statutory discrimination culminated on **February 02, 2024,** when Defendant Booz Allen Hamilton executed the formal, bad-faith, and wrongful termination of Plaintiff's employment. This discharge was a direct reprisal for her internal reports opposing workplace harassment and her refusal to be silently forced out, satisfying all essential elements of a claim under Va. Code § 40.1-27.3.

**Application of Equitable Tolling to the Statutory Window:** To the extent that Defendant asserts a one-year statute of limitations defense under Va. Code § 40.1-27.3(C), Plaintiff explicitly asserts that Defendant is legally and equitably estopped from relying on any timing defenses under the controlling principles set forth in Section VI of this Complaint. Because Defendant actively, fraudulently, and covertly concealed its conspiratorial agreements with Fairfax County, monitored Plaintiff's private legal communications, and engineered a physical proxy arrest to

obstruct her access to the courts, all applicable state limitations periods must be equitably tolled in the interest of justice.

**Causation and Harm:** As a direct and proximate consequence of Defendant's intentional violation of the Virginia Whistleblower Protection Act, Plaintiff suffered catastrophic economic and non-economic injuries. Plaintiff suffered severe and enduring emotional distress, the profound physical and psychological exacerbation of an existing medical condition, an absolute loss of professional income, benefits, and future earning capacity following her February 02, 2024 termination, and permanent destruction of her professional reputation within the defense sector, entitling her to full compensation for lost wages, benefits, injunctive relief, and reasonable attorney's fees and costs.

## 347. COUNT 19: VIOLATION OF VA. CODE § 40.1-27.3 – RETALIATORY HOSTILE WORK ENVIRONMENT

*(Against Defendant Booz Allen Hamilton)*

Plaintiff realleges and incorporatesby reference all preceding paragraphs as though fully set forth herein.

**The Statutory Framework:** The Virginia Whistleblower Protection Act, Va. Code § 40.1-27.3, explicitly prohibits an employer from retaliating against an employee through harassment, intimidation, coercion, or the creation of an abusive workplace environment because the employee reports a violation of law in good faith or opposes unlawful administrative misconduct.

**Summary of Protected Internal Disclosures:** Following the statutory enactment of the VWPA, Plaintiff continuously engaged in protected activity by transmitting multiple formal internal complaints directly to corporate supervisors and high-ranking internal legal leadership, including Executive Vice President Nancy Laben. In these disclosures, Plaintiff explicitly reported the severe, systemic workplace hostility, bad-faith professional blacklisting, and the manufactured pretext of a "lack of work" being used to freeze her out of the organization in violation of basic employment standards.

**Execution of the Post-2020 Hostile Environment:** In direct reprisal for these protected internal reports, and acting with covert knowledge of her external school division disclosures, Defendant Booz Allen Hamilton created, tolerated, and perpetuated a severe and pervasive retaliatory hostile work environment. Corporate management intentionally allowed this workplace abuse to persist across a multi-year duration to humiliate Plaintiff, impede her professional functioning, and force her out of the company, executing a sustained pattern of workplace isolation that included:

- **The Manipulation of Workplace Relationships:** Influencing, encouraging, or directing colleagues and direct reports to actively disrespect Plaintiff's authority, ignore her project leadership, and sabotage her technical deliverables.

- **Systemic Administrative Exclusion:** Intentionally excluding Plaintiff from mission-critical briefings, removing her from collaborative digital communication channels, and denying her access to the essential data and corporate resources required to perform her defense sector duties.

**133. Causation and Harm:** As a direct and proximate result of Defendant's intentional creation of a retaliatory hostile work environment in violation of Va. Code § 40.1-27.3, Plaintiff suffered profound economic and non-economic harm. Plaintiff suffered severe emotional distress and psychological trauma persisting throughout her employment, permanent damage to her professional reputation and standing within her industry, and long-term personal, medical, and familial consequences, entitling her to full compensatory damages and reasonable litigation costs.

**348.** **COUNT 20: VIOLATION OF VA. CODE §§ 18.2-499 AND 18.2-500 – VIRGINIA STATUTORY BUSINESS CONSPIRACY**

*(Against All Defendants)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

**The Statutory Framework:** Under Virginia Code §§ 18.2-499 and 18.2-500, it is unlawful for any two or more persons to combine, associate, agree, mutually undertake, or concert together for the purpose of willfully and maliciously injuring another in their reputation, trade, business, or profession. Any person so injured is entitled to recover threefold the damages sustained, alongside reasonable attorney's fees and costs.

