FILED

2026 SEP 15 P 1:57

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF VIRGINIA**

**ALEXANDRIA DIVISION**

**TEGEST TESFAYE**

*Plaintiff,*

**v.** **Civil Action No. 1:26-cv-00309**

**BOOZ ALLEN HAMILTON INC. et al**

*Defendants.*

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S CONSOLIDATED MOTION FOR MANDATORY RECUSAL AND DISQUALIFICATION OF THE HONORABLE PATRICIA TOLLIVER GILES AND FORMAL PRESERVATION OF APPELLATE RIGHTS**

Pursuant to 28 U.S.C. §§ 144 and 455, the Due Process Clause of the Fifth Amendment to the United States Constitution, and Rule 7 of this Court's Local Civil Rules, Plaintiff Tegest Tesfaye, proceeding pro se, submits this Memorandum of Points and Authorities in Support of her Consolidated Motion for Mandatory Recusal and Disqualification of the Honorable Patricia Toliver Giles and Formal Preservation of Appellate Rights.

## I. INTRODUCTION

Plaintiff Tegest Tesfaye, proceeding pro se, respectfully moves for the mandatory recusal and disqualification of the Honorable Patricia Toliver Giles pursuant to 28 U.S.C. §§ 144, 455(a), and the Fifth Amendment Due Process Clause. Disqualification is required because the record presents a compounding, multi-layered appearance of partiality that makes a detached

adjudication of this 28-count whistleblower and civil rights action impossible. This appearance of bias stems from four converging structural factors: (1) an extraordinary pattern of non-neutral case management that functions as a clinical containment of Plaintiff's claims; (2) a direct institutional overlap between Judge Giles's service as a senior federal prosecutor and the timeline of Plaintiff's underlying agency disclosures; (3) a history of repeated, favorable adjudicative contact with Co-Defendant Booz Allen Hamilton, Inc.,("Booz Allen") a primary logistics contractor for the Department of Justice; and (4) an intricate network of prosecutorial-peer, judicial, and familial relationships that links the regional footprint directly to adverse actors executing extrajudicial retaliation against the Plaintiff. This appearance of partiality is anchored by Judge Giles's direct institutional links within her immediate professional footprint, which flows systematically into an adverse cross-court peer network. During her nearly two-decade tenure as a senior federal prosecutor within the EDVA Alexandria Division, Judge Giles operated concurrently within the same tight-knit regional infrastructure as career Department of Justice official Judge James A. Crowell IV. Furthermore, her prosecutorial tenure directly overlapped with Fairfax County Circuit Court Judge John M. Tran's extensive litigation career in that same Alexandria federal forum up until his 2013 election to the bench. This shared institutional baseline connects the presiding judge directly to her former regional network, to Judge Tran, and to Co-Defendant Booz Allen Hamilton, Inc.—a major DOJ contractor in whose favor this Court has maintained a dense pattern of pre-trial dismissals. Moving directly from these baseline relationships, the cross-court pipeline intersects with the specific extrajudicial acts committed by these very peer actors to destroy Plaintiff's stability. Since April 2024, Judge Tran has presided over the state divorce proceedings, actively permitting the divorce track to be weaponized as a tool for acute housing displacement and financial starvation. This state-court pressure was

synchronized with an extrajudicial pincer movement executed by Judge Giles's direct DOJ peer, Judge Crowell, who committed the overt act of staging a lawless 30-hour physical incarceration and shackling of the Plaintiff under a fabricated landlord-tenant docket. This insular pipeline loops back into the federal framework through Judge Crowell's immediate D.C. professional colleague, Senior AUSA Nebiyu Feleke, establishing a network that isolates these peer actors, cushions corporate non-disclosure, and shields their shared extrajudicial actions from public judicial review. The Court's administrative actions in the current docket reflect this broader institutional alignment that has crossed the boundary of neutral judicial discretion into active, calculated structural antagonism. Since the inception of this action, the Court has maintained an absolute administrative abeyance on Plaintiff's critical motions while systematically terminating all requests for oral argument. This non-neutral posture operates to strip Plaintiff of her voice, sanitize the record of clerk-level irregularities, and dismiss severe physical, environmental, and economic retaliation without a hearing. By continuously removing scheduled matters from the oral docket under the representation that they will be decided on the papers—only to maintain a calculated wall of silence for months before issuing summary, boilerplate denials—the Court has effectively converted a neutral federal forum into a functional instrument of the ongoing extrajudicial retaliation.

On September 1, 2026, culminating this silence, in DKt. #95, the Court executed an aggressive administrative sweep, weaponizing the concept of procedural mootness to summarily wipe out five (5) distinct, foundational emergency and protective applications (Dkts. 7, 8, 67, 68, and 85) that had been frozen in an absolute administrative freeze for several months.

Concurrently, the Court summarily denied Plaintiff's emergency Temporary Restraining Order (TRO) framework and her comprehensive applications for Reconsideration (Dkts. 47 and 48)

under a boilerplate "lack of good cause" stamp without holding an alternative evidentiary hearing or examining the restored record. By dismissing these applications as "lacking any good cause," the Court completely ignored a flagrant, escalated campaign of retaliation following the filing of this case, including an unlawful physical incarceration, residential displacement, property vandalism, and financial starvation intersecting with municipal agencies (DCHA, DOB) and tenants to disrupt her rental properties and rental income which features acute financial starvation explicitly flowing from the already executed stripping away of her fifteen-year career.

The Court's denial of the protective framework, the TRO and injunction (Dkts. 47 and 48) is a profound error, abdication of its mandatory duties and a total failure to protect the federal case and a pro se federal whistleblower. By freezing these vital applications for months and dismissing them via a single omnibus stroke, the Court insulated itself from the underlying evidence of extrajudicial retaliation, stripping Plaintiff of a meaningful opportunity to be heard while indirectly empowering Defendants and state actors to sabotage this action.

Egregiously, the subsequent September 4, 2026 Order (Dkt. 98) utilizes stated court unavailability on a mutually proposed hearing date by the parties to impose an indefinite procedural limbo that threatened s a total "paper lockout" on this massive 28-count action, effectively reversing the commitment to open argument and ensuring Plaintiff's voice is permanently suppressed in this court.