**The Multi-Agency Commercial Conspiracy:** Plaintiff alleges that Booz Allen Hamilton employees operating within the Global Defense Sector pyramid governed by Judi Dotson, alongside Fairfax County municipal actors and associated external state proxies, combined, associated, and entered into an ongoing, malicious agreement. The explicit, unlawful objective of this

conspiracy was to target, undermine, and destroy Plaintiff's established professions, livelihood, and independent **real estate rental and property management business.**

**Utilization of Improper Methods to Destroy Business Operations:** Driven by actual malice and a shared desire to punish Plaintiff for her protected disclosures, the corporate and municipal conspirators actively deployed improper, tortious, and extrajudicial methods to execute a coordinated campaign of economic destruction against Plaintiff's commercial assets, including:

- **Communications Interception to Prevent Leases:** Utilizing their joint surveillance apparatus to unlawfully intercept and violate Plaintiff's private telephonic and digital communications, actively working to block, divert, and prevent prospective tenants from successfully contacting Plaintiff or securing available rental vacancies.

- **Orchestrated Tenant Evacuation:** Coercively interfering with existing tenant relationships and manufacturing artificial property disputes to deliberately force existing tenants to vacate her properties, thereby engineering an unnatural, devastating loss of rental income and structural cash flow.

- **Contractor and Maintenance Sabotage:** Targeting and covertly interfering with Plaintiff's essential business relationships with external contractors, handymen, and maintenance professionals. Conspirators actively manipulated these service providers to disrupt building repairs, delay necessary maintenance, and professionally isolate Plaintiff from the critical logistical support required to manage her real estate holdings.

- **Coordinated Workplace and Salary Suppression:** Utilizing municipal state actor leverage to exert administrative pressure on Booz Allen Hamilton executives to isolate Plaintiff,

strip her of her leadership roles, and suppress her market salary adjustments below the 48th percentile to ensure her household faced total financial collapse.

- **Malicious Temporal Alignment:** Deliberately timing and executing her sudden project removals (including the April 2020 medical leave displacement) and her final **February 02, 2024 wrongful termination** to align precisely with critical leverage points in the plan targeting her daughter's educational achievements and Ivy League higher education trajectory.

**Weaponization of Housing Forums and Physical Obstruction:** Conspirators furthered their business-injury scheme by deploying the exact improper methods, communication interceptions, and the **unlawful 39-hour incarceration detailed in Count II of this Amended Complaint.** Conspirators explicitly weaponized a civil landlord-tenant housing matter in **June 2026** to fabricate an unlawful criminal record, trap Plaintiff in a jail cell, and run off her contractors, systematically paralyzing her ability to manage her properties and freezing her out of her commercial property cash flows.

**Separation of Conspiratorial Actors:** This conspiracy did not occur solely within a single corporate entity. It explicitly relied on a continuous concert of action between independent outside state officials (Fairfax County) and internal corporate executives (Booz Allen Hamilton), thereby satisfying all elements of a multi-person combination under Virginia law [INDEX].

**Causation and Harm:** As a direct and proximate result of Defendants' willful and malicious statutory business conspiracy in violation of Va. Code §§ 18.2-499 and 18.2-500, Plaintiff suffered immediate and catastrophic injury to her trade and profession [INDEX]. Plaintiff

suffered an absolute loss of corporate and independent real estate income, continuous rental disruptions, engineered structural vacancies, the permanent destruction of her business reputation and credibility within the defense sector and property industry, severe emotional distress, and deep, long-term psychological and familial trauma, entitling her to statutory treble damages, punitive damages, and mandatory attorney's fees and costs [INDEX].

349. **COUNT 21: TORTIOUS INTERFERENCE WITH EMPLOYMENT RELATIONSHIP**

*(Against Defendants Fairfax County, The Fairfax County School Board, and State/County Actors)*

Plaintiff realleges and incorporatesby reference all preceding paragraphs as though fully set forth herein.

**Summary of Allegations:** Plaintiff maintained a valid, ongoing, and tenured employment relationship with Defendant Booz Allen Hamilton for approximately fifteen years. During this period, Fairfax County actors and associated municipal state agents, acting wholly outside of Booz Allen Hamilton and without any legitimate business justification, intentionally and maliciously interfered with Plaintiff's employment relationship by influencing, pressuring, and encouraging Booz Allen Hamilton personnel to take adverse actions against her. These government actors communicated false, misleading, and retaliatory information to corporate employees, conspiring with certain corporate personnel under the Judi Dotson pyramid to undermine Plaintiff's professional standing, disrupt her work assignments, and damage her credibility.