A party who claims zero participation in a multi-agency conspiracy, and who maintains they are free of all underlying allegations, must be compelled to prove their defense on a clean, transparent record, not through extrajudicial containment, tactical suppression, and the silencing of the opposing party in a manner that mirrors the historical nature of the core actions challenged in this complaint.

The Court has a non-discretionary constitutional duty to protect the physical integrity and jurisdiction of an active federal case; it must never allow its administrative machinery to indirectly empower or shield adverse actors who seek to escape liability by escalating real-time retaliation to deter and silence a self-represented whistleblower. Because the cumulative convergence of these administrative, prosecutorial, corporate, and relational factors creates an unconscionable breakdown of due process, immediate disqualification and reassignment are required under the binding ***Liteky*** **exception**.

## II. FACTUAL SPECIFICS OF THE SYSTEMIC CLERK-LEVEL SABOTAGE AND CHAMBERS LOCKOUT

### A. Phase 1 (April–June) Tactical Duress and Overridden Orders

1. On April 7, 2026, Plaintiff filed an Emergency Motion to Proceed In Forma Pauperis (Doc. 8). On April 9, 2026, the Magistrate Judge formally placed this emergency application on the court's active docket for an oral hearing scheduled for April 10, 2026. Within ten minutes of its scheduling, the hearing was abruptly stripped from the docket via a text entry stating the matter would be "ruled on the papers". When Plaintiff sought clarification, Senior Case Manager Dana VanMetere characterized the cancellation as a "miscommunication"—an admission confirming the Magistrate Judge's independent scheduling order had been deliberately bypassed and overridden without her input or the filing party's prior knowledge. Exactly 134 days elapsed during which time the Court held this critical fee waiver application in an absolute administrative freeze.

2. On May 19, 2026, Plaintiff filed an Emergency Consolidated Motion to Extend Time and Continue Hearing. Chambers staff immediately stripped the motion from the active docket. To protect her constitutional rights under crushing, unaddressed deadlines, Plaintiff drafted a

formal Letter Notice to the Judge detailing this emergency vacuum (Doc. 36). On May 21, 2026, at the exact minute Plaintiff was standing at the clerk's counter physically filing this distress notification, the Court uploaded an Order (Dkt. 35) partially resolving the extension. This razor-thin, minutes-apart timing demonstrates a non-neutral administrative posture that systematically forces an unrepresented litigant to operate under severe tactical duress, withholding critical docket entries until the absolute final moment before automated default.

**B. Phase 2 (June–July Injunction Sabotage)**

3. On June 24, 2026, Plaintiff filed a motion for an Injunction and TRO (Doc. 43 and Doc. 44) to halt retaliatory state court property liquidation. This filing faced an intentional administrative blockade by Senior Case Manager Dana VanMetere at the clerk's counter, who secretly removed the physical evidence of the parallel criminal tracking case. This unlawful case track had been located online by Plaintiff and was later represented as having been created "in error," as shown in Exhibits 8 and 10. She also took a judicial role on her own, explicitly informed Plaintiff not to come the next day for a hearing, and declared that it would not be docketed for a presentation, acting as the Judge right at the filing counter. The hearing was summarily terminated via text entry (Dkt. 45).

4. Plaintiff's bare memorandum was uploaded to the electronic docket at 5:00 PM, while her vital evidence packet and verified exhibit list were purposefully severed and withheld from the entry by the case manager to ensure the court received a completely stripped-down and deficient file. At 6:30 PM, the electronic system routed the bare filing. At approximately 7:00 PM, a mere thirty (30) minutes after receiving the bare file, a boilerplate denial order was signed (Docket Entry 46), mechanically invoking the Younger abstention doctrine and canceling the scheduled June 25 public hearing.

5. Far from a routine oversight, the timeline confirms this omission operated intentionally to construct a deficient record to validate an immediate, bad-faith denial before raw evidence could enter the public record. Most critically, Judge Giles completely ignored this highly prejudicial administrative removal of Plaintiff's June 24 Exhibit List (Docket Entry 43). These excluded files contained the smoking-gun proof of an unlawful, retaliatory 30-hour cross-border jailing executed against Plaintiff on May 27, 2026, including Exhibit 8 (Commitment Pending Disposition DC Jail Case No. 2026-CNC-000267) and Exhibit 10 (Order to Seal a Criminal Record Created by Error Case No. 2026-CCC-000311).

6. This rapid, back-to-back sequence occurred approximately one month after Defendants were served. Nineteen (19) days after Plaintiff's unlawful incarceration, and three (3) days after Plaintiff placed the unlawful jailing on the record on June 11, 2026, Judge James Crowell's formal nomination to the D.C. Court of Appeals was announced on June 15, 2026. On August 25, 2026, Plaintiff filed detailed evidence of this matter with the appellate court. The very next day, August 26, 2026, Judge Crowell's nomination was confirmed. Judge Giles nevertheless refused to address the administrative removal of Plaintiff's June 24 Exhibit List and the resulting suppression of the evidence Plaintiff had sought to place before the Court. This sequence, occurring immediately after Plaintiff placed the unlawful jailing on the record and on the eve of Judge Crowell's confirmation, further demonstrates the institutional protection Plaintiff contends she was denied.

**<u>C. The Targeted Chambers Communication Lockout</u>**

7. On May 29, 2026, Plaintiff filed a formal "Letter Regarding Procedural Difficulties, Pending Motions, and Request for Guidance Concerning Procedural Communications" (Doc. 38). This letter explicitly detailed that chambers staff abruptly terminated telephone

communications when Plaintiff sought basic, non-substantive scheduling tracking information.

8. Plaintiff has since been explicitly informed by court administration that Judge Giles' specific branch maintains a unique, targeted administrative practice of completely refusing to answer basic procedural or administrative tracking questions for pro se individuals. Plaintiff is entirely barred from speaking to anyone within chambers or the Deputy Courtroom Clerk, with court administration confirming her only avenue to ask a basic administrative question is to file a formal written motion on the electronic docket. By forcing this restriction while simultaneously maintaining an absolute wall of silence on those very filings, the Court engineered a bad-faith procedural loop designed to leave an unrepresented litigant completely blind to the administrative tracking of her own federal case.