**Utilization of Improper Third-Party Methods:** Operating wholly outside of the corporate structure, these municipal Defendants functioned as true third-party interferers with no lawful

authority or justification to involve themselves in Plaintiff's workplace affairs. To penalize Plaintiff for her protected disclosures regarding school system score and data manipulation, these third-party government actors actively deployed improper methods to disrupt her career, including:

- **Administrative Coercion:** Knowingly communicating false, misleading, and highly stigmatizing information to Booz Allen Hamilton personnel to artificially damage Plaintiff's corporate standing.

- **Coordinated Assignment Sabotage:** Exerting intense administrative pressure and political influence on corporate defense managers to actively induce her removal from high-visibility assignments and block her access to alternative projects.

- **Engineering Corporate Termination:** Conspiring with specific corporate personnel to ensure Plaintiff was subjected to continuous workplace isolation and salary suppression below the 48th percentile, directly contributing to her final wrongful termination on February 02, 2024.

**Legal Basis Under Virginia Law:** Under Virginia law, a claim for tortious interference with a contract or business expectancy requires a valid relationship, knowledge of that relationship by the interferer, intentional interference using improper methods, and resulting damages. Because these municipal Defendants were not Plaintiff's employer and possessed no lawful economic interest in her defense sector contracts, they qualify as true third parties. Their utilization of retaliatory misrepresentations, unauthorized surveillance, and coordinated cross-agency pressure to destroy her career satisfies all statutory and common-law elements of

intentional interference. Their conduct directly caused the complete severing of Plaintiff's employment relationship and professional opportunities.

**Causation and Harm:** As a direct and proximate result of the tortious interference by these municipal Defendants, Plaintiff's 15-year career was completely destroyed. Plaintiff suffered an absolute loss of corporate income, benefits, and project-based compensation, permanent destruction of her professional standing and leadership opportunities within the defense industry, severe emotional distress, and long-term psychological and financial disruption to her household.

### 350. COUNT 22: TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONSHIPS

*(Against All Defendants)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

**Interference with Business Standing:** Plaintiff possessed valid contractual rights, business relationships, and expectations of continued employment within her assigned defense contracts beneath the Judi Dotson operational pyramid.

**Intentional Disruption:** Fairfax County and municipal state actors, with full knowledge of Plaintiff's employment status, intentionally, maliciously, and without justification induced Booz Allen Hamilton to breach and terminate Plaintiff's employment relationship. Concurrently, corporate executives permitted outside political influence to disrupt Plaintiff's professional standing to protect their upcoming regional commercial partnerships.

**Causation and Harm:** As a direct and proximate result of this intentional interference, Plaintiff's employment contract was completely severed, resulting in a total loss of salary, benefits, and long-term career advancement.

351. **COUNT 23: FRAUDULENT CONCEALMENT AND ADMINISTRATIVE DECEPTION**
     *(Against All Defendants)*

Plaintiff realleges and incorporatesby reference all preceding paragraphs as though fully set forth herein.

**False Pretext and Omissions:** Defendants intentionally made material misrepresentations and actively concealed vital conflicts of interest regarding the multi-million dollar Lorton facility negotiations during the administrative steps leading to Plaintiff's termination on February 02, 2024.

**Reliance and Obstruction:** Defendants fabricated false, pretextual performance or organizational metrics to deceive Plaintiff as to the true, retaliatory reason for her discharge. Defendants intended for Plaintiff to rely on these false administrative rationales so she would fail to uncover the explicit state-action nexus and corporate-county agreement driving her termination.

**Causation and Harm:** As a direct and proximate result of this fraudulent deception, Plaintiff was actively misled, her ability to seek timely legal remedies was obstructed, and she suffered severe financial and logistical injuries.

352. **COUNT 24: DEFAMATION AND RETALIATORY TORTIOUS BLACKLISTING**

*(Against All Defendants)*

Plaintiff realleges and incorporatesby reference all preceding paragraphs as though fully set forth herein.

**Defamatory Statements:** Defendants, acting in concert, knowingly published, circulated, and maintained false, defamatory, and stigmatizing statements regarding Plaintiff's professional competence, mental stability, and personal character to third parties, including potential employers and administrative agencies.