## III. SUBSEQUENT EVIDENCE OF ESCALATED BIAS: THE MANUFACTURED MOOTNESS CYCLES AND SCHEDULING PRETEXTS

The breakdown of due process and active structural antagonism culminated in a rapid sequence of targeted orders issued between August 26, 2026, and September 4, 2026, establishing a clear intent to execute a quiet, extrajudicial containment of this action while ignoring active threats of incarceration, displacement, and environmental vandalism:

9. **The Manufactured Mootness of the In Forma Pauperis Waiver (Dkt. 95):** In a flagrant abuse of administrative authority, Judge Giles held Plaintiff's Emergency Motion to Proceed In Forma Pauperis (Dkt. 7) in an absolute administrative freeze for over 134 days. This calculated delay forced an unrepresented, resource-starved whistleblower under extreme tactical duress to physically pay the filing fee to avoid automated administrative default. In

her September 1, 2026 Order (Dkt. 95), Judge Giles used the payment *she forced via delay* as the sole legal justification to deny the motion as "moot" and explicitly ordered that "no refund shall be given". This cyclical trap violates the very core of the adversary system, continuing to burden a deprived Plaintiff not only with filing fees, but with the additional costs of accessing court records and documents, obtaining copies and transcripts, and other court-related expenses necessary to prosecute her federal action

10. **The Page-Expansion and Extension Ambush (Dkt. 95):** When Plaintiff faced highly complex, separate multi-party attacks against her complaint, she filed emergency requests for brief extensions and page expansions to protect her claims from unintended waiver (Dkts. 67, 68). Judge Giles personally maintained a wall of total silence, forcing Plaintiff to draft and file her massive substantive opposition briefs under crushing page constraints and extreme time pressure to prevent total case dismissal. Having forced compliance through structural silence, Judge Giles turned around in Dkt. 95 and summarily denied Dkts. 67 and 68 as "moot". A judge cannot remain silent to force compliance under duress and then claim the underlying procedural violations are cured by that forced compliance.

11. **The Prejudicial Application of the Younger Doctrine and Abdication of Safety (Dkt. 95):** In denying Plaintiff's Emergency Motion for Reconsideration (Dkt. 47) for a "lack of good cause," Judge Giles willfully ignored a critical fact on the face of the active record: the parallel state court trial judge explicitly stated on the record on July 31, 2026, that he would fully defer to and comply with any protective order or stay issued by this Federal Court. Because the state court explicitly invited federal equity intervention, there was zero threat to state-federal comity. By sweeping this context aside under a boilerplate denial, Judge Giles actively permitted the asset-stripping machinery to execute a forced liquidation of Plaintiff's

residence, permanently scatter her legal files, and subject her home environment to active vandalism and ongoing threats of physical incarceration.

12. **The Selective Sanitization of the Record (Dkt. 94):** On August 26, 2026, the Court granted Plaintiff's Emergency Motion to cancel the September 3rd hearing. However, the Court's order intentionally stripped out and omitted the two primary pillars of Plaintiff's motion: her critical need for an extension to safely secure professional counsel under duress, and her notice that Defendants had unilaterally calendered the date in flagrant violation of EDVA Local Civil Rule 7(E) without a meet-and-confer. By framing the cancellation strictly as an accommodation for family travel, the Court engineered a false narrative of standard administrative accommodation to hide severe due-process deficits and defense rule-breaking from the public record.

13. **The Pretextual Muzzling of Oral Advocacy (Dkt. 98):** Following the cancellation of the September date, the Parties successfully met and conferred via electronic mail, filing a Joint Motion on September 2, 2026, to set a rescheduled hearing date for October 15, 2026, to which all corporate and municipal defense counsel affirmatively consented (Dkt. 96). On September 4, 2026, Judge Giles summarily issued an Order DENYING the non-opposed Joint Motion under the highly questionable pretext of "the Court's schedule" (Dkt. 98). Instead of providing alternative dates, the Court declared that it will determine at a later date whether it will ever reset a public hearing or simply decide the defendants' corporate motions strictly "on the papers". The Court's sudden shift to holding the scheduling track in absolute limbo, actively entertaining an absolute paper lockout after a formal public dismissal date had already been set constitutes a severe structural deviation. Because the Court previously recognized the necessity of a public venue by calendaring the original September 3rd

hearing, its subsequent refusal to lock in the consented October date is a strategic move to push this litigation back into a closed administrative track. This is a massive federal case spanning twenty-eight counts of conspiracy and whistleblower retaliation; it must not be silenced behind closed doors. If this Court intends to entertain a total dismissal of these claims, due process and the public interest demand that the arguments be heard openly in a public venue. Re-opening a paper track to bypass open argument for a self-represented litigant who has been a victim of documented whistleblower retaliation operates as an active administrative cover-up. By blocking a mutually agreed-upon oral argument date on a deeply prejudicial timeline, the Court's matrix functions as a clinical containment mechanism that directly empowers adverse actors to execute a swift corporate dismissal on a silenced, engineered record.

14. The Complete Abdication of the Mandatory Duty to Protect (Dkts. 47, 48, and 95): This systematic containment of the litigation operates as a direct structural shield for an escalating campaign of cross-border extrajudicial warfare. If the Defendants are truly free of the 28 counts of conspiracy and whistleblower retaliation brought against them, they must be compelled to defend their records openly in court. They cannot be permitted to deter a federal civil rights lawsuit by deploying highly coordinated, parallel retaliation across different areas of Plaintiff's life—including engineering lawless incarcerations, executing rapid property liquidations, and executing targeted vandalism to strip away her shelter, legal files, and physical safety. When a federal court is presented with verified proof that these multi-jurisdictional assaults are explicitly timed to coincide with federal service of process, it owes an absolute, non-discretionary constitutional and statutory obligation under 28 U.S.C. § 1651(a) to issue an emergency protective shield. By holding Plaintiff's emergency

applications for a Temporary Restraining Order, an injunction, and a judicial monitor in a silent administrative freeze for months, only to summarily stamp them as "lacking merit and good cause" in Document 95 without ever holding an evidentiary hearing, the Court did not engage in routine docket management. Instead, the Court actively condoned the administrative sabotage of its own files, rubber-stamping an unlawful pincer movement and converting the federal courtroom into an instrument of the ongoing retaliation by ensuring that the physical destruction of Plaintiff's environment was completely insulated from public judicial review.