**Malice and Intent:** These statements were made with actual malice, reckless disregard for the truth, and the specific intent to blackball Plaintiff from her industry, ruin her professional reputation, and justify her sudden termination from the Booz Allen Hamilton defense sector pyramid.

**Causation and Harm:** As a direct and proximate result of Defendants' defamatory blacklisting campaign, Plaintiff suffered severe and permanent reputational harm, a total destruction of her earning capacity within the defense sector, and extreme professional humiliation.

### 353. COUNT 25: ABUSE OF LEGAL PROCESS IN DC SUPEIOR COURT
*(Against All Defendants)*

Plaintiff realleges and incorporatesby reference all preceding paragraphs as though fully set forth herein.

**The Legal Framework:** Under Virginia law, a claim for Abuse of Process requires proof of the existence of an institutional legal mechanism or process that was intentionally perverted and weaponized against an individual for an improper, collateral, and extortionate purpose outside the legitimate scope of the underlying litigation.

**Perversion of Institutional and Judicial Mechanisms:** Plaintiff alleges that the corporate and municipal Defendants, acting in a continuous joint concert of action under color of law, expanded their conspiratorial meeting of the minds to intentionally manipulate, delay, and pervert multiple parallel judicial and administrative forums. Conspirators maliciously weaponized these legal processes for an improper collateral purpose: to create severe personal distractions, deplete Plaintiff's remaining financial resources, destroy her public credibility, and physically obstruct her from maintaining this federal civil rights action.

**Specific Overt Acts of Process Abuse:** In direct violation of common-law protections, Defendants perverted the legal process across multiple distinct forums through a joint division of labor, including:

- **The Landlord-Tenant Perversion (June 2026):** Misusing a standard civil housing matter to engineer a fraudulent criminal proceeding, leading directly to a **30-hour proxy jail incarceration** to sever her real estate business cash flows and sabotage her federal filing access.

- **The Family Court Manipulation:** Actively feeding fabricated corporate records and false performance metrics into state tribunal divorce proceedings to intentionally delay hearings without explanation, discourage her from pursuing remedies against Booz Allen Hamilton, and artificially favor her ex-husband despite clear evidence of misconduct.

- **The Defamatory Court Filings:** Utilizing parallel state and D.C. Superior Court filings to publish highly prejudicial and false characterizations, intentionally distorting her testimony to falsely label a civil whistleblower as a criminal actor.

**Execution of Actual Malice:** The utilization of these legal processes was not a legitimate attempt to adjudicate civil or property disputes. Defendants acted with actual malice, using the coercive power of local tribunals as administrative weapons to inflict ongoing duress, disrupt her property management operations, and destabilize her family unit.

**Causation and Harm:** As a direct and proximate result of Defendants' intentional and malicious abuse of process, Plaintiff suffered a total disruption of her federal litigation access, severe financial disadvantage, the acute destruction of her independent property cash flows, intense emotional and psychological trauma, and deep, ongoing personal and familial disruption.

### 354. COUNT 26: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY (*BOWMAN* CLAIM)

*(Against Defendant Booz Allen Hamilton)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

**The Bowman Public Policy Doctrine:** Under the landmark doctrine established in *Bowman v. State Bank of Keysville*, 229 Va. 534 (1985), the Commonwealth of Virginia recognizes a vital exception to the at-will employment rule where an employer executes a discharge that violates a deeply entrenched public policy explicitly expressed in Virginia statutory law. This protection applies directly when an employee is terminated for exercising a clear statutory right, fulfilling an explicit statutory duty, or refusing to participate in a violation of public safety and record integrity.

**The Protected Public Policies and Statutory Anchors:** Plaintiff's resistance to municipal corruption and her persistent internal reporting of workplace containment directly implicate fundamental public policies of the Commonwealth, which are anchored in:

- **The Integrity of Public Records:** The deep-seated public policy protecting the absolute transparency and honesty of state-mandated educational assessments and records, prohibiting the falsification of government data.

- **The Protection of Parental Liberty:** The fundamental liberty interests of a parent to advocate for their minor children's academic welfare, safety, and testing record accuracy without facing corporate-state retaliation.