## IV. DISQUALIFICATION STATUTORY GROUNDS REQUIRING MANDATORY DISQUALIFICATION

### A. Judge Giles's Prior Federal Prosecutorial Role Directly Overlaps the Federal Disclosure and Investigation History Underlying This Action

15. This federal case is a 28-count action arising from over a ten-year, multi-agency course of alleged retaliation and cover-up concerning systemic student-testing-record manipulation involving Defendant Fairfax County School Board, a public entity that accepts federal grant funding. Plaintiff's protected disclosures began with filings to the Department of Justice (DOJ) and Department of Defense (DOD) in 2014, followed by disclosures to the Department of Education (DOE) in 2016 and 2021. This decade-long sequence of federal disclosures constitutes the core of the protected activity alleged in this case and the source of the escalating whistleblower retaliation and extrajudicial containment campaigns alleged by Plaintiff.

16. Judge Giles, who currently presides over this case, served as an Assistant United States Attorney within the EDVA Alexandria Division from 2003 through 2019 and as Managing Assistant United States Attorney from 2019 through 2021. Her federal prosecutorial service

therefore overlapped for years with the period in which Plaintiff made federal disclosures concerning the misconduct now forming the foundation of this action. She was not serving in an unrelated governmental position during this period; she was a federal prosecutor within the EDVA prosecutorial structure while Plaintiff's disclosures were being made to federal executive agencies, including DOJ and DOE.

17. The significance of this overlap cannot reasonably be minimized as merely the fact that Judge Giles once worked for the federal government. Plaintiff's disclosures were directed to DOJ and DOE, and the misconduct underlying those disclosures was allegedly the subject of investigation. As a senior AUSA serving within the EDVA during this same period, Judge Giles occupied a position within the federal prosecutorial system in which federal matters of this nature were received, reviewed, evaluated, referred, allegedly investigated, and either closed with a complete cover-up or declined for prosecution. The issue is therefore not whether her former federal employment, standing alone, automatically requires recusal, but whether the nature, timing, subject matter, and institutional overlap create an objective basis for questioning impartiality under **28 U.S.C. § 455(a).**

18. The circumstances are particularly significant because Plaintiff's federal lawsuit challenges governmental and government-connected conduct involving Fairfax County, the Fairfax County School Board, and Defendant Booz Allen Hamilton, a major federal government contractor with contracts with agencies to which Plaintiff made disclosures. The presiding judge's federal prosecutorial history therefore cannot reasonably be separated from the broader governmental and institutional circumstances Plaintiff alleges gave rise to this action.

19. Plaintiff does not contend that Judge Giles's prior service as an AUSA, standing alone, establishes personal bias or proves that she personally handled Plaintiff's disclosures. Rather,

her senior prosecutorial position during the very period and within the federal prosecutorial structure implicated by Plaintiff's disclosures and the alleged federal investigation is itself an objectively significant circumstance. Section 455(a) does not require Plaintiff to prove actual bias before recusal is warranted; the governing standard is whether the circumstances would cause a reasonable observer to question the Court's impartiality.

20. Thus, the reasonable observer is not confronted with a judge who merely once worked for the federal government. The reasonable observer is confronted with a federal judge whose federal service spans the relevant period—from Assistant U.S. Attorney in the EDVA from 2003 through 2019, to Managing Assistant U.S. Attorney from 2019 through 2021, and now as a federal district judge presiding over the very matter arising from the governmental conduct Plaintiff challenged through her federal disclosures. This convergence between Judge Giles's prior prosecutorial service, continuing federal judicial role, and the subject matter of this action cannot reasonably be dismissed as coincidental and warrants recusal where impartiality might reasonably be questioned.

**B. <u>The Chronology Of Plaintiff's Federal Doe Disclosures And Judge Giles's Transition To The Federal Bench Presents A Distinct Appearance Of Impartiality Concern</u>**

21. Plaintiff's federal disclosure history extends across nearly a decade. Plaintiff made protected federal disclosures beginning in 2014, including disclosures to DOJ and DOD, and continued making disclosures to DOE. On November 2, 2015, Plaintiff filed a second DOE/OCR Complaint, No. 11-16-1062. That matter remained unresolved for nearly four years until DOE issued its final response on October 2, 2019. Plaintiff subsequently filed a third DOE complaint on September 21, 2021, Complaint No. 11-21-1376. The 2021 complaint therefore followed years of continuing federal disclosure activity and was part of the same broader

sequence of federal complaints and disclosures that Plaintiff alleges gave rise to the continuing retaliation underlying this action.

22. The chronology surrounding Plaintiff's September 21, 2021 DOE complaint is particularly significant because of Judge Giles's position and immediate transition to the federal bench. Judge Giles served as Managing Assistant United States Attorney for the Alexandria Division from 2019 through 2021. Plaintiff filed DOE Complaint No. 11-21-1376 on September 21, 2021. Thirty-five (35) days later, on October 26, 2021, Judge Giles was confirmed to the federal bench. Six (6) days thereafter, on November 1, 2021, her judicial commission issued. Thus, Plaintiff's third federal DOE complaint occurred only 35 days before Judge Giles's confirmation and only 41 days before her judicial commission.

23. This precise chronology presents a distinct concern under § 455(a). The significance is not simply that Judge Giles previously served as a federal prosecutor. Rather, Plaintiff was continuing to pursue federal administrative relief at the very time Judge Giles was completing her service as a senior federal prosecutor and transitioning into federal judicial office. The September 21, 2021 DOE complaint was therefore filed during the immediate period preceding Judge Giles's confirmation and assumption of federal judicial office. The unusually close temporal relationship is objectively relevant to the reasonable-observer inquiry.