**Summary of Allegations and Fabricated Pretext:** Plaintiff maintained a strong, stable, and highly decorated 15-year career trajectory within Defendant Booz Allen Hamilton. However, in the multi-year timeline leading to her discharge, corporate management—acting in a covert public-private alliance with Fairfax County officials to protect their shared regional commercial initiatives, systematically isolated Plaintiff. Within the final two weeks of her employment, corporate supervisors abruptly stripped her of leadership responsibilities, blocked her from high-visibility defense sector assignments under the Judi Dotson pyramid, and tolerated severe peer-to-peer sabotage explicitly to manufacture a false pretext of a "lack of work" and force her out of her position.

**Intentional Infliction of Familial and Financial Duress:** To maximize the punitive impact of the discharge, corporate management deliberately timed her sudden professional isolation and ultimate **February 02, 2024 termination** to align precisely with critical, time-sensitive

milestones in her daughter's academic trajectory and Ivy League higher education opportunities. Defendant utilized this termination as an economic weapon to break Plaintiff's financial stability, satisfying a long-term design engineered with state actors to penalize her public advocacy and disrupt her daughter's future social mobility.

**Statutory Violation:** Defendant Booz Allen Hamilton's execution of a bad-faith, pretextual discharge directly violates Virginia public policy under the *Bowman* doctrine [INDEX]. Defendant intentionally terminated a tenured, high-performing professional as a punitive reprisal because she refused to remain silent regarding municipal data manipulation and actively opposed an unlawful, cross-agency campaign of workplace hostility.

**Causation and Harm:** As a direct and proximate result of Defendant's wrongful termination in violation of public policy, Plaintiff's livelihood was destroyed. Plaintiff suffered an absolute loss of corporate employment, salary, and benefits, permanent devastation to her industry career trajectory, severe emotional distress, acute financial trauma, and a long-term disruption to her family's stability and her daughter's educational opportunities

355.    **COUNT 27: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)**

   *(Against All Defendants)*

Plaintiff realleges and incorporatesby reference all preceding paragraphs as though fully set forth herein.

**Extreme and Outrageous Conduct Beyond Decency:** Plaintiff alleges that the collective, synchronized conduct of the corporate and municipal Defendants was extreme, outrageous, malicious, and utterly intolerable in a civilized community. Defendants abandoned all bounds of

decency by orchestrating a 13-year campaign of relentless personal and professional containment that weaponized public, corporate, and judicial machinery to break Plaintiff's mental and physical stability, including:

- **Executing** a retaliatory termination, weaponizing and manipulating her children's educational and social service environments, and deploying continuous unauthorized surveillance against her household

- **Severe Workplace Cruelty:** Authorizing and encouraging an environment of administrative bullying beneath the Judi Dotson pyramid, freezing her individual market salary adjustments below the 48th percentile, and suddenly terminating her 15-year career on February 02, 2024.

- **The Multi-Forum Character Assassination:** Systematically feeding false, highly stigmatizing characterizations into state tribunals and family court proceedings to falsely label a protective parent and whistleblower as an unstable "harasser" and "stalker."

- **The June 2026 Criminal Sabotage:** Coordinated action in **June 2026** to weaponize a local landlord-tenant housing forum to manufacture an unlawful criminal record against a *Pro-Se* federal litigant.

- **The 30-Hours Unlawful Incarceration:** Intentionally engineering a fraudulent arrest through proxy actors, resulting in Plaintiff being forcefully trapped and **incarcerated in a jail cell for thirty (30) consecutive hours** to physically disrupt her federal litigation access and cut off her safety.

**Intent and Recklessness:** Defendants acted intentionally and maliciously with the explicit, shared purpose of inflicting severe emotional distress and psychological trauma upon Plaintiff to force her into total submission, or acted with absolute, reckless disregard for the high probability that such acute, life-altering suffering would occur.

**Severity of the Emotional Injury:** The continuous and sustained nature of Defendants' multi-domain harassment campaign made it legally and logistically impossible for Plaintiff to live a normal, free, or safe life. The constant threat of electronic surveillance, property sabotage, and weaponized police power caused actual, severe, and debilitating psychological trauma, severe sleep disruption, acute anxiety, and persistent physical manifestations of extreme stress.

**Causation and Harm:** As a direct and proximate result of Defendants' extreme and outrageous behavior, Plaintiff suffered severe and debilitating emotional distress, mental anguish, physical illnesses induced by chronic stress, permanent reputational harm across professional and community domains, a profound disruption to her personal and familial security, and substantial financial losses, entitling her to compensatory and punitive damages.