24. Plaintiff does not contend that Judge Giles personally handled the September 21, 2021 DOE complaint, the November 2, 2015 DOE complaint, or any other particular federal disclosure. Nor does Plaintiff contend that the chronology, standing alone, establishes actual bias. The significance is instead the objective circumstances and their timing. Section 455(a) does not require proof of actual bias before recusal is warranted; the question is whether the

circumstances are such that a reasonable person, knowing the relevant facts, might reasonably question the judge's impartiality.

25. The chronology is particularly significant because Plaintiff's September 21, 2021 complaint did not arise in isolation. It followed the November 2, 2015 DOE/OCR Complaint No. 11-16-1062, which remained unresolved for nearly four years before DOE issued its October 2, 2019 final response. Plaintiff thereafter continued pursuing federal relief, culminating in the September 21, 2021 DOE complaint. Thus, the relevant chronology reflects continuing federal disclosure activity extending across the very period in which Judge Giles served as a federal prosecutor and then transitioned from senior federal prosecutorial service to the federal judiciary.

26. The reasonable observer would therefore consider not merely one date, one complaint, or one prior government position, but the convergence of the circumstances: The unusually close temporal convergence between Plaintiff's continuing federal disclosure activity and Judge Giles's transition from senior federal prosecutorial service to the federal judiciary cannot reasonably be dismissed as ordinary or immaterial timing. Viewed objectively, the chronology presents a distinct circumstance that, together with the institutional overlap described in Section A and the additional circumstances set forth below, provides an independent basis for concluding that Judge Giles's impartiality might reasonably be questioned under § 455(a).

**C. The Repeat Corporate Ruling and Appearance of Partiality — 28 U.S.C. § 455(a)**

27. As alleged in the Federal complaint, Co-Defendant Booz Allen Hamilton, Inc. abruptly terminated Plaintiff's fifteen-year employment in February 2024, as part of the retaliatory and financially starvation course of conduct underlying this action. The timing of that

financial starvation is significant. It occurred in January 2024 precisely as Plaintiff's younger daughter, who is now attending Brown University, was at that time advancing toward top-tier college opportunities, and exact timing of the closing of the UVA college-application process, which was the only local college that Plaintiff's daughter had previously indicated an intention to pursue but ultimately did not. As alleged, the initial financial deprivation was intended to impair Plaintiff's ability to support her daughter's attendance at a top-tier institution. That circumstance aligns with the core issue and history of the matters raised in this very Federal complaint as well as the protected disclosures to the DOJ and DOE concerning the alleged efforts to implement a longstanding plan and design formulated, since her daughters were young, by school officials and state actors to restrict their educational opportunities and future paths. Booz Allen is not a peripheral entity in this case. It is a central defendant whose alleged conduct forms a substantial part of Plaintiff's claims.

28. The § 455(a) concern is heightened by the fact that Judge Giles has already presided over multiple employment and retaliation actions brought against Booz Allen Hamilton in the Eastern District of Virginia, exhibiting a highly concentrated pattern of utilizing pre-trial mechanisms in cases involving employee claims against Booz Allen Hamilton, including the dismissal of retaliation claims in favor of Booz Allen Hamilton. These proceedings are expressly documented across multiple employee lawsuits. These include recent cases, *Mitchell v. Booz Allen Hamilton*, No. 1:23-cv-00653, in which Judge Giles granted Booz Allen's motion to dismiss Plaintiff's Title VII discrimination and retaliation claims on March 7, 2024, resulting in dismissal of the claims; *Sales v. Booz Allen & Hamilton, Inc.*, No. 1:23-cv-01621, in which Judge Giles granted Booz Allen's amended motion to dismiss on January 16, 2025, resulting in dismissal of Plaintiff's retaliation claim and dismissal without

prejudice of the remaining claims; and *Cosmann v. Booz Allen Hamilton, Inc.*, No. 1:22-cv-00933, an employment disability-discrimination, retaliation and termination case in which Judge Giles presided over Booz Allen's motion to dismiss, narrowed Plaintiff's claims, and thereafter presided over the case as it proceeded to the summary-judgment stage before the parties ultimately settled.

29. These prior proceedings do not, standing alone, establish judicial bias, nor does Plaintiff rely upon the mere fact that Booz Allen prevailed on motions to dismiss. **The § 455(a)** concern arises from the cumulative and case-specific circumstances presented here: Judge Giles repeatedly presided over employment litigation involving the very corporate defendant whose conduct is now alleged to constitute a central component of Plaintiff's retaliation claims; Booz Allen is a major federal government contractor with longstanding technical, logistical, and other contractual relationships with the Department of Justice ("DOJ"), the same federal institution in which Judge Giles served for approximately eighteen years as a federal prosecutor; and Plaintiff's claims arise against the backdrop of protected federal disclosures to the DOJ and DOE concerning governmental misconduct and retaliation. The significance therefore does not rest upon any single prior ruling, but upon the convergence of the same corporate defendant, Judge Giles's prior DOJ institutional role, Booz Allen's longstanding governmental relationships, and Plaintiff's allegations that Booz Allen itself became an actor in the retaliatory sequence following Plaintiff's federal disclosures.

30. That concern is particularly substantial here because Plaintiff's claims against Booz Allen do not arise from an ordinary employment dispute. Plaintiff alleges that Booz Allen's termination of her fifteen-year employment was not an isolated employment decision, but part of a broader, multi-year retaliation and institutional-interference sequence that began

with her federal disclosures to the DOJ and DOE in 2014 and continued through subsequent governmental, employment, and judicial events. Thus, the prior adjudication of Booz Allen employment claims by Judge Giles is not merely evidence that Booz Allen is a repeat litigant before the Court. It places the present case within a recurring judicial relationship involving the same corporate defendant, while Plaintiff simultaneously alleges that Booz Allen's conduct was itself connected to the broader federal-retaliation history that forms the subject of this action. Viewed from the perspective of a reasonable observer possessing knowledge of all of these circumstances, the question is whether Plaintiff's claims can be adjudicated with the detached neutrality required by § **455(a),** not whether any individual prior ruling, standing alone, demonstrates actual bias.