356. <u>**COUNT 28: INVASION OF PRIVACY – INTRUSION UPON SECLUSION**</u>
*(Against All Defendants)*

Plaintiff realleges and incorporatesby reference all preceding paragraphs of this Complaint as though fully set forth herein.

**Expectation of Privacy:** Plaintiff possessed a reasonable, constitutionally and legally protected expectation of privacy regarding her personal life, daily movements, private communications, and medical files.

**Offensive Intrusion:** Defendants, acting in concert, intentionally and without legal authorization or justification intruded upon the solitude, seclusion, and private affairs of Plaintiff. This offensive intrusion was executed through targeted electronic or physical surveillance and the unauthorized manipulation and interception of her personal financial, educational, and legal records.

**Causation and Harm:** As a direct and proximate result of Defendants' ongoing invasion of privacy, Plaintiff suffered an ongoing infringement of her basic rights, financial damages, severe emotional distress, and acute fear for her family's physical safety and security.

## VIII.PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in her favor and against all Defendants, jointly and severally, **on all counts** of this Amended Complaint, and award the following relief:

## I. MONETARY DAMAGES

- **A. General Compensatory Damages:** Actual, compensatory, and consequential damages in an amount to be proven at trial for severe financial instability, (financial, property and federal benefits loss) as well as emotional distress due to Judicial divorce interference, financial loss due to career devastation, total loss of professional income, loss of health and retirement benefits, out-of-pocket costs, acute personal trauma, and severe emotional distress.

- **B. Treble (Triple) Economic Damages:** Threefold the total economic and structural damages sustained by Plaintiff's independent real estate rental and property

management business, pursuant to Virginia Code § 18.2-500, resulting from Defendants' malicious statutory business conspiracy.

- **C. Double Back-Pay and Special Damages:** Double the amount of back-pay, plus interest on the back-pay, and compensation for any special damages sustained as a direct result of Defendant Booz Allen Hamilton's statutory retaliation, pursuant to 31 U.S.C. § 3730(h).

- **D. Liquidated and Statutory Damages:** All applicable statutory and liquidated damages, including front pay, interest, and statutory fines allowed under the Family and Medical Leave Act (FMLA), the Americans with Disabilities Act (ADA), and the Rehabilitation Act.

- **E. Punitive Damages:** Substantial punitive and exemplary damages against all Defendants in their individual capacities for their willful, malicious, oppressive, and high-handed conduct of thirteen years, and for their egregious abuse of public and corporate machinery.

## II. DECLARATORY RELIEF

- **F. General Violations:** A declaration that Defendants' conduct violated federal and state law, including Plaintiff's constitutional rights, civil rights statutes, the Electronic Communications Privacy Act (ECPA), and common law privacy protections.

- **G. Civil Rights Conspiracies:** For § 1985(2) and § 1985(3) counts, a declaration that Defendants engaged in a conspiracy to deprive Plaintiff and her children of equal protection and equal privileges under the law.

- **H. Privacy Violations:** A declaration that Defendants unlawfully surveilled Plaintiff and intruded upon her seclusion.

- **I. Right to Protection:** A declaration that Plaintiff, her children, and her family unit are entitled to ongoing legal protection against further interference, retaliation, or privacy violations.

## III. PERMANENT INJUNCTIVE RELIEF

- **J. Record Rectification:** A formal order vacating and expunging any fraudulently engineered local criminal or administrative records.

- **K. Restraint on Civil Rights Conspiracies:** A permanent injunction enjoining Defendants, their agents, and those acting in concert with them from:

  1. Retaliating, intimidating, harassing, or coercing Plaintiff or her family for engaging in protected activity;

  2. Interfering with Plaintiff's access to courts, attorneys, legal proceedings, or administrative remedies;

  3. Engaging in conspiratorial conduct to deprive Plaintiff or her children of equal protection, employment, education, housing, property, or services;

  4. Coordinating character assassination campaigns or assigning community members, tenants, or coworkers to harass, intimidate, surveil, or discredit Plaintiff or her family; and

5.  Using unlawfully obtained information to manipulate community perception or obstruct access to essential services.

- **L. Restraint on Privacy and Surveillance:** A permanent injunction commanding Defendants to:

    1.  Cease all unauthorized surveillance, interception, wiretapping, or monitoring of Plaintiff and her family; and

    2.  Cease any retaliatory interference with Plaintiff's professional, legal, medical, educational, or personal services.

## IV. RESTITUTION AND EQUITABLE REMEDIES

- **M. Family Restitution:** Full financial restitution to restore Plaintiff, her children, and her family to the position they would have been in but for Defendants' wrongful acts, including reimbursement for costs incurred from interference with property management, legal remedies, educational opportunities, or essential services.