31. The reasonable observer would therefore encounter not an isolated prior ruling, but a recurring institutional and adjudicative relationship involving the same corporate defendant, the same federal judicial district, and a judge whose professional career was deeply rooted in the federal prosecutorial institution. That relationship is particularly significant here because Booz Allen is not merely a repeat litigant: it is a central defendant in Plaintiff's present action, Plaintiff alleges that Booz Allen's conduct forms part of the retaliation arising from her federal disclosures to DOJ and DOE, and Booz Allen has longstanding contractual relationships with those federal institutions. The question is not whether Judge Giles is actually biased, nor whether any prior ruling was improper or incorrect, but whether the circumstances, considered cumulatively and from the perspective of an objective observer knowing all relevant facts, would reasonably cause that observer to question whether Plaintiff can receive the detached neutrality and impartial adjudication required by § 455(a)

32. Accordingly, Plaintiff does not contend that an adverse ruling in another Booz Allen case, standing alone, warrants recusal. Rather, the repeated adjudicative contact with the same corporate defendant, combined with Judge Giles's prior DOJ prosecutorial role and Booz Allen's historical contractual relationships with DOE and DOJ, contributes to the circumstances that, viewed cumulatively, create an objectively reasonable question concerning impartiality under § 455(a).

**D. <u>Prosecutorial, Judicial, and Familial Relationships Collectively Create Institutional Convergence Under 28 U.S.C. § 455(a)</u>**

33. The circumstances requiring disqualification become substantially more serious when the relationship between Plaintiff's claims, the federal prosecutorial and judicial institutions is examined as a whole. Plaintiff does not rely upon any single professional association, former government position, judicial ruling, or familial relationship in isolation. The concern arises from their cumulative convergence around the very events, actors, and institutions implicated by this action.

34. Judge Giles served as an Assistant United States Attorney in the Eastern District of Virginia from 2003 through 2021, including in the Major Crimes Unit from 2003 through 2019 and as Managing AUSA of the Alexandria Division from 2019 through 2021. She was confirmed by the Senate on October 26, 2021, and received her judicial commission on November 1, 2021. Her nearly two decades within the EDVA prosecutorial structure therefore substantially overlap the period in which Plaintiff's federal disclosures and subsequent governmental proceedings arose and remained active.

35. The institutional relationship extends directly to Judge James A. Crowell IV. Crowell was not merely another former federal prosecutor within the same broad professional community;

during Giles's prosecutorial career, he occupied a superior DOJ leadership position, including as Director of the Executive Office for United States Attorneys (EOUSA), placing him within the federal prosecutorial hierarchy governing the United States Attorneys' Offices. Plaintiff therefore alleges a former DOJ superior-subordinate relationship that is materially different from an ordinary professional acquaintance. Significantly, Judge Crowell also emerged from this same federal apparatus, having served in senior positions within the Department of Justice's Criminal Division, as a federal Criminal Chief, and as Director of the Executive Office for United States Attorneys during the period spanning 2014, 2015, and 2021 when Plaintiff's whistleblower disclosures and complaints were actively filed with the DOJ.

36. The convergence extends further through Senior AUSA Nebiyu Feleke, a federal prosecutor in the U.S. Attorney's Office for the District of Columbia and the biological brother of Alazar Feleke, Plaintiff's former husband. Plaintiff alleges that her ex-husband, Alazar Feleke, became a major participant in the financial oppression and destabilization of Plaintiff, beginning at essentially the same time as her termination from Booz Allen Hamilton and his filing of the divorce action the very next day after their daughter was accepted to Brown University. As Plaintiff alleged in her complaint that the divorce proceedings were subsequently weaponized to impose severe financial deprivation, specifically targeting her ability to support her daughter's college payments as well as causing overall financial starvation and deliberate housing instability, incarceration, property damage, and escalating retaliation in an effort to deter her federal claims.

37. The professional connection between Crowell and Nebiyu Feleke is not merely theoretical. Official D.C. appellate records identify Feleke as an AUSA in 2014, 2017, and 2018. During that same period, Crowell held senior DOJ positions and, beginning December 10, 2017,

served as Director of EOUSA. Their DOJ careers therefore overlapped for years. In 2018, while both remained connected to the federal prosecutorial institution, Crowell and Feleke were also applicants for the same D.C. Superior Court judicial vacancy. Crowell subsequently moved from senior DOJ service to the D.C. Superior Court bench, while Feleke continued his federal prosecutorial career and his professional appearances within the D.C. Superior Court system. The significance is the documented progression of overlapping DOJ service, a common judicial-selection process, and subsequent judicial-prosecutorial interaction, not merely that two individuals once worked for the federal government.

38. That institutional proximity becomes especially significant because Plaintiff alleges that Judge Crowell presided over the May 27, 2026 D.C. proceeding in which she was subjected to approximately 30 hours of incarceration and physical shackling arising from what she alleges was a fabricated landlord-tenant proceeding conducted through an unindexed and undisclosed chambers docket related to the very joint property that the divorce court enforced upon her against the law. Plaintiff alleges that although Alazar Feleke asserted the status of landlord, while Plaintiff was merely a co-owner of the property, he was completely bypassed by this manufactured process while Plaintiff alone was the designated target of a swift, unlawful incarceration. This blatant preferential treatment was driven directly by familial connections, with his brother, Senior AUSA Nebiyu Feleke, and the overlapping judicial actors coordinating their actions in concealment through an undisclosed docket.