- **N. Court-Ordered Compliance and Monitoring:**

    1.  An order establishing a compliance reporting mechanism requiring Defendants to submit regular reports to the Court or a designated monitor verifying adherence to all injunctive orders; and

    2.  Authorization for Plaintiff to report suspected violations directly to the Court or the designated monitor for immediate review.

## V. FEES, INTEREST, AND GENERAL RELIEF

- **O. Pre- and Post-Judgment Interest:** An award of pre-judgment and post-judgment interest on all economic and non-economic damages awarded, as allowed by law.

- **P. Litigation Fees and Costs:** Reasonable attorney's fees (should counsel be retained), expert witness fees, administrative expenses, and all litigation costs incurred in maintaining this action, pursuant to 42 U.S.C. § 1988, 31 U.S.C. § 3730(h), Va. Code § 18.2-500, and all other applicable fee-shifting statutes.

- **Q. General Relief:** Such other, further, different, or alternative relief as this Court deems just, proper, and equitable to fully redress the harm suffered, including any future harm traceable to Defendants' ongoing unlawful practices.

## IX. JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable as a matter of right under the United States Constitution and applicable federal law.

## X. CONCLUSION

Plaintiff has presented detailed factual allegations demonstrating a long-standing pattern of retaliation, unlawful interference, and coordinated misconduct carried out by Defendants across multiple institutions. It is crucial for the Court to understand that the retaliation Plaintiff has faced is not the result of a single incident or a narrow workplace dispute. It is a well coordinated and ongoing campaign in which individuals with significant institutional power have systematically used their influence across multiple systems, including education, healthcare, financial services, housing programs, employment, and legal services, to suppress Plaintiff's

protected activity and exert control over nearly every aspect of her life. This conduct has included persistent violations of privacy, ongoing surveillance, and interference with daily functioning, demonstrating a deliberate effort to destabilize and silence Plaintiff for exposing wrongdoing.

The harm inflicted upon Plaintiff and her children is not merely personal. It represents a profound abuse of authority and a systematic suppression of an individual who attempted to stand against corruption. Defendants' actions have created extreme power imbalances and have hindered Plaintiff's and her children's constitutional rights, including their liberty interests, their right to live free from oppression, and their ability to pursue safety, stability, and happiness. By obstructing Plaintiff's ability to work, maintain financial security, access essential services, and support her children's futures, Defendants have directly interfered with her freedom to build a meaningful life and to pursue her aspirations.

The breadth and duration of this retaliation, combined with the unlawful intrusion into Plaintiff's private life and the continuous monitoring of her activities, have left her with no meaningful avenues for protection outside of judicial intervention. Given the seriousness, duration, and systemic nature of the wrongdoing described herein, judicial intervention is not only warranted but essential.

Plaintiff respectfully asks the Court to recognize the severity of these actions and to ensure that this ongoing harm is brought to an end, and further submits that this matter must proceed so that the full factual record may be developed, accountability may be imposed where appropriate, and the rights of Plaintiff and her children may finally be protected.

Dated:  June 15, 2026

Respectfully Submitted,

Tegest Tesfaye, Pro se,
7047 Solomon Seal ct.
Springfield, VA 22152
Email: tegestmelu@yahoo.com
Phone :703-980-5318

**DECLARATION OF PLAINTIFF**

I declare under penalty of perjury that this filing 'First Amended Complaint' was prepared solely

by me without assistance of an attorney.

Date June 15, 2026

Tegest Tesfaye
Pro Se Plaintiff
7047 Solomon Seal ct
Springfield, VA
Phone: 703.989.5318
Email: tegestmelu@yahoo.com

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2026, I presented the foregoing Plaintiff's First Amended

Complaintthe Clerk of Court for filing in person.

I further certify that upon filing, a copy of the foregoing will be served on all counsel of record

via the Court's CM/ECF electronic filing system.

Tegest Tesfaye
Pro Se Plaintiff
7047 Solomon Seal ct
Springfield, VA
Phone: 703.989.5318
Email: tegestmelu@yahoo.com