39. The Fairfax County divorce court judge, Judge John M. Tran, who presided over Plaintiff's divorce case since April 2025, adds another relevant institutional connection. Before taking the Fairfax County Circuit Court bench in 2013, Judge Tran served as a prosecutor in the Alexandria Commonwealth's Attorney's Office and as a Special Assistant United States

Attorney in the Eastern District of Virginia. As alleged by Plaintiff, during the divorce proceedings Judge Tran was aware of Plaintiff's efforts to pursue legal claims against Booz Allen and discouraged those efforts on the record. Judge Tran also revealed his inner circle knowledge of the core issue in this case, where Plaintiff's right to legal representation is denied through systemic control, by telling her on the record, in substance, "good luck" finding an attorney willing to take her case against Booz Allen. Plaintiff further alleges that the court characterized her separation from Booz Allen contrary to her testimony and documentary evidence, including portraying her as having voluntarily left the company and threatening to sue instead of using opportunities provided. Plaintiff also alleges that these resulting divorce rulings, and the very joint real property that was unlawfully enforced upon her, exposed her to the incarceration executed by Judge Crowell through a pre-designed, fabricated landlord-tenant case. One of Plaintiff's requests from this Court was to issue a stay of the execution of orders from this weaponized divorce case, which Judge Giles summarily ruled there was "no good cause" and issued a denial. While their service in that office was consecutive rather than simultaneous, both Judge Tran and Judge Giles emerged from the exact same federal prosecutorial pipeline within the Alexandria division.

The sequence alleged by Plaintiff therefore runs from her federal disclosures and complaints, through the prosecutorial institutions in which those matters arose, into judicial positions later occupied by individuals connected to those institutions, and ultimately into judicial proceedings that Plaintiff alleges were used to intimidate, degrade, financially destabilize, and constrain her while her federal case was pending.

For a reasonable observer, the concern is not merely that this shared institutional lineage within a highly specialized, close-knit legal network creates a substantial, objective question

as to whether the court can maintain complete institutional detachment when evaluating actions and orders heavily implicated by the network's overlapping judicial actors. It is also how their explicit actions directly interlock together. The functional intersection of choices, where one judge constructs the financial burden or unlawfully incarcerates, and the other insulates it from review, creates a substantial, objective question as to whether the court can maintain complete institutional detachment.

40. These professional histories matter because Plaintiff alleges an interconnected sequence rather than isolated events: federal disclosures beginning in 2014; prolonged federal administrative proceedings; employment retaliation; judicial proceedings affecting Plaintiff's financial and housing security; the later D.C. incarceration; and continuing efforts that Plaintiff alleges restricted or contained the consequences of her disclosures. The identified relationships place multiple participants in Plaintiff's allegations within overlapping federal prosecutorial and judicial structures. Plaintiff therefore alleges that these relationships created an appearance of institutional access and influence extending across the prosecutorial and judicial systems relevant to the events at issue.

41. The concern is further heightened by Judge Giles's adjudication of Plaintiff's requests for a TRO and injunction. Plaintiff sought emergency protection from displacement, financial starvation arising from the divorce proceedings for which a stay has been requested, incarceration, vandalism, and other retaliatory harms. Judge Giles denied that protection, including on the stated absence of "good cause," while Plaintiff alleges that the same institutional actors and proceedings identified above remained capable of exercising authority over her. Plaintiff further alleges that the clerk's office ex parte removed the physical evidence documenting the prosecutor-judicial relationships described in Exhibits 8 and 10,

and that Judge Giles maintained silence regarding that removal. From the perspective of a reasonable observer, the combined effect of these choices was to insulate Judge Crowell and the underlying extrajudicial machinery from federal scrutiny while leaving Plaintiff completely stripped of required judicial protection.

42. Plaintiff does not contend that every federal prosecutor who later becomes a judge is disqualified, or that every professional relationship creates a statutory conflict. Her argument is narrower and more substantial: the unusual convergence of these relationships with the actual events presented in this case creates an appearance of institutional access and influence that an ordinary observer cannot reasonably disregard. That observer would see the direct structural links between Judge Giles's long-standing EDVA tenure, her former superior Judge Crowell, an active federal prosecutor whose brother is the adverse party, and the interlocking actions of the state divorce court. The unique alignment of these specific actors within the same narrow institutional family over a multi-year period removes this case from the realm of ordinary professional acquaintance.

43. Plaintiff does not ask the Court to treat these allegations as adjudicated facts. They are presented as circumstances that a reasonable observer would consider when evaluating the appearance of impartiality. Nor does Plaintiff contend that any one circumstance, standing alone, compels recusal. It is the cumulative convergence, and particularly the fact that Judge Giles was called upon to deny emergency protection from harms allegedly arising through the same interconnected judicial and institutional network, that materially changes the objective appearance presented by this case.

44. Under 28 U.S.C. § 455(a), the inquiry is objective: whether, considering the circumstances as a whole, a reasonable observer would question the judge's impartiality. Here, the reasonable

observer would not be evaluating a routine professional history or an isolated adverse ruling. The observer would see an unusually interconnected prosecutorial, judicial, familial, and adjudicative sequence surrounding Plaintiff's protected federal activity and the subsequent harms alleged in this action. Even if no single relationship is deemed independently dispositive, their convergence creates an objectively reasonable appearance that Plaintiff cannot receive the detached and impartial adjudication required by § 455(a). Plaintiff therefore respectfully submits that disqualification is required.

## V. CONCLUSION

The federal judiciary cannot maintain its institutional integrity if a presiding tribunal uses its administrative authority to construct a procedural shield that immunizes corporate and municipal defendants from public accountability, insulates an overlapping regional network of professional peers, and systematically abdicates its non-discretionary mandate to protect an active federal case under the **All-Writs Act, 28 U.S.C. § 1651(a).** Plaintiff respectfully submits that the significance of the circumstances alleged in this Motion lies in their convergence over time. The accumulation and temporal convergence of these circumstances materially change the appearance presented by any one circumstance considered in isolation. The federal lawsuit did not create this historical pattern; rather, it brought into a single proceeding a series of events that had unfolded across governmental, employment, administrative, prosecutorial, and judicial settings over many years, which then drastically escalated immediately upon its commencement. Thus, the relevant question under **28 U.S.C. § 455(a)** is not whether any particular judge or prosecutor can presently be shown to have participated in a coordinated effort to defeat this lawsuit. The question is whether, knowing the chronology and the relationships alleged here, an objective and informed observer could reasonably question the impartiality of the judge assigned

to adjudicate the resulting federal action. Under the governing objective standard, that question must be assessed from the circumstances as a whole, not by artificially separating each connection from the others.

Crucially, the Court's administrative management of the current docket directly mirrors this underlying pattern, demonstrating a profound abdication of its non-discretionary constitutional and supervisory obligations to protect the physical integrity and independent jurisdiction of an active federal case. By holding vital emergency and protective entries in an absolute administrative abeyance for months, only to summarily sweep them away via a single omnibus stroke (Dkt. 95) under a boilerplate "lack of good cause" stamp, the Court actively insulated itself from evaluating verified evidence of real-time extrajudicial warfare. This procedural containment completely deprives a self-represented federal whistleblower of a meaningful opportunity to be heard while facing a severe, confirmed escalation of physical, residential, and acute financial retaliation explicitly designed to deter and disable this litigation. The breakdown of due process in this chamber moves far past routine docket management, revealing a profound degree of institutional bias that triggers the mandatory disqualification commands of 28 U.S.C. §§ 144 and 455. An objective, informed observer reviewing this record as a whole would encounter a severe convergence of prejudicial factors that completely shatter the appearance of judicial neutrality. Furthermore, the subsequent enforcement of an unconstitutional communications barrier and the imminent threat of an absolute "paper lockout" (Dkt. 98) strategically strip open public advocacy from this massive 28-count action, ensuring Plaintiff's voice is permanently suppressed behind closed doors. By actively facilitating an administrative environment where corporate and municipal defendants escape public accountability and parallel

asset-stripping machinery continues unhindered, the Court's non-neutral posture transforms this federal forum into a functional instrument of the ongoing extrajudicial containment.

Plaintiff therefore submits that the present record warrants scrutiny precisely because matters that once appeared to exist in separate compartments have converged in this proceeding. The federal disclosures, the prolonged administrative history, the federal prosecutorial institutions, the judicial transition, the repeat-player defendant, and the additional prosecutorial, judicial, and familial relationships identified above are not presented as independent accusations of misconduct. They are presented as the circumstances from which the appearance of impartiality must be evaluated. The issue is not whether Plaintiff can prove, before discovery, the existence of a concealed plan to position particular judicial officers for a future lawsuit. The core legal issue under 28 U.S.C. § 455(a) is whether the observable chronology, deep institutional dependencies, and non-neutral docket containment actions would cause a reasonable person, knowing all relevant circumstances, to question whether this case can be adjudicated with the required detached neutrality. Plaintiff respectfully submits that they would, rendering fair judgment an absolute legal impossibility under the binding Liteky exception.

Supervisory intervention and immediate judicial oversight are strictly required because this litigation presents a systemic, cross-court breakdown of administrative integrity that a single compromised branch cannot be permitted to self-adjudicate. Direct judicial intervention is necessary to dismantle an engineered procedural trap by chambers administration. This high-stakes action must be permanently removed from standard assignment pipelines, and reallocated under the direct authority of the Chief Judge to an independent, Senior District Judge possessing specialized expertise in high-sensitivity public-sector whistleblower dockets, complex cross-jurisdictional civil rights conspiracies, and executive agency cover-ups. Only a specialized

Senior Judge, entirely insulated from local prosecutorial peer networks, municipal and corporate player influence, can restore the baseline boundaries of the adversary system, and guarantee the safe, meaningful avenue to justice demanded by the Fifth Amendment.

## VI. EXPLICIT PRESERVATION FOR APPELLATE REVIEW

Plaintiff explicitly submits this comprehensive record to ensure that the full scope of her statutory claims under 28 U.S.C. §§ 144 and 455(a), alongside her structural due process objections under the Fifth Amendment, are preserved in their entirety for any subsequent appellate review or mandamus petition. Crucially, this preservation explicitly encompasses the Court's omnibus order (Dkt. 95) that summarily denied Plaintiff's emergency Temporary Restraining Order (TRO) and Preliminary Injunction frameworks while executing the omnibus dismissal of her foundational protective and emergency applications (Dkts. 7, 8, 67, 68, and 85). Plaintiff preserves her absolute right to challenge the Court's failure to intervene against the confirmed cross-court retaliatory campaign, acute financial starvation, and physical displacement executed to sabotage this litigation. This formal section serves notice that no part of the documented chronology, regional institutional dependencies, denied injunctive protections, or non-neutral docket containment actions is waived, forfeited, or abandoned for purposes of immediate interlocutory review or subsequent appellate proceedings.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Tegest Tesfaye respectfully requests that this Court, under the direct administrative oversight, supervisory review, and enforcement authority of the Chief Judge of this District, enter an Order:

1. Granting the mandatory Recusal and Disqualification of the Honorable Patricia Toliver Giles pursuant to 28 U.S.C. §§ 144 and 455;

2. Reassignment of this matter by the chief Judge to a Senior District Judge within the Alexandria Division who has never presided on this case and possessing specialized expertise in complex cross-jurisdictional civil rights conspiracies, public-sector whistleblower dockets, and employment retaliation frameworks and is entirely insulated from local prosecutorial peer networks, municipal and corporate player influence, and

3. Staying any further rulings on the papers pending reassignment to prevent irreversible structural prejudice to the unrepresented Plaintiff, **pursuant to the Court's inherent case-management authority and EDVA Local Civil Rule 7.**

Dated: September 16, 2026

Respectfully submitted,

Tegest Tesfaye
*Pro Se Plaintiff*
7047 Solomon Seal Ct
Springfield, VA 22152
PH:703.989.5318| Email: tegestmelu@yahoo.com

**CERTIFICATE OF SERVICE**

I hereby certify that, on the 16th day of September, 2026, a true copy of the foregoing Motion for along with the Proposed\ Order, were served via the Court's CM/ECF system upon filing in person, which will send a notification of such filing to all counsel of record registered with the CM/ECF system.

Tegest Tesfaye
*Pro Se Plaintiff*

**DECLARATION OF NO ASSISTANCE FROM AN ATTORNEY**

Plaintiff hereby declares and certifies under penalty of perjury that she is proceeding completely *pro se* in this matter. No attorney has drafted, revised, or provided ghostwriting assistance for this filing or any accompanying documents. All submissions are entirely the independent work product of the self-represented Plaintiff.

Tegest Tesfaye
*Pro Se Plaintiff